**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| WUXI APPTEC CO., LTD.,<br><br>*Plaintiff,*<br><br>v.<br><br>U.S. DEPARTMENT OF DEFENSE a/k/a<br>U.S. DEPARTMENT OF WAR, et al.,<br>*Defendants*. | Civ. Action No. 1:26-cv-02069-JEB<br><br>**REDACTED** |

**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

Plaintiff WuXi AppTec Co., Ltd. respectfully moves for a preliminary injunction enjoining Defendants from enforcing, implementing, or otherwise giving effect to the Department of Defense's designation of WuXi AppTec Co., Ltd. as a "Chinese military company" under Section 1260H. The grounds for this motion are set forward in the accompanying Memorandum of Law in Support of Plaintiff's Motion for Preliminary Injunction, the declaration of Steve Qing Yang and exhibit thereto, the declaration of Richard Damian Connell and exhibit thereto, the declaration of Joseph Damond and exhibit thereto, and the declaration of Melissa Mills and exhibits thereto. Pursuant to Local Rule 65.1(d), Plaintiff respectfully requests that the Court schedule a hearing on this Motion at the Court's earliest convenience, and no later than 21 days after the filing of this Motion. A proposed order is attached.

WILSON SONSINI GOODRICH & ROSATI, P.C.

Dated: June 29, 2026                   /s/ Melissa Mills

Melissa Mills (D.C. Bar No. 90033390)
  (*pro hac vice*)
953 East Third Street, Suite 100
Los Angeles, CA 90013-1955
(323) 210-2991mmills@wsgr.com

Michael S. Sommer
  (*pro hac vice forthcoming*)
Morris Fodeman
  (*pro hac vice*)
Sheryl Shapiro Bassin
  (*admission forthcoming*)
31 West 52nd Street, Fifth Floor
New York, NY 10019-6118
(212) 999-5800
msommer@wsgr.com
mfodeman@wsgr.com
sbassin@wsgr.com

Timothy M. Broas (D.C. Bar No. 391145)
1700 K Street NW, Fifth Floor
Washington, DC 20006-3814
(202) 973-8846
tbroas@wsgr.com

*Counsel for Plaintiff WuXi AppTec Co., Ltd.*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

WUXI APPTEC CO., LTD.,

        *Plaintiff,*

        v.

U.S. DEPARTMENT OF DEFENSE a/k/a
U.S. DEPARTMENT OF WAR, et al.,

        *Defendants*.

Civ. Action No. 1:26-cv-02069-JEB

**REDACTED**

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S**
**MOTION FOR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

**Page(s)**

INTRODUCTION ........................................................................................................1

STATEMENT OF FACTS ..........................................................................................3

    A.    The Company is a Global Pharmaceutical Services Provider with Extensive and Significant Ties to the United States. ................................3

    B.    The Company Is Widely Held, Publicly Traded, and Ultimately Accountable to Its Shareholders and Has No Ties to the Chinese Military.............4

    C.    The Department of War Designated the Company as a "Chinese Military Company" Without Notice or an Opportunity to Be Heard, Despite Facts Presented to the Department on Multiple Occasions. ...............................5

        1.    Section 1260H Requires the Department of War to Publish an Annual List of CMCs Operating in the United States. ................................5

        2.    The Company Repeatedly Provided Information to the Department of War Regarding its Lack of Chinese Government Affiliation. ..................7

        3.    Contrary to the Facts Before it, the Department of War Designated the Company as a CMC in 2026. ...............................................................10

    D.    The Department of War's Designation of the Company Triggers Immediate Harms. ..........................................................................................12

ARGUMENT ............................................................................................................16

I.    The Company Is Likely to Succeed on the Merits..........................................17

    A.    The Department of War's Designation Violates the APA Because it Lacks Any Reasoned Basis. ........................................................................17

        1.    The Department of War's Designation is a Final Agency Action. ............18

        2.    The Department of War's Designation of the Company Lacks Sufficient Basis. ................................................................................18

        3.    The Department of War's Designation was Unreasonable and Unsupported. ..........................................................................................21

    B.    The Department of War Violated Due Process by Failing to Provide the Company Notice or An Opportunity to Contest the Designation. .........................23

        1.    The Company Is Protected by the Due Process Clause. ............................24

2.  The Company Was Entitled to Due Process Before It Was Deprived of Liberty and Property. ............................................. 25

3.  The Designation Deprived the Company of Liberty and Property Interests. ..................................................................................... 27

4.  The Department of War Failed to Provide the Company with Due Process. ...................................................................................... 28

C.  The Department of War's Designation Exceeded Its Authority Under Section 1260H Because the Company Does Not Meet the Criteria Required. ........................................................................................... 29

D.  Section 1260H Is Void for Vagueness as Applied to the Company, or, in the Alternative, on its Face. ............................................................ 29

II.  The Department of War's Actions Are Inflicting, and Will Continue to Inflict, Irreparable Harm on the Company. ............................................................. 30

A.  The Company Faces Severe Legal Consequences and Reputational Injuries as a Result of the Department of War's Actions. ................... 31

1.  By Virtue of the Company's 1260H Designation, it Will Also Be Subject to Additional, Significant Regulatory Restrictions and Scrutiny. ........................................................................... 32

2.  The Company's Designation Creates Market Uncertainty— Impacting Its Relationships with Customers and Suppliers. ............ 34

3.  The Company's Designation Harms Employee Recruitment and Retention. .................................................................................... 35

4.  The Company's Designation Harms Relationships with Financial Institutions. ..................................................................................... 36

B.  The Company Faces Substantial, Unrecoverable Economic Injury as a Result of the Department of War's Actions. ...................................... 37

C.  The Company Faces Constitutional Injury as a Result of the Department of War's Actions. ........................................................................... 41

III.  The Balance of Equities and the Public Interest Support a Preliminary Injunction. ........ 42

IV.  No Bond Should Be Required. .......................................................................... 44

CONCLUSION ...................................................................................................... 44

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Aamer v. Obama*,
742 F.3d 1023 (D.C. Cir. 2014)................................................................................17

*Advance Am. v. FDIC*,
No. 14-CV-953 (GK), 2017 WL 2672741 (D.D.C. Feb. 23, 2017)...................................41

*Aid Ass'n for Lutherans v. U.S. Postal Serv.*,
321 F.3d 1166 (D.C. Cir. 2003)................................................................................29

*Am. Sch. of Magnetic Healing v. McAnnulty*,
187 U.S. 94 (1902)................................................................................................29

*Anthropic PBC v. U.S. Dep't of War*,
2026 WL 836842 (N.D. Cal. Mar. 26, 2026).................................................23, 24, 27, 32

*Armour & Co. v. Freeman*,
304 F.2d 404 (D.C. Cir. 1962)..................................................................................35

*Armstrong v. Manzo*,
380 U.S. 545 (1965)..............................................................................................25

*Bd. of Regents of State Colleges v. Roth*,
408 U.S. 564 (1972)..............................................................................................27

*BNSF Ry. Co. v. Surface Transp. Bd.*,
741 F.3d 163 (D.C. Cir. 2014)..................................................................................23

*Boddie v. Connecticut*,
401 U.S. 371 (1971)..............................................................................................25

*Bonumose, Inc. v. FDA*,
747 F. Supp. 3d 211 (D.D.C. 2024)............................................................................21

*Calero-Toledo v. Pearson Yacht Leasing Co.*,
416 U.S. 663 (1974)), *aff'd,* 333 F.3d 156 (D.C. Cir. 2003)............................................25

*Chaplaincy of Full Gospel Churches v. England*,
454 F.3d 290 (D.C. Cir. 2006)..................................................................................31

*Citizens to Preserve Overton Park v. Volpe*,
401 U.S. 402 (1971)..............................................................................................19

*City of Brookings Mun. Tel. Co. v. FCC*,
    822 F.2d 1153 (D.C. Cir. 1987)..................................................................................23

*Cmtys. For a Better Env't v. EPA*,
    748 F.3d 333 (D.C. Cir. 2014)...............................................................................18, 19

*Coburn v. McHugh*,
    679 F.3d 924 (D.C. Cir. 2012)..................................................................................23

*CSL Plasma Inc. v. U.S. Customs & Border Prot.*,
    628 F. Supp. 3d 243 (D.D.C. 2022).................................................................20, 21, 38

*Delaware Dep't of Nat. Res. & Env't Control v. E.P.A.*,
    785 F.3d 1 (D.C. Cir. 2015), *as amended* (July 21, 2015)...............................................22

*Dickson v. Sec'y of Def.*,
    68 F.3d 1396 (D.C. Cir. 1995).............................................................................19, 20

*Dist. of Columbia v. U.S. Dep't of Ag.*,
    444 F. Supp. 3d 1 (D.D.C. 2020)..............................................................................38

*Elec. Priv. Info. Ctr. v. U.S. Dep't of Just.*,
    15 F. Supp. 3d 32 (D.D.C. 2014)..............................................................................31

*Elrod v. Burns*,
    427 U.S. 347 (1976).............................................................................................41

*Ethyl Corp. v. EPA*,
    541 F.2d 1 (D.C. Cir. 1976)....................................................................................19

*Everglades Harvesting and Hauling, Inc. v. Scalia*,
    427 F. Supp. 3d 101 (D.D.C. 2019)...........................................................................38

*Fuentes v. Shevin*,
    407 U.S. 67 (1972)...............................................................................................25

*Gen. Elec. Co. v. Jackson*,
    610 F.3d 110 (D.C. Cir. 2010)..................................................................................27

*Global Relief Found., Inc. v. O'Neill*,
    315 F.3d 748 (7th Cir. 2002) ...................................................................................26

*Goings v. Court Servs. & Offender Supervision Agency for D.C.*,
    786 F. Supp. 2d 48 (D.D.C. 2011)..............................................................................41

*Grayned v. City of Rockford*,
    408 U.S. 104 (1972)..........................................................................................29, 30

*Greatness v. FEC*,
831 F.3d 500 (D.C. Cir. 2016)......................................................................................42

*Greene v. McElroy*,
360 U.S. 474 (1959).....................................................................................................23

*Hill v. Colorado*,
530 U.S. 703 (2000).....................................................................................................30

*Holy Land Found. for Relief & Dev. v. Ashcroft*,
219 F. Supp. 2d 57 (D.D.C. 2002)..........................................................................25, 26

*Humanitarian L. Project v. U.S. Dep't of Treasury*,
463 F. Supp. 2d 1049 (C.D. Cal. 2006),
*on reconsideration*, 484 F. Supp. 2d 1099 (C.D. Cal. 2007)..............................................30

*Humanitarian L. Project v. U.S. Treasury Dep't*,
578 F.3d 1133 (9th Cir. 2009) .....................................................................................30

*Islamic Am. Relief Agency v. Unidentified FBI Agents*,
394 F. Supp. 2d 34 (D.D.C. 2005),
*aff'd in part and remanded sub nom. Islamic Am. Relief Agency v. Gonzales*,
477 F.3d 728 (D.C. Cir. 2007).....................................................................................26

*J.G.G. v. Trump*,
772 F.Supp.3d 18 (D.D.C. 2025)..................................................................................18

*Jenner & Block LLP v. U.S. Dep't of Just.*,
784 F. Supp. 3d 76 (D.D.C. 2025)...............................................................................40

*Johnson v. United States*,
576 U.S. 591 (2015).....................................................................................................30

*Judulang v. Holder*,
565 U.S. 42 (2011).......................................................................................................17

*League of Women Voters v. Newby*,
838 F.3d 1 (D.C. Cir. 2016).........................................................................................43

*Learning Resources, Inc. v. Trump*,
784 F.Supp.3d 209 (D.D.C. 2025),
*cert. granted before judgment*, 146 S. Ct. 73 (2025),
*vacated and remanded on different grounds*, 607 U.S. 229 (2026)..................................38

*Lopez Bello v. Smith*,
651 F. Supp. 3d 20 (D.D.C. 2022),
*aff'd sub nom. Bello v. Gacki*,
94 F.4th 1067 (D.C. Cir. 2024).....................................................................................26

*Luokung Tech. Corp. v. Dep't of Def.,
    538 F. Supp.3d 174 (D.D.C. 2021) ................................................................. *passim*

Mathews v. Eldridge,
    424 U.S. 319 (1976) ...............................................................................25, 28

Meyer v. Nebraska,
    262 U.S. 390 (1923) ...........................................................................................27

Milice v. Consumer Prod. Safety Comm'n,
    2 F.4th 994 (D.C. Cir. 2021) ...........................................................................18

Mills v. District of Columbia,
    571 F.3d 1304 (D.C. Cir. 2009) ......................................................................41

Morall v. DEA,
    412 F.3d 165 (D.C. Cir. 2005) .........................................................................23

Morgan Stanley DW Inc. v. Rothe,
    150 F. Supp. 2d 67 (D.D.C. 2001) ..................................................................35

Motor Vehicle Manufacturers Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,
    463 U.S. 29 (1983) ............................................................................................21

Mullane v. Central Hanover Bank & Trust Co.,
    339 U.S. 306 (1950) ..........................................................................................28

Mylan Pharm., Inc. v. Shalala,
    81 F. Supp. 2d 30 (D.D.C. 2000) ....................................................................37

N. Mariana Islands v. United States,
    686 F. Supp. 2d 7 (D.D.C. 2009) ....................................................................44

Nalco Co. v. EPA,
    786 F. Supp. 2d 177 (D.D.C. 2011) ................................................................39

Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget,
    775 F. Supp. 3d 100 (D.D.C. 2025) ................................................................44

Nat'l Council of Resistance of Iran v. Dep't of State,
    251 F.3d 192 (D.C. Cir. 2001) ........................................................................24

Patriot, Inc. v. U.S. Dep't of Housing & Urban Dev.,
    963 F. Supp. 1 (D.D.C. 1997) .........................................................................32

Perkins Coie LLP v. U.S. Dep't of Just.,
    783 F. Supp.3d 105 (D.D.C. 2025) ........................................................24, 39, 40

*Power Mobility Coal. v. Leavitt*,
   404 F. Supp. 2d 190 (D.D.C. 2005) ...................................................................................30

*Propert v. District of Columbia*,
   948 F.2d 1327 (D.C. Cir. 1991) .........................................................................................28

*PSEG Energy Res. & Trade LLC v. FERC*,
   665 F.3d 203 (D.C. Cir. 2011) ...........................................................................................23

*R.I.L-R v. Johnson*,
   80 F. Supp. 3d 164 (D.D.C. 2015) .....................................................................................44

*Rafeedie v. INS.*,
   795 F. Supp. 13 (D.D.C. 1992) ..........................................................................................30

*Ralls Corp. v. Comm. on Foreign Inv.*,
   758 F.3d 296 (D.C. Cir. 2014) .....................................................................................24, 29

*Reeve Aleutian Airways, Inc. v. United States*,
   982 F.2d 594 (D.C. Cir. 1993) ...........................................................................................28

*Sierra Club v. Salazar*,
   177 F. Supp. 3d 512 (D.D.C. 2016) ...................................................................................20

*Simms v. District of Columbia*,
   872 F. Supp. 2d 90 (D.D.C. 2012) ...............................................................................41, 44

*Singh v. Berger*,
   56 F.4th 88 (D.C. Cir. 2022) ..............................................................................................43

*Snohomish Cnty., Washington v. Surface Transp. Bd.*,
   954 F.3d 290 (D.C. Cir. 2020) ...........................................................................................19

*Stewart v. Stackley*,
   251 F. Supp. 3d 138 (D.D.C. 2017) ...................................................................................20

*Strait Shipbrokers Pte. Ltd. v. Blinken*,
   560 F. Supp. 3d 81 (D.D.C. 2021) .....................................................................................26

*Susman Godfrey LLP v. Exec. Off. of the President*,
   789 F. Supp. 3d 15 (D.D.C. 2025) .....................................................................................40

*SZ DJI Tech. Co. v. U.S. Dep't of Def.*,
   2025 WL 2761210 (D.D.C. Sept. 26, 2025) ......................................................................21

*\*TikTok Inc. v. Trump*,
   490 F. Supp. 3d 73 (D.D.C. 2020) ................................................................................36, 39

vii

*TikTok Inc. v. Trump*,
    507 F. Supp. 3d 92 (D.D.C. 2020)..................................................................... 23

*Transactive Corp. v. United States*,
    91 F.3d 232 (D.C. Cir. 1996)........................................................................... 22

*Trifax Corp. v. District of Columbia*,
    314 F.3d 641 (D.C. Cir. 2003) .................................................................. 27, 32

*United States v. E-Gold, Ltd.*,
    521 F.3d 411 (D.C. Cir. 2008),
    *abrogated on other grounds by Kaley v. United States*,
    571 U.S. 320 (2014).......................................................................................... 25

*United States v. Verdugo-Urquidez*,
    494 U.S. 259 (1990).......................................................................................... 24

*United Student Aid Funds v. Espinosa*,
    559 U.S. 260 (2010).......................................................................................... 28

*Whitman-Walker Clinic, Inc. v. HHS*,
    485 F. Supp. 3d 1 (D.D.C. 2020) (Boasberg, C.J.) .................................... 38, 40

*Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of the President*,
    784 F. Supp. 3d 127 (D.D.C. 2025).................................................................. 40

*Winter v. Nat. Res. Def. Council*,
    555 U.S. 7 (2008)....................................................................................... 16, 42

*Wis. Gas Co. v. FERC*,
    758 F.2d 669 (D.C. Cir. 1985) ......................................................................... 30

*Wisconsin v. Constantineau*,
    400 U.S. 433 (1971).......................................................................................... 27

*\*Xiaomi Corp. v. Dep't of Def.*,
    No. CV 21-280 (RC), 2021 WL 950144 (D.D.C. Mar. 12, 2021)............................*passim*

*Zaid v. Exec. Off. of the President*,
    815 F. Supp. 3d 113 (D.D.C. 2025).................................................................. 42

*Zevallos v. Obama*,
    10 F. Supp. 3d 111 (D.D.C. 2014),
    *aff'd*, 793 F.3d 106 (D.C. Cir. 2015) ................................................................ 26

## STATUTES

5 U.S.C. § 701................................................................................................................. 18

5 U.S.C. § 702..................................................................................................17, 39

5 U.S.C. § 704........................................................................................................18

5 U.S.C. § 706........................................................................................................17

10 U.S.C. § 113 note..............................................................................................19

Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*........................................ *passim*

BIOSECURE Act, Pub. L. No. 119-60, § 851, 139 Stat. 718 (Dec. 18, 2025) ..................... *passim*

National Defense Authorization Act for Fiscal Year 1999, Pub. L. No. 105-261,
    Section 1237 (1998)...........................................................................................5

National Defense Authorization Act for Fiscal Year 2021, Pub. L. No. 116-283,
    Section 1260H, 134 Stat. 3388 .................................................. *passim*

2026 Neb. Laws L.B. 904 ......................................................................................33

Tex. Gov't Code Ann. § 2270 *et seq.* .....................................................................33

Utah Code Ann. § 63L-13-101 ..............................................................................33

## RULES

Federal Rule of Civil Procedure 65 ........................................................................45

**INTRODUCTION**

Plaintiff WuXi AppTec Co., Ltd. (the "Company" or "WXAT") plays an integral role in the discovery, development, and manufacture of lifesaving and life-improving medicines for patients in the United States and worldwide. It asks this Court to preliminarily enjoin the Department of War's arbitrary, capricious, and fundamentally lawless actions that have—with a few unexplained keystrokes—threatened its ability to serve its largest market.

The Company is one of the world's leading and most impactful service providers to pharmaceutical and life science companies. It facilitates the discovery and development of new medicines and other therapies by its thousands of customers, including over a thousand American companies, in the global pharmaceutical and life sciences industry. In supporting those customers, the Company by extension serves countless patients in the United States and elsewhere who rely on its discovery, development, and expansion of access to lifesaving and life-improving medicines. A publicly traded company with a current market capitalization of over $50 billion, the Company is managed primarily by Americans, with U.S. citizens comprising the majority of its board of directors and senior executive management team. It is not owned by, controlled by, or affiliated with the Chinese military or the Chinese government.

The Department of Defense—or, as it now prefers to be called, the Department of War—has for years been legally required to publish a list of all companies that it considers to be "Chinese military companies" operating in the United States. Because it is not a Chinese military company, the Company was never included on that list before this year. In 2024, the Company met with Department of Defense officials, presented them with detailed facts showing its civilian ownership and control and its lack of Chinese government affiliation, and invited and answered their follow-up questions. After considering those facts, Department of Defense again declined to include the

1

Company on the published list, reflecting its reasoned, and accurate, assessment that the Company is not a "Chinese military company."

Three weeks ago, under the current administration's Department of War, that assessment was officially changed. No new facts arose to support this reversal. The Company remains under the civilian leadership and control of primarily American board members and senior executives. It still is not a "Chinese military company."

At the Company's initiative, it met with Department of War officials in November 2025 and provided detailed information about its governance and control and its lack of ties to the Chinese government. The Department of War did not meaningfully engage, nor did it accept the Company's offer to provide any follow-up information it might need. This meeting was a sham. Unbeknownst to the Company, and for reasons still unknown, the Department of War had already made up its mind to designate the Company, as the Deputy Secretary of War reportedly made clear in an October 2025 letter to Congress sent *before* the perfunctory November meeting. On June 8, 2026, consistent with the Department of War's predetermined and baseless decision, it included the Company on the published 1260H list of Chinese military companies.

The impacts to the Company of that unwarranted designation are immediate and severe. The reputational and economic effects started on the day of designation, and they will only continue to unfold and compound. The designation will also subject the Company to the restrictions of the BIOSECURE Act, a fact that furthers the degradation of the Company's critical business relationships.  Certain customers and suppliers are already expressing concerns over the 1260H designation and the intertwined implications of the BIOSECURE Act, and, in several cases, they are even beginning to wind down or suspend the relationship.

In a massive overreach of Executive power, the Department of War's arbitrary, capricious,

2

and process-free action has thus threatened the underpinnings of the Company's U.S.-based business, which amounts to approximately 70% of the Company's global revenue. The Company respectfully requests this preliminary injunction to protect the Company and its shareholders, employees, and patients—including many in the United States—from the irreparable harm resulting from the unlawful actions of the Department of War.

## STATEMENT OF FACTS

### A.    The Company is a Global Pharmaceutical Services Provider with Extensive and Significant Ties to the United States.

The Company is a publicly traded provider of services to pharmaceutical and life science companies worldwide with a robust U.S. presence. Declaration of Steve Qing Yang ("Yang Decl.") ¶¶ 8, 9, 18. Established in 2000 in China, the Company rapidly developed into an international contract research development, and manufacturing organization with thousands of active customers and operations across the United States, Europe, and Asia. *Id*. ¶¶ 13, 18. The Company does not sell its own products, but provides research, development, and manufacturing services to pharmaceutical and life science companies to advance discoveries and deliver groundbreaking treatments to patients at scale. *Id*. ¶ 2. The Company helps its customers discover, manufacture, and test new drugs. *Id*. It adheres to the highest international quality standards and is regularly subject to rigorous regulatory and customer inspections and audits in the United States and around the world. *Id*. ¶ 15. It has a sterling reputation in the global drug research and development market. *Id*; Declaration of Joseph Damond (Damond Decl.) ¶ 15.

The Company has significant and deep ties to the United States. Its substantial U.S. footprint includes six facilities, approximately 450 employees, and more than 1,000 customers that in turn serve millions of patients. Yang Decl. ¶¶ 8, 17-19. The Company also has made significant investments in U.S. manufacturing, supporting the United States' goals of strengthening supply

3

chains and domestic production capacity of medicines and other essential healthcare products. *Id*. ¶ 18. The Company's most recent U.S. investment includes approximately $600 million for the construction of a manufacturing site in Middletown, Delaware. *Id*. This 190-acre site, scheduled for completion later this year, will handle drug manufacturing and commercial assembly (*e.g.*, packaging and labeling), and is expected to bring hundreds of skilled jobs to Middletown. *Id*.

A majority of the Company's directors and senior executive management team are U.S. citizens. *Id*. ¶ 17. The Company's controlling shareholder and Chairman and Chief Executive Officer of the Company, Dr. Ge Li, is a U.S. citizen, as are the Company's co-CEOs, Dr. Steve Yang and Dr. Mingzhang Chen. *Id*. ¶¶ 1, 17. The Company complies with U.S. regulatory standards in carrying out its international operations. *Id*. ¶ 15. In 2025, the Company had more than 700 quality audits and inspections by global customers, regulatory authorities, and third parties, with zero critical findings. *Id*.

**B.    The Company Is Widely Held, Publicly Traded, and Ultimately Accountable to Its Shareholders and Has No Ties to the Chinese Military.**

While the Company is incorporated in China and publicly traded on the Hong Kong and Shanghai stock exchanges, *id.* ¶ 9, neither the Company nor its affiliated companies are directly or indirectly affiliated with the Chinese government or military, much less directly or indirectly owned by an entity affiliated with the Chinese government, such as the State-Owned Assets Supervision and Administration Commission of the State Council ("SASAC"). *Id*. ¶¶ 30, 31.

The Company is not owned by the Chinese Communist Party ("CCP"), and it does not participate in defense work. *Id*. ¶¶ 30, 31, 32. It does not produce, deliver, or maintain any military weapons systems, subsystems, components, or other defense-related items, and it does not conduct research for the People's Republic of China ("PRC") military. *Id*. ¶¶ 31, 32. The Company has no military production licenses, no military personnel, no advertisements on military procurement

platforms and no CCP members or People's Liberation Army ("PLA") association among directors or senior executive management. *Id*. ¶ 32. The Company does not sponsor PLA, CCP, or Chinese government events. *Id*. Even under Chinese law, the Company is not treated as a Chinese domestic enterprise, but rather a "Foreign-Invested Enterprise" due to the Company's substantial non-PRC ownership. *Id*. ¶ 24. Accordingly, under PRC law, the Company is treated in the same manner as a U.S. or European company's Chinese subsidiary. *Id*.

Conversely, the Company's ties to the United States are strong. As of March 31, 2026, the Company had 280,000 institutional and individual shareholders, including non-PRC foreign investors, mutual funds, and social security and pension funds. *Id*. ¶ 21. The founder, chairman, and Chief Executive Officer of the Company, Dr. Ge Li—a U.S. citizen—controls approximately 16.7% of the Company's issued capital as of December 31, 2025. *Id*. ¶ 17. The Company is not aware of ownership or controlling interests held by any entity affiliated with the Chinese government or military. *Id*. ¶¶ 30 & n.2, 31. Moreover, in 2025, approximately 70% of the Company's revenue came from customers headquartered in the United States. *Id*. ¶ 13.

**C.     The Department of War Designated the Company as a "Chinese Military Company" Without Notice or an Opportunity to Be Heard, Despite Facts Presented to the Department on Multiple Occasions.**

1.     Section 1260H Requires the Department of War to Publish an Annual List of CMCs Operating in the United States.

For years, the Department of Defense has been required to identify certain Chinese military companies operating in the United States. Section 1237 of the National Defense Authorization Act ("NDAA") for Fiscal Year 1999, Pub. L. No. 105-261 (1998) required the Department of Defense to identify and designate "Communist Chinese military companies" ("CCMC") operating in the United States. These designations did not always go undisputed. Several companies challenged their CCMC designations in this district, alleging, among others, that the designations were

5

arbitrary and capricious under the Administrative Procedure Act ("APA"). Because the unwarranted designations threatened the designated companies with irreparable harm, including reputational damage and unrecoverable financial harm, the court granted preliminary injunctions as to Luokung Technology Corporation and Xiaomi Corporation, preventing their designations as CCMCs. *See Luokung Tech. Corp. v. Dep't of Def.*, 538 F. Supp.3d 174 (D.D.C. 2021); *Xiaomi Corp. v. Dep't of Def.*, No. CV 21-280 (RC), 2021 WL 950144 (D.D.C. Mar. 12, 2021). Accordingly, the Department of Defense removed Luokung and Xiaomi's designations. Following these legal challenges, the NDAA for Fiscal Year 2021 implemented Section 1260H, with expressly the same goals of the Section 1237 CCMC List—primarily "naming and shaming" companies designated as "Chinese military companies" or "CMCs." *See* Declaration of Melissa Mills ("Mills Decl.") Ex. 1 ("Section 1260H is a part of a largely bipartisan, years-long effort to name and shame CCP companies operating in our Nation"); Ex. 2 (Section 1260H was established "to blacklist Chinese companies," and "Section 1260H addition certainly hurts a company's shareholder value, which is the point"); Ex. 3.

Section 1260H requires the Secretary of Defense to determine entities operating in the United States that meet the criteria of a CMC "based on the most recent information available." Section 1260H(a). The Secretary of Defense is to publish an annual report listing each entity identified as a CMC, *i.e.*, the 1260H List.

Section 1260H defines a CMC as an entity that is:

    (I)   directly or indirectly owned by, controlled by, or beneficially owned by, affiliated with, or in an official or unofficial capacity acting as an agent of or on behalf of, the People's Liberation Army, Chinese military and paramilitary elements, security forces, police, law enforcement, border control, the People's Armed Police, the Ministry of State Security (MSS) or any other organization subordinate to the Central Military Commission of the Chinese Communist Party, the Chinese Ministry of Industry and Information Technology (MIIT), the State-Owned Assets

> Supervision and Administration Commission of the State Council (SASAC), or the State Administration of Science, Technology, and Industry for National Defense (SASTIND); or
>
> (II) identified as a military-civil fusion contributor to the Chinese defense industrial base.

Section 1260H(g)(2)(B)(i).

Accordingly, one of two criteria must apply before an entity can be designated as a CMC: (i) the entity must be directly or indirectly owned by, or controlled by or affiliated with, one of several specified Chinese-government entities; or (ii) the entity must be a military-civil fusion contributor to the Chinese defense industrial base.

Section 1260H was revised in 2025, requiring a justification for any entities added to or removed from the 1260H List and requiring updates to the list to be made "not less frequently than annually based on the latest information available." *Id.* at (b)(2)-(3). The 2025 revision also included a definition for the term "affiliated with" to mean "in close formal or informal association." *Id.* at (g).

### 2. The Company Repeatedly Provided Information to the Department of War Regarding its Lack of Chinese Government Affiliation.

In 2024, the Company repeatedly attempted to meaningfully engage the Department of Defense to explain its business and why the Company is not a CMC. During that year, the Company presented information directly to the Department of Defense, via meetings and emails, explaining the Company's governance structure and showing why the Company does not meet the Section 1260H designation criteria. Yang Decl. ¶ 25. The Department of Defense engaged with the briefing and asked several follow-up questions. *Id.* The Company provided written responses to the Department of Defense's questions, including confirming that the Company never received financial sponsorship from the CCP, PLA, or Chinese Academy of Sciences. *Id.* Having engaged with the facts about the Company's ownership, control, and affiliations, the Department of Defense

7

elected not to designate the Company as a CMC on the 1260H List published on January 7, 2025. Declaration of Richard Connell ("Connell Decl.") ¶ 9.

Following the 2025 amendments to Section 1260H, on August 25, 2025, the Company requested to meet with the Trump administration's newly rebranded Department of War to provide an updated presentation. *Id.* ¶ 10. This meeting was originally scheduled for October 2025, but was rescheduled to November due to a U.S. government shutdown. *Id.* In the interim, and unbeknownst to the Company, Deputy Secretary of War Feinberg reportedly wrote to the U.S. House and Senate Armed Services Committees on October 7, 2025, stating that the Company and several other businesses would soon be added to the 1260H List. *Id.*; *see* Mills Decl. Ex. 4. In short, the Department of War *had already predetermined* that it would designate the Company as a "Chinese military company," despite a pending meeting with the Company purportedly to discuss and consider the propriety of designation. The Department of War made no mention of this predetermination during the performative meeting that followed. Connell Decl. ¶¶ 10-11; Yang Decl. ¶ 26. Deputy Secretary Feinberg's letter to the Armed Services Committee reportedly identified eight companies with alleged ties to the Chinese military and was sent mere weeks prior to the October 30, 2025 summit between President Trump and President Xi Jinping, where the United States and China were set to negotiate a broad truce in the escalating trade war. Mills Decl. Ex. 4. The Department of War's October decision thus put the Company squarely in the crosshairs of the administration's geopolitical maneuvering.

Unaware of Deputy Secretary Feinberg's letter revealing the internal decision that had already been made, the Company continued to attempt to address any concerns that the Department of War might have, and the Department of War did nothing to convey that the die was already cast. On November 24, 2025, Department of War personnel sat mostly silent for an in-person

presentation that explained the Company's business model, governance, and structure; detailed its substantial investment in the United States, its extensive U.S. and global footprint; and its lack of Chinese state ownership, control, or affiliation; and provided other information demonstrating that it is not a Chinese military company and does not qualify as one under 1260H. Connell Decl. ¶ 11; Yang Decl. ¶ 26.

At the conclusion of the November 2025 presentation, the Company invited further questions about its operations and business and requested that the Department of War carefully consider all information related to its evaluation for the 1260H List. Connell Decl. ¶ 11. Unsurprisingly—given that the Department of War had already made a decision before the meeting—it raised no questions or requests after the meeting. *Id*. Public reporting of the October letter from Deputy Secretary of War Feinberg surfaced less than two days after the Company's November 2025 meeting with the Department of War. Mills Decl. Ex. 4. Upon learning that the Department of War had already made up its mind *before* the very meeting where it had agreed to hear and consider the relevant facts, the Company immediately contacted the Department of War to: (1) inquire about the media reports of the Department of War's intention to designate the Company prior to the scheduled meeting, and (2) correct the record and address any questions from the Department of War. Yang Decl. ¶ 26; Connell Decl. ¶¶ 10-11. The Department of War responded that it had no comment on the press reporting and that it would follow up with any questions it might have regarding the Company. Connell Decl. ¶ 11. To date, the Department of War has never followed up with the Company in any manner. *Id.*

Instead of engaging in these briefings or relying on facts, the Department of War bent to Executive and Congressional political pressure campaigns. For example, on December 18, 2025, several members of Congress wrote to the Secretary of War, urging the Department of War to add

a number of companies to the 1260H List; the letter specifically urged designation of the Company. Mills Decl. Ex. 7. The December 2025 letter cited a prior congressional letter from February 2024 that similarly advocated for the addition of the Company and other entities to the 1260H List. *Id*. Notably, these unsupported allegations—and the Company's detailed refutations thereof in a written response to the 2024 letter—were available to the Department of Defense when it made the reasoned determination not to include the Company on the January 7, 2025 publication of the 1260H List. Mills Decl. Exs. 5-6.

3.      <u>Contrary to the Facts Before it, the Department of War Designated the Company as a CMC in 2026.</u>

The 1260H List was first published in 2021, and the Department of Defense did not see fit to include the Company on any published version through 2025. Then, in 2026, the Department of War abruptly changed course, including the Company on the 1260H List without notice or meaningful explanation, disregarding the copious information detailing the Company's non-PRC governance, control, affiliations, and structure.

On February 13, 2026, without providing notice or a meaningful opportunity to be heard, the Department of War published an updated 1260H List that included the Company. Mills Decl. Ex. 8; *see also* Connell Decl. ¶ 12. This list was posted publicly in the Federal Register ***for around one hour*** before it was withdrawn, pursuant to a letter request from the Department of War to the Federal Register requiring immediate removal. Connell Decl. ¶ 12; Mills Decl. Ex. 9. The briefly posted list was devoid of explanation, offering only minimal, conclusory language regarding the Company's inclusion, stating: "WuXi AppTec is indirectly owned by SASAC and is indirectly affiliated with SASTIND and the PLA (Section 1260H(g)(2)(B)(i)(I))." Connell Decl. ¶ 12; Mills Decl. Ex. 8. This boilerplate assertion, which mirrored the barebones "explanations" offered for many other listed entities, was inaccurate, and the Department of War provided no supporting

10

evidence. Nor could it; the Company is not a Chinese military company, as defined by 1260H or otherwise. While only briefly posted, the February 2026 1260H List received attention from the press, casting a shadow over the Company's reputation that only darkened with subsequent governmental actions. *Id*. Public reporting widely attributed the 1260H List to an effort by the Trump administration to influence US-China trade relations and to rile Chinese technology companies. Mills Decl. Ex. 9.

On May 9, 2026, the Company submitted a Freedom of Information Act ("FOIA") request to the Department of War Office of the Secretary and Joint Staff seeking communications and documents pertaining to the Company's designation. Connell Decl. ¶ 12; Mills Decl. Ex. 10. While brief, the February 2026 CMC designation tarnished the Company, and the Company sought to understand the reasoning and any purported factual support for the momentary designation. *See id*. The Department of War provided an interim response on May 13, 2026, stating only that it would not respond within FOIA's mandatory 20-day statutory period. Mills Decl. Ex. 11. To date, the Company has received no substantive response to its request for information. On June 8, 2026, the Company wrote directly to Deputy Secretary of War Feinberg to explain again why the Company is not a CMC and to specifically explain that the Company is not "indirectly owned by SASAC and indirectly affiliated with SASTIND and the PLA," as alleged in the briefly posted February list. Connell Decl. ¶ 12; *Id.* Ex. 1. The Company offered to answer any questions and reminded Deputy Secretary of War Feinberg that the Department of War has a legal obligation to consider all available information in evaluating the 1260H designation. *Id*. Ex. 1. To date, the Company has received no response. *Id*. ¶ 13.

A few hours after the Company wrote to Deputy Secretary of War Feinberg to reiterate the absence of any legal basis for designating the Company, the Department of War posted an updated

11

1260H List, with an official publication date of June 10, 2026 (the "June 2026 1260H List"). *Id.*; Mills Decl. Ex. 12. The June 2026 1260H List included the Company without providing any prior notice to the Company, without providing any opportunity to be heard, and without providing any meaningful explanation of the Department of War's decision. Yang Decl. ¶ 34, 35. The June 2026 1260H List contained a single conclusory sentence for the Company that was the same as in the withdrawn February 2026 1260H List: "WuXi AppTec is indirectly owned by SASAC and is indirectly affiliated with SASTIND and the PLA (Section 1260H(g)(2)(B)(i)(I))." *See* Mills Decl. Ex. 12. As explained in the Company's several engagements with the Department of War, this statement is false.

> **D.    The Department of War's Designation of the Company Triggers Immediate Harms.**

The Department of War's designation has inflicted significant immediate and ongoing harm on the Company. By branding the Company as a threat to U.S. national security, the designation has damaged the reputation and goodwill the Company has built over 25 years and has begun to disrupt the complex and longstanding commercial relationships on which its business depends. Yang Decl. ¶¶ 33, 36; Connell Decl. ¶¶ 15-17. That injury is accruing now—measured in paused engagements, cancelled and suspended orders, and suppliers imposing new conditions—and it compounds with each day the designation remains in place. Yang Decl. ¶¶ 38–45.

The designation's consequences are intertwined with the BIOSECURE Act, Section 851 of the NDAA for Fiscal Year 2026. Pub. L. No. 119-60, § 851, 139 Stat. 718, 981 (Dec. 18, 2025). The BIOSECURE Act bars federal agencies, and the many federal contractors and grant recipients the Company serves, from using the services of a "biotechnology company of concern" ("BCC") in the performance of federally funded work. Damond Decl. ¶¶ 29, 37. Businesses like the Company that are "involved in the manufacturing, distribution, provision, or procurement of any

12

biotechnology equipment or service" and identified on the Section 1260H List, are deemed BCCs under the BIOSECURE Act. Section 1260H(g)(2)(C) of NDAA; *id.* ¶31. While the BIOSECURE Act provides notice and an opportunity to contest a designation to entities designated through its criteria-based pathway, that protection is not available to entities, like the Company, designated under Section 1260H. Pub. L. No. 119-60, § 851(f)(5)(A). Thus, while the original goal of the Section 1260H List may have been to merely inflict reputational damage by "naming and shaming" companies as purported extensions of the Chinese military and a threat to the American people, (*supra* at 6), the consequences of the Company's CMC designation are now even more far-reaching and devastating, ███████████████████████████████████████ ███████████████████████.

The impact of the CMC designation was immediate and widespread. While the BIOSECURE Act restrictions must take hold *no later than* the second half of 2028, with sustained congressional pressure and the 1260H List already published, the restrictions could take effect more imminently, and companies, including the Company's customers, are already preparing for that date. Damond Decl. ¶ 31; Yang Decl. ¶¶ 36-45. In the ten days after the designation, ██████ of the Company's customers, including some of the Company's ██████ customers, contacted it with concerns about the 1260H designation. Yang Decl. ¶ 42. Those were not idle inquiries. Customers across the Company's business lines began pausing, curtailing, and reassessing their engagement. *Id.* ¶¶ 41-43; Damond Decl. ¶ 40 (noting that such reaction is predictable, as companies that regularly do business with federal agencies do not wait for a prohibition to take legal effect).

Even in this early period, customer reactions have already spanned from withholding new work, to suspending projects already underway, to reassessing commitments the Company had

13

already booked. One customer advised that it would award the Company no new projects for the foreseeable future, and another paused all new activity with the Company. Yang Decl. ¶ 43. Others stopped works in progress. A customer in the Company's ██████████████ placed all collaborative projects on hold until the Company is removed from the 1260H List. *Id.* Another halted contracts across multiple clinical-stage projects and suspended ongoing work, treating any continued cooperation as a matter of "wait and see." *Id.*

The designation has reached relationships already under contract. A customer in the Company's ██████████████ advised that its in-process contracts—worth more than ██ ███[1]—would have to be reassessed. *Id.* And in two further instances, customers terminated or redirected ongoing programs, each citing the need to preserve or obtain government funding that the Company's 1260H designation could place at risk. *Id.*

Those reactions reflect harm that will endure because of how commercial relationships work in this industry. Drug development is a years-long, multi-stage process, and qualifying a contract research, development, and manufacturing partner is an expensive undertaking, which entails revalidating manufacturing processes, transferring analytical methods, and, in many cases, filing regulatory supplements with the FDA. Damond Decl. ¶¶ 37, 38. Once a customer begins qualifying an alternative provider, its relationship with the Company is, as a practical matter, over, regardless of when the contract formally ends. *Id.* ¶ 37. Thus, the designation would pose permanent, unrecoverable losses to the Company which stands to lose a substantial share of its U.S. customer base now. *Id.* ¶ 42; Yang Decl. ¶ 43.

---

[1] All RMB amounts have been converted to USD at a rate of RMB 1.00 to USD 0.15, the approximate exchange rate as of June 28, 2026. Converted figures are approximate and may reflect rounding.

14

The designation has disrupted the Company's supply chain as well. One supplier, ███████, delivered written notice suspending shipments to the Company and stated that the suspension is attributable to the 1260H designation. Yang Decl. ¶ 44. Were ████████ to cease supplying the Company entirely, the Company estimates the resulting loss would be approximately ████████ in revenue. *Id.* Because ████████████ are an upstream input to the Company's research and development work, the suspension threatens downstream consequences for the Company's ████ ████████████████████. *Id.* A second supplier, which supplies ████████████████ ████████████████████████████████████, conditioned continued shipments on the Company's certifying that its products would not be used in any military project—a demand first made the day after the designation was posted. *Id.* ¶ 45.

The designation also ████████████████████████████████████ ████████████. This harm is not speculative. ████████████████████████ ████████████████████████████████████. *Id.* ¶ 49. In 2024 and 2025, when the potential impact of the BIOSECURE Act on the Company was ambiguous, ████████████ ████████████████████████████████████████████████████████ ████████████████. Now that the Defendants' 1260H designation actions have made clear that the BIOSECURE Act will bar the Company from the government procurement supply chain, ████████████████████████████████████████████. *Id.*; Damond Decl. ¶ 17.

The designation further imperils the relationships with major U.S. commercial banks, investment banks, and venture capital funds, and threatens the Company's continued access to U.S. banking and capital. Yang Decl. ¶ 50.

The consequences of the designation do not stop with the Company. The Company partners

with more than 1,000 U.S. pharmaceutical and life-sciences companies, many of which do not have a readily available alternative for services the Company provides. *Id.* ¶¶ 8, 51. The Company contributed to the development or manufacture of eight of the thirty small-molecule drugs the FDA approved in 2025. *Id.* ¶ 12. It contributes to the development or manufacture of therapies for cancer and HIV, and GLP-1 medicines used to manage obesity, type 2 diabetes, and cardiovascular conditions. *Id.* ¶¶ 10, 51; Connell Decl. ¶ 17. By disrupting the Company's commercial relationships, the designation threatens to delay or impede the development and supply of medicines on which millions of American patients depend. Yang Decl. ¶ 51; Connell Decl. ¶ 17.

## ARGUMENT

To obtain relief, the Company must show: "[(1)] that [it] is likely to succeed on the merits, [(2)] that [it] is likely to suffer irreparable harm in the absence of preliminary relief, [(3)] that the balance of equities tips in [its] favor, and [(4)] that an injunction is in the public interest." *Luokung Tech. Corp.*, 538 F.Supp.3d at 182 (quoting *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008)). When the defendant is the Government, the third and fourth elements, the balance of equities and the public interest, merge and are considered together. *Id*.

As demonstrated herein, the Company has carried its burden. It is likely to succeed on the merits of its claims, as it is not a "Chinese military company." It has already suffered, and will continue to suffer, irreparable reputational, legal, financial, and constitutional harms from the Department of War's arbitrary and indefensible overreach. Without the requested relief, the harms that the Department of War has already set in motion ███████████████████ ███████. The public interest is unquestionably served when the Department of War is required to comply with its legal obligations. And a preliminary injunction is further in the public interest because it will allow the Company to continue developing lifesaving and life-improving

treatments.

## I.    THE COMPANY IS LIKELY TO SUCCEED ON THE MERITS.

The "most important factor" is the plaintiff's likelihood of success on the merits. *Luokung Tech. Corp*, 538 F. Supp. 3d 174, 182 (quoting *Aamer v. Obama,* 742 F.3d 1023, 1038 (D.C. Cir. 2014)). While the Company is likely to succeed on the merits of all its claims, the Court need find that the Company is likely to prevail on *only one* of its claims. *See Luokung Tech. Corp*, 538 F. Supp. 3d at 191 n.13. Here, this threshold is easily met.

### A.    The Department of War's Designation Violates the APA Because it Lacks Any Reasoned Basis.

The APA provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. Courts must "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "contrary to constitutional right," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(1), (2)(A)-(C). While courts afford heightened deference to agency determinations in matters involving national security, courts retain an important gatekeeping role: "ensuring that agencies have engaged in reasoned decisionmaking." *Xiaomi Corp.*, 2021 WL 950144, at *4 (quoting *Judulang v. Holder*, 565 U.S. 42, 53 (2011)); see also *Luokung Tech. Corp.*, 538 F. Supp. 3d at 195 (the court was "somewhat skeptical that weighty national security interests are actually implicated," holding that "[d]eference is only appropriate when national security interests are actually at stake"). \ Here, Defendants' decision to designate the Company as a CMC was a final agency action. The explanation provided by Defendants was not only insufficient as a matter of law, but also contrary to the facts before it. Defendants' actions thus violate the most basic tenets of the APA and must

be set aside.

### 1.    The Department of War's Designation is a Final Agency Action.

The APA allows for judicial review of "final agency action for which there is no other adequate remedy." 5 U.S.C. § 704. The Department of War is an "agency" whose final actions are reviewable under the APA, and the action is final regardless of the ability to request administrative reconsideration. *See* 5 U.S.C. §§ 701, 704 ("Except as otherwise expressly required by statute, agency action otherwise final is final for the purposes of this section whether or not there has been presented or determined an application … for any form of reconsideration."); *see also Milice v. Consumer Prod. Safety Comm'n*, 2 F.4th 994, 1000–01 (D.C. Cir. 2021) ("[I]f a party has sought only judicial review, the agency action can be deemed final and hence reviewable as to that party, regardless of whether other parties have moved for administrative reconsideration.") (quotation marks omitted).

The Department of War's designation of the Company as a CMC constitutes "final agency action" subject to judicial review because it is the consummation of the Department of War's decision-making process with respect to the Company's placement on the 1260H List "by which...legal consequences will flow." *J.G.G. v. Trump*, 772 F.Supp.3d 18, 30 (D.D.C. 2025) (determining that a government order of removal is a "final agency action" permitting judicial review under the APA); 5 U.S.C. §§ 551(13); 701(b)(2).

### 2.    The Department of War's Designation of the Company Lacks Sufficient Basis.

The Department of War has provided only a one-sentence, boilerplate, *ipse dixit* "explanation" for its unreasoned and unfounded designation. This is wholly insufficient to satisfy the tenets of the APA. To survive judicial scrutiny, the Department of War's decision must be "reasonable and reasonably explained." *Cmtys. For a Better Env't v. EPA*, 748 F.3d 333, 335 (D.C.

18

Cir. 2014) (quotation omitted). In reviewing its action, courts consider whether the Department of War articulated a "rational connection between the facts and the decision made." *Xiaomi Corp.*, 2021 WL 950144, at \*4; *see also Ethyl Corp. v. EPA*, 541 F.2d 1, 35 (D.C. Cir. 1976) (quoting *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415–16 (1971)) (A reviewing court "must engage in a 'substantial inquiry' into the facts, one that is 'searching and careful.'"). To survive judicial scrutiny, the Department of War must adequately explain its actions— contemporaneously or in advance of taking the action—to enable both the Company and this Court to understand the basis for its decision. *Snohomish Cnty.*, *Washington v. Surface Transp. Bd.*, 954 F.3d 290, 301 (D.C. Cir. 2020). It has not.

Here, the statute refers to entities "directly or indirectly owned by … or … affiliated with" various Chinese government actors, and the List stated only that "WuXi AppTec is indirectly owned by SASAC and is indirectly affiliated with SASTIND and the PLA." William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021, Pub. L. No. 116-283, § 1260H, 134 Stat. 3388, 3965 (codified as amended at 10 U.S.C. § 113 note); June 2026 1260H List. The Department of War's "explanation" parroted the statutory text and provided nothing more. No description of SASAC's ownership other than qualifying it as "indirect"; no reference to *how* the Company is allegedly "indirectly affiliated with SASTIND and the PLA;" no discussion of anything the Company has done for, at the direction of, or in conjunction with, the SASAC, SASTIND, or PLA, or any control exercised by those entities over the Company.

This is not enough to withstand judicial scrutiny. Courts have held that this exact type of "boilerplate language," "parrot[ing] the language of [the] statute" is insufficient to explain the basis for its decision. *Dickson v. Sec'y of Def.*, 68 F.3d 1396, 1405–06 (D.C. Cir. 1995) ("[T]he boilerplate language used by the Board makes it impossible to discern the Board's 'path.' … [W]e

19

cannot determine whether the decision making process was deficient until we are allowed to understand what that process was."); *see also Stewart v. Stackley*, 251 F. Supp. 3d 138, 156–57 (D.D.C. 2017) (finding agency action to be arbitrary and capricious where the agency "merely parrot[ed] the language of [the] statute without providing an account of how [it] reached the results"); *Xiaomi Corp.*, 2021 WL 950144, at *5 ("Because the Department of Defense has done little more than parrot the language of a statute followed by a conclusory statement, it has not adequately explained the basis for its decision.") (internal quotation marks and citation omitted).

The absence of facts regarding the Company's designation, much less any information connecting those facts to the supposed conclusion that the Company is owned by or affiliated with SASAC, SASTIND, or the PLA, is fatal to the Department of War's flawed designation of the Company as a CMC. *See Dickson*, 68 F.3d at 1407 (finding agency action arbitrary and capricious where explanation stated only facts and conclusions without "connect[ing] them in any rational way"). Even more damning, the Department of War made its unreasoned designation in the face of all information to the contrary presented to the Department of Defense over the preceding years. To date, despite its best efforts to engage with the Department of War after the erroneous CMC designation, the Company has received no response and no supporting basis.

Further, the Department of War has not provided an explanation for why, after five years of declining to designate the Company as a CMC, the Department of War decided, with no change in relevant circumstances, to include the Company on the 2026 1260H List. "One of the core tenets of reasoned decision-making is that an agency [when] changing its course ... is obligated to supply a reasoned analysis for the change." *Sierra Club v. Salazar*, 177 F. Supp. 3d 512, 532 (D.D.C. 2016) (quotation omitted); *see also CSL Plasma Inc. v. U.S. Customs & Border Prot.*, 628 F. Supp. 3d 243, 259–60 (D.D.C. 2022) (finding sudden enforcement of a statute against a "longstanding

20

practice" not expressly allowed by official policy to nonetheless constitute a shift in practice). The Department of War was required to "examine the relevant data and articulate a satisfactory explanation for its action." *Motor Vehicle Manufacturers Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 30, 43 (1983). In the absence of such agency-provided explanation, the "court should not attempt itself to make up for such deficiencies: [it] may not supply a reasoned basis for the agency's action that the agency itself has not given." *Id.* (finding agency action to be arbitrary and capricious on this basis). As described further herein, the Department of War's lack of any reasoned basis requires a finding of arbitrary and capricious action.

### 3.    The Department of War's Designation was Unreasonable and Unsupported.

What little boilerplate basis the Department of War offered for the Company's designation "runs counter to the evidence before the agency" and "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Bonumose, Inc. v. FDA*, 747 F. Supp. 3d 211, 223, 232 (D.D.C. 2024) (quoting *State Farm*, 463 U.S. at 43) (overturning agency action because "*ipse dixit* [rationale] does not satisfy the APA"). The June 2026 1260H List states: "WuXi AppTec is indirectly owned by SASAC and is indirectly affiliated with SASTIND and the PLA (Section 1260H(g)(2)(B)(i)(I))." Yang Decl. ¶ 29; Connell Decl. ¶ 12. As the Company repeatedly made clear to the Department of War—with supporting facts laying bare its ownership, governance, and control—in advance of its designation, the Company is not indirectly owned by SASAC, and Defendants could not have reasonably determined otherwise. Yang Decl. ¶ 30; Connell Decl. ¶ 13. This Court has held that, for the purposes of Section 1260H, "ownership" requires "some level of control, not just mere possession of [] equity." *SZ DJI Tech. Co. v. U.S. Dep't of Def.*, 2025 WL 2761210, at *19–20 (D.D.C. Sept. 26, 2025) (finding that "purchasing an unspecified number of [a company's] shares and ... continu[ing] to hold some or all of those

21

shares" is insufficient to meet the threshold of "ownership" or "control" when there is no "evidence … suggesting that [the] ownership stake amounts to a controlling person"). If equity alone amounted to ownership under Section 1260H, there would be no limiting principle, and the 1260H List should include the thousands of companies with some degree of investment by SASAC. *See Transactive Corp. v. United States*, 91 F.3d 232, 237 (D.C. Cir. 1996) ("A long line of precedent has established that an agency action is arbitrary when the agency offered insufficient reasons for treating similar situations differently.").

Simply put, SASAC has no control, directly or indirectly, over the Company's business or decision-making. Yang Decl. ¶ 30; Connell Decl. ¶ 13. Defendants were made aware of, and did not challenge, facts showing SASAC's lack of control. Connell Decl. ¶ 13. Defendants had no reasonable basis to conclude that the Company was indirectly owned by SASAC.

Similarly, the Department of War could not have reasonably concluded that the Company is "indirectly affiliated with SASTIND and the PLA." Section 1260H defines "affiliated with" as "in close formal or informal association." Section 1260H(g)(1). *But see* Section I.D (terms "affiliated with" and "owned by" are unconstitutionally vague). The Company has no such close association with or control by SASTIND or the PLA, Yang Decl. ¶ 30; Connell Decl. ¶ 13., as the Company repeatedly made clear to the Department of War on multiple occasions, with supporting facts. Defendants had no reasonable basis to conclude otherwise.

The Department of War's failure to engage with or address any of the information provided by the Company is a further indicator of the arbitrary and capricious nature of their decision making. Yang Decl. ¶ 35; *see Delaware Dep't of Nat. Res. & Env't Control v. E.P.A.*, 785 F.3d 1, 11 (D.C. Cir. 2015), *as amended* (July 21, 2015) (reversing agency action is appropriate where "based on speculation" or "when the agency did not engage the arguments raised before it."). As

22

explained herein (*supra* at 7-10)*,* while the prior administration's Department of Defense meaningfully engaged with the Company during the decision-making process before electing not to designate the Company as a CMC, the Company's attempts to engage the current administration's Department of War on these same issues went unheeded and unanswered and were followed by a baseless designation. Connell Decl. ¶ 13, Ex. 1. These facts demonstrate that the Department of War did not engage in reasoned decision making and that its actions lacked a reasonable basis consistent with the facts before it. *See BNSF Ry. Co. v. Surface Transp. Bd.*, 741 F.3d 163, 168 (D.C. Cir. 2014) (*quoting PSEG Energy Res. & Trade LLC v. FERC,* 665 F.3d 203, 208 (D.C. Cir. 2011)) ("an agency's 'failure to respond meaningfully' to objections raised by a party renders its decision arbitrary and capricious"); *Coburn v. McHugh*, 679 F.3d 924, 934 (D.C. Cir. 2012) (same); *see also City of Brookings Mun. Tel. Co. v. FCC*, 822 F.2d 1153, 1169 n.46 (D.C. Cir. 1987) (noting that "the duty to consider alternatives … inheres in the agency's broader responsibility for exercising its expertise in a reasoned manner"); *TikTok Inc. v. Trump*, 507 F. Supp. 3d 92, 111 (D.D.C. 2020) (finding that TikTok ban implemented under IEEPA was likely arbitrary and capricious for lack of consideration of alternative); *Morall v. DEA*,  412 F.3d 165, 178 (D.C. Cir. 2005) (finding revocation of DEA registration arbitrary and capricious where the agency "entirely ignored" the plaintiff's relevant evidence).

**B.     The Department of War Violated Due Process by Failing to Provide the Company Notice or An Opportunity to Contest the Designation.**

The Company is also likely to prevail on its due process claim. The Fifth Amendment to the U.S. Constitution protects and recognizes a liberty interest in the right to "follow a chosen profession free from unreasonable governmental interference." *Anthropic PBC v. U.S. Dep't of War*, 2026 WL 836842, at *15 (N.D. Cal. Mar. 26, 2026) (citing *Greene v. McElroy*, 360 U.S. 474, 492 (1959)). "[W]here a person's good name, reputation, honor, or integrity is at stake because of

23

what the government is doing to him, notice and an opportunity to be heard are essential." *Id.* (discussing reputational harm to Anthropic).

The Government must provide due process of law *before* depriving a private party of property or liberty interests. National security concerns do not change that requirement. *See, e.g.*, *Ralls Corp. v. Comm. on Foreign Inv.*, 758 F.3d 296, 319 (D.C. Cir. 2014) (finding a due process violation where a foreign-owned corporation was subject to an order preventing a merger without an opportunity to rebut the findings on which the order was based); *Perkins Coie LLP v. U.S. Dep't of Just.*, 783 F. Supp.3d 105, 173 (D.D.C. 2025) ("[E]ven in cases involving legitimate national security interests, some level of due process is required.").

The Company did not receive the requisite due process—or indeed any meaningful process—before the Department of War reversed its prior determinations that it did not belong on the 1260H List and summarily designated it as a CMC. Because Defendants' actions have deprived and will continue to deprive the Company of constitutionally protected liberty and property interests without notice and opportunity to challenge that taking, the Company's due process claim should succeed on the merits.

### 1. The Company Is Protected by the Due Process Clause.

The Due Process Clause's protections extend to foreign corporations when they have "entered the territory of the United States and established substantial connections with this country." *Nat'l Council of Resistance of Iran v. Dep't of State*, 251 F.3d 192, 203 (D.C. Cir. 2001) [hereinafter *NCRI*]; *see also United States v. Verdugo-Urquidez*, 494 U.S. 259, 271 (1990). The Company has operated in the United States since 2007, it has six facilities in the United States, it has invested over $600 million in manufacturing in the territory, it employs hundreds of workers in the United States, most of the Company's directors and its senior executive management team are U.S. citizens, and it has substantial business relationships with U.S. entities with over 1,000

active U.S. customers. Yang Decl. ¶¶ 8, 51. These connections satisfy both requirements and trigger due process protection. *See*, *e.g.*, *NCRI*, 251 F.3d at 203.

2. The Company Was Entitled to Due Process Before It Was Deprived of Liberty and Property.

"The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). The Department of War cannot cure its failure to provide due process by only now considering the Company's objections to its CMC designation. Absent "extraordinary situations," due process requires notice and an opportunity to be heard **before** a party is deprived of a protected interest. *Fuentes v. Shevin*, 407 U.S. 67, 90 (1972) (quoting *Boddie v. Connecticut*, 401 U.S. 371, 379 (1971)); *see also United States v. E-Gold, Ltd.*, 521 F.3d 411, 416–17 (D.C. Cir. 2008), *abrogated on other grounds by Kaley v. United States*, 571 U.S. 320 (2014).

Postponing notice and hearing until after deprivation is only permissible if the Government satisfies three requirements: (1) the deprivation must be "necessary to secure an important governmental interest"; (2) there must be "a special need for very prompt action"; and (3) "the party initiating the deprivation must be a government official responsible for determining … that [the deprivation] was necessary and justified in the particular instance" under a narrowly drawn statute. *Holy Land Found. for Relief & Dev. v. Ashcroft*, 219 F. Supp. 2d 57, 76 (D.D.C. 2002) (quoting *Calero-Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663, 679–80 (1974)), *aff'd,* 333 F.3d 156 (D.C. Cir. 2003). Even if Defendants could establish that there is an important government interest at issue or that the actions are justified under the circumstances, the Defendants' course of action makes clear there is no "special need for very prompt action." The Department of War apparently determined that it would add the Company to the 1260H List no

25

later than October 7, 2025, when Deputy Secretary of War Feinberg reportedly wrote to the U.S. House and Senate Armed Services Committees, stating that the Company and other companies should be added to the 1260H List. Mills Decl. Ex. 4. Further, on February 13, 2026, the Department of War published an updated 1260H List, which included the Company, to the Federal Register for approximately one hour before it was removed at the Department of War's request. Mills Decl. Ex. 9. But the Department of War did not officially and finally place the Company on the 1260H list until June 8, 2026, over eight months after Deputy Secretary of War Feinberg's letter, and nearly four months after the Department of War published and quickly removed its initial list. Its actions were not prompt, and there was ample time to provide the required notice.

Likewise, the circumstances presented in this case are distinguishable from those where courts have found the special need for very prompt action, such as freezing assets to address the risk of asset flight in the context of a foreign terrorist organization under IEEPA. *See*, *e.g.*, *Holy Land Found.*, 333 F.3d at 163–64; *Islamic Am. Relief Agency v. Unidentified FBI Agents*, 394 F. Supp. 2d 34 (D.D.C. 2005), *aff'd in part and remanded sub nom. Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728 (D.C. Cir. 2007) (same); *Global Relief Found., Inc. v. O'Neill*, 315 F.3d 748, 754 (7th Cir. 2002) (same); *Strait Shipbrokers Pte. Ltd. v. Blinken*, 560 F. Supp. 3d 81, 97 (D.D.C. 2021) (similar in context of sanctions violator); *see also*, *e.g.*, *Zevallos v. Obama*, 10 F. Supp. 3d 111, 127 (D.D.C. 2014), *aff'd*, 793 F.3d 106 (D.C. Cir. 2015) (similar, in drug kingpin designation context); *Lopez Bello v. Smith*, 651 F. Supp. 3d 20, 39–40 (D.D.C. 2022), *aff'd sub nom. Bello v. Gacki*, 94 F.4th 1067 (D.C. Cir. 2024) (same). Providing the Company with notice and opportunity before placing it on the 1260H List would not have created any comparable risk of asset flight. *See NCRI*, 251 F.3d at 208–09 (finding additional process necessary prior to foreign terrorist organization designation under AEDPA, despite government's significant national

26

security interest). It would have merely allowed the Company to continue effectively operating its chosen, lawful business working with its U.S. partners to support the development and manufacturing of innovative and life-saving medicines for patients in need while providing sufficient time for the Company to explain, and for the Department of War to consider, why the Company is not a Chinese military company and does not belong on the 1260H List.

3.    The Designation Deprived the Company of Liberty and Property Interests.

The Company has been, and without the Court's intervention will continue to be, deprived of liberty and property interests without due process of law. When the Department of War included the Company on the 1260H List and designated the Company as a CMC, it altered the Company's legal status. This action has already affected the Company's existing contractual relationships and will affect its ability to contract with customers going forward. Yang Decl. ¶¶ 36-45; Damond Decl. ¶¶ 6, 13, 15, 18, 35. Courts recognize that the Due Process Clause protects a liberty interest in the right to contract. *See Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 572 (1972) (Due Process Clause protects liberty interests in the "right … to contract") (quoting *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923)); *see also Anthropic PBC*, 2026 WL 836842, at *15.

Moreover, as discussed further below, *infra* Section II, the Company's branding as a national security threat has caused public stigmatization, severely damaging the Company's international reputation and professional goodwill. Yang Decl. ¶¶ 36-38; Damond Decl. ¶ 13. "Where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential." *Anthropic PBC*, 2026 WL 836842, at *15 (citing *Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971)); *see also Gen. Elec. Co. v. Jackson*, 610 F.3d 110, 121 (D.C. Cir. 2010) (quoting *Trifax Corp. v. District of Columbia*, 314 F.3d 641, 644 (D.C. Cir. 2003)) (finding reputational harm triggers due process protections when the resulting stigma deprives a party of "some benefit to which [it has] a legal

27

right," or when "the government imposed stigma is so severe that it broadly precludes [the company] from pursuing a chosen trade or business"); *Reeve Aleutian Airways, Inc. v. United States*, 982 F.2d 594, 598 (D.C. Cir. 1993) (acknowledging a "liberty interest in avoiding[] damage to [a company's] reputation and business caused by" stigmatizing government action). The Company has suffered an alteration of its legal status, extensive resulting deprivations of liberty and property, and substantial reputational harm.

4.        The Department of War Failed to Provide the Company with Due Process.

The Department of War's summary designation of the Company deprived it of due process. "Due process requires notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *United Student Aid Funds v. Espinosa*, 559 U.S. 260, 272 (2010) (quoting *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950)). How much process is due depends on (1) "the private interest that will be affected by the official action," (2) "the risk of an erroneous deprivation of such interest through the procedures used" and the likely value of additional process, and (3) "the Government's interest." *Mathews*, 424 U.S. at 335.

Here, additional process was due. The Department of War's erroneous designation affects the Company's ability to continue its U.S.-facing business, putting in jeopardy ███████████ ███, its investment of hundreds of millions of dollars in U.S. manufacturing, its partners who rely on the Company for drug development and manufacturing, and, importantly, *approximately 70% of the Company's global revenue*. Yang Decl. ¶ 19. But the Department of War took its official action without affording the Company an opportunity to meaningfully present its well-founded objections. *See supra* at 7-10. "[H]owever weighty the governmental interest may be in a given case, the amount of process required can never be reduced to zero," *Propert v. District of Columbia*, 948 F.2d 1327, 1332 (D.C. Cir. 1991), for when that happens, the afflicted party (like

28

the Company) has no opportunity to "rebut the factual premises underlying the [agency's] action." *Ralls Corp.*, 758 F.3d at 320. When process is thrown to the wayside, the risk of erroneous deprivation is at its greatest, and additional process would have confirmed that the Company does not meet the statutory criteria for CMC designation. *See supra* at 8.

C.    **The Department of War's Designation Exceeded Its Authority Under Section 1260H Because the Company Does Not Meet the Criteria Required.**

The Company is also likely to succeed on its claim that the Department of War's designation of the Company is *ultra vires* and in excess of the agency's authority under Section 1260H. "When an executive acts *ultra vires*, courts are normally available to reestablish the limits on his authority." *Aid Ass'n for Lutherans v. U.S. Postal Serv.*, 321 F.3d 1166, 1173 (D.C. Cir. 2003) (quoting *Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94 (1902)). For the reasons discussed at *supra* Section I, the Department of War's actions are *ultra vires*—the Company is not a CMC under the criteria of Section 1260H, and the Department of War has not provided any explanation for its designation of the Company.

D.    **Section 1260H Is Void for Vagueness as Applied to the Company, or, in the Alternative, on its Face.**

Section 1260H's use of "affiliated with" and "owned by" is void for vagueness, and thus the Company is likely to succeed in its claims. "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). The phrases "affiliated with" and "owned by" as applied to the Company are impermissibly broad and have no limiting principle. If "arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them." *Id*. The vagueness of Section 1260H has resulted in just that arbitrary and discriminatory enforcement against the Company.

While "affiliated with" is defined as "in close formal or informal association" in Section

29

1260H, this definition provides no limiting mechanism and is thus unconstitutionally vague. *See Grayned*, 408 U.S. at 114 (finding an ordinance was not impermissibly vague because it "defines boundaries sufficiently distinct"); *see also Johnson v. United States*, 576 U.S. 591, 602 (2015) (a vague provision is not constitutional "merely because there is some conduct that clearly falls within the provision's grasp"). That language offers no more clarity than the unconstitutionally vague "otherwise associated with" and provides no mechanism for the statute to be enforced in a manner that is not arbitrary. *See Hill v. Colorado*, 530 U.S. 703, 732 (2000) (a statute can be impermissibly vague "if it authorizes or even encourages arbitrary and discriminatory enforcement"); s*ee also Rafeedie v. INS.*, 795 F. Supp. 13, 23 (D.D.C. 1992).

Other courts considering similar language in an Executive Order found that the phrase "otherwise associated with" was unconstitutionally vague on its face. *Humanitarian L. Project v. U.S. Dep't of Treasury*, 463 F. Supp. 2d 1049, 1070 (C.D. Cal. 2006), *on reconsideration*, 484 F. Supp. 2d 1099 (C.D. Cal. 2007), *aff'd sub nom. Humanitarian L. Project v. U.S. Treasury Dep't*, 578 F.3d 1133 (9th Cir. 2009). On reconsideration, the court found the constitutional defects were remedied only when the provision was amended to specifically define that language. *Humanitarian L. Project*, 484 F. Supp. 2d 1099. No such definition is present in Section 1260H, and the language is thus unconstitutionally vague.

## II.    THE DEPARTMENT OF WAR'S ACTIONS ARE INFLICTING, AND WILL CONTINUE TO INFLICT, IRREPARABLE HARM ON THE COMPANY.

The Department of War's arbitrary and capricious CMC designation has inflicted immediate and irreparable harm on the Company. Irreparable harm requires "proof that the movant's injury is 'certain, great and actual—not theoretical—and imminent, creating a clear and present need for extraordinary equitable relief to prevent harm.'" *Power Mobility Coal. v. Leavitt*, 404 F. Supp. 2d 190, 204 (D.D.C. 2005) (quoting *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C.

30

Cir. 1985)). In addition, "the certain and immediate harm that a movant alleges must also be truly irreparable in the sense that it is 'beyond remediation.'" *Elec. Priv. Info. Ctr. v. U.S. Dep't of Just.*, 15 F. Supp. 3d 32, 44 (D.D.C. 2014) (quoting *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006)). The movant must "substantiate the claim that irreparable injury is likely to occur" and "provide proof … indicating that the harm is certain to occur in the near future." *Wis. Gas Co.*, 758 F.2d at 674.

The Company is already suffering profound reputational, regulatory, economic, and constitutional harm. The peril to its relationships, reputation, and financial standing are exponentially compounded by the BIOSECURE Act, to which the Company is only subject because of its 1260H designation, and which effectively restricts the Company from maintaining or developing business relationships with its U.S market. Its commercial relationships have been damaged and will continue to deteriorate as customers reevaluate contracts to avoid reputational risks and government contracting bans. Taken together, these harms—reputational damage, derivative regulatory restrictions, lost relationships, financial impacts, and constitutional harms— are immediate, ongoing, and incapable of full repair through later remedy. Absent preliminary relief, the Company will continue to suffer irreversible injury in the days and weeks ahead.

**A.    The Company Faces Severe Legal Consequences and Reputational Injuries as a Result of the Department of War's Actions.**

The Department of War's baseless and unconstitutional decision to wrongly designate the Company a CMC unfairly brands the Company an extension of the Chinese military and a threat to U.S. national security. Defendants' actions defame the Company's hard-won reputation and create fear and uncertainty over every U.S. business relationship the Company relies on to maintain and grow its business. Moreover, the damage to its relationships and reputation is intertwined with and compounded by the BIOSECURE Act. The 1260H designation subjects the Company to the

31

additional very significant restrictions of that Act, which will essentially restrict the Company from maintaining or developing commercial relationships with U.S.-facing businesses. *Anthropic PBC,* 2026 WL 836842, at *15 (citing *Trifax Corp.*, 314 F.3d at 644) (granting preliminary injunction and citing the D.C. Circuit's "reputation plus" standard to find a deprivation "of protected liberty interests" when Executive action caused (1) a "permanent debarment with absolutely no pre- or post-deprivation process" and (2) "a broad preclusion that seriously affects, if not destroys, a company's ability to obtain contracts in its chosen field of business."). These relationships have been damaged and will continue to deteriorate as customers pause, delay, renegotiate, and reconsider contracts because they fear supporting the Chinese military and risking their U.S. government business or funding. Yang Decl. ¶¶ 36-45; *Patriot, Inc. v. U.S. Dep't of Housing & Urban Dev.*, 963 F. Supp. 1, 5 (D.D.C. 1997) (finding irreparable harm in damage to the plaintiffs' business reputation caused by the agency's characterization).

1. <u>By Virtue of the Company's 1260H Designation, it Will Also Be Subject to Additional, Significant Regulatory Restrictions and Scrutiny.</u>

By labeling the Company as an asset of the Chinese military and a threat to national security, the Department of War has also subjected the Company to a web of additional legal impacts and regulatory scrutiny, significantly impacting the Company's current and future operations.

First, and foremost, the Company's 1260H designation will subject the Company to the devastating restrictions in the BIOSECURE Act. As described above, *supra* at 12-13, federal agencies as well as federal contractors and grant recipients (which describes the majority of the Company's U.S. business partners) are barred from using the 1260H designated-biotechnology companies' services in the performance of federally funded work. While the restrictions of the BIOSECURE Act have not yet been implemented, as described further below, their chilling effect

on the Company's current and future business cannot be overstated.

The 1260H designation's triggering of the BIOSECURE Act's restrictions is far from the only regulatory consequence of Defendants' actions. The designation also exposes the Company to a growing body of state-level restrictions. Some states maintain scrutinization and divestment regimes that target entities related to countries of concern, drawing on federal designations in doing so. For example, Texas requires its investing entities to divest the securities of companies controlled by or tied to China, and it directed its comptroller to compile a scrutinized-company list. *See* Tex. Gov't Code Ann. § 2270 *et seq*. (West 2026). Other States similarly target federal designees.[2] *See, e.g*., Utah Code Ann. § 63L-13-101 (West 2026) (limiting land ownership for 1260H designees); 2026 Neb. Laws L.B. 904 (limiting lobbying activity for 1260H designees).

Additionally, members of Congress have already issued calls to action, amplifying the impacts of Defendants' improper designation. For example, in a press release following the announcement of the updated 1260H List including the Company, Congressman John Moolenaar of Michigan, Chairman of the House Select Committee on the Strategic Connection Between the United States and the Chinese Communist Party, characterized the 1260H List as "a warning to American businesses, all levels of government, and the American people," described 1260H listed entities as "working with the Chinese military against our national interests," and demanded that listed entity's "products should be removed from supply chains our country depends on. American companies must stop doing business with these threats to our national security, otherwise they are

---

[2]Also beginning on June 30, 2026, the Department of War may not contract with any entity that is a party to a contract with a lobbyist who also engages in "lobbying activities" for a designated CMC. *See* Pub. L. No. 118-159, § 851, 138 Stat. 1995, 2010 (Dec. 23, 2024) (codified at 10 U.S.C. § 4663). Thus, the Company's lobbyists are being forced to consider cutting ties with the Company in order to preserve their other business.

33

enabling China's military ascendance." Rep. John Moolenaar, Press Release, *American Companies & Governments Should Cut Ties with New Pentagon-Listed Chinese Military Companies* (June 8, 2026) https://chinaselectcommittee.house.gov/media/press-releases/moolenaar-american-companies-governments-should-cut-ties-with-new-pentagon-listed-chinese-military-companies. Representative Moolenaar specifically called out the Company: "[T]hanks to the bipartisan BIOSECURE Act that was signed into law in December, Americans' medical data will be protected from BGI and Wuxi Apptec, two malicious Chinese biotech companies that enable the PLA's biological experimentation." *Id*.

The practical effect of these legal and regulatory consequences (and attendant reputational damage), including the looming bar from the government's procurement supply chain, is to pressure U.S. investors and force U.S. partners to diminish, pause, or sever ties with the Company.

    2.    The Company's Designation Creates Market Uncertainty—Impacting Its Relationships with Customers and Suppliers.

The reputational harms the Company faces are not speculative. Fear generated by Defendants' unjustified actions has already begun to yield the Defendants' intended results: undermining market confidence in the Company and introducing uncertainty into its relationships with partners and customers. In the days following Defendants' actions, the Company's customers, investors, and business partners have been inundated with media coverage relating to the Company's CMC designation and the attendant negative consequences. *See, e.g.*, Mills Decl. Exs. 13-15, 17-18. Industry publications have rung similar warning bells. *E.g.*, Mills Decl. Ex. 16; Yang Decl. ¶ 38. Even if a business partner somehow missed this wave of harmful coverage, compliance screenings would still flag the Company's CMC designation, subjecting any potential transaction to additional scrutiny. Damond Decl. ¶ 14.

The Company's customers and suppliers have already begun to react. Within a 10-day

34

period after the designation, approximately ███████████ have contacted the Company regarding

concerns ████████████████████████████████████████████████████████████ and

indicated ████████████████████████████████████████████████████████████████

█████████. Yang Decl. ¶ 42; Damond Decl. ¶ 37-41; *see*, *e.g.*, *Morgan Stanley DW Inc. v.*

*Rothe*, 150 F. Supp. 2d 67, 77 (D.D.C. 2001) (loss of "customer trust and goodwill" constitutes

irreparable harm); *Armour & Co. v. Freeman*, 304 F.2d 404, 406 (D.C. Cir. 1962) (irreparable

harm where defendant's conduct "could not fail to damage [plaintiff's] good name").

The 1260H designation has also already begun subjecting the Company to new conditions

and heightened scrutiny from suppliers, burdening its procurement process and introducing

uncertainty into its supply chain. In the wake of the Department of War's smearing of the Company

as an extension of the Chinese military, at least one supplier has begun requiring all purchase

orders to include a commitment that the products would not be used in military projects before

shipment. Yang Decl. ¶ 45. Because the Company is *not* associated or affiliated with the Chinese

military, the Company was easily able to satisfy the request; however, that the request was made

at all reveals that the Department of War's actions have injected apprehension and unease into the

Company's relationships with its trusted business partners. *Id*. This supplier's products support the

Company's ████████████████████████████████████████, and work on therapeutics

used to treat a range of diseases such as genetic disorders, metabolic diseases, and cancer. *Id.*

Should this supplier ultimately stop supplying the Company because of the 1260H designation,

the Company's ██████████████████████ would be significantly disrupted. *Id*.

3.    The Company's Designation Harms Employee Recruitment and Retention.

Defendants' actions have negatively impacted recruiting and retention efforts by devaluing

the Company's brand, reputation, and goodwill and creating uncertainty about the Company's

prospects. The Company relies on highly specialized scientists and technical personnel whose

35

skills are in demand across the industry. *Id.* ¶ 49. The reputational damage and uncertainty caused by Defendants' actions will disrupt the Company's ability to attract and maintain employees. *Id.*

This harm is imminent and non-speculative. When the BIOSECURE Act was initially introduced in 2024, even with the uncertainty of the Company's then potential 1260H designation, the ███████████████████████████████████████████. Connell Decl. ¶ 15. For example, in San Diego alone, ███████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████. *Id*. Here, now that Defendants' actions have placed the Company fully in the crosshairs of the BIOSECURE Act, the Company has every reason to expect ███████████████████████████. *Id.*; Yang Decl. ¶ 49. *See, e.g.*, *TikTok Inc. v. Trump*, 490 F. Supp. 3d 73, 84 (D.D.C. 2020) (loss of workforce is irreparable harm); *Xiaomi Corp.* at *12 (finding irreparable harm where, among other consequences, plaintiff "now faces difficulty recruiting and retaining top talent due to the restrictions—an outcome with the potential to seriously harm its business"); *Luokung Tech. Corp.*, 538 F. Supp. 3d at 192 ("[L]oss of talent and the inability to 'recruit and retain employees…' constitutes irreparable harm") (citations omitted).

4. The Company's Designation Harms Relationships with Financial Institutions.

The CMC designation will also harm the Company's strategic relationships with U.S.

financial institutions. The Company maintains close banking relationships with ▮ major U.S. commercial banks, which together account for more than ▮ of the Company's payment and collection volume and more than ▮ of its foreign-exchange transactions. The Company has also engaged several leading U.S. investment banks, to support its capital markets activities. As of March 31, 2026, the Company has committed approximately ▮ of capital across ▮ U.S. venture-capital funds, supporting innovative drug research and development in the United States. Yang Decl. ¶ 50. If the designation is allowed to stand, these U.S. organizations will be chilled from cultivating and maintaining relationships with the Company and will focus on building relationships with its similarly situated competitors that have not been designated. Damond Decl. ¶¶ 13-15. Once these critical business relationships are formed with competitors, it will be difficult or impossible for the Company to repair the resulting damage to its business from the loss of these relationships and connections, even if the CMC designation is eventually lifted. *Id.* ¶ 38; *see Mylan Pharm., Inc. v. Shalala*, 81 F. Supp. 2d 30, 43 (D.D.C. 2000) ("[C]ourts have found irreparable harm where the movant has made a strong showing that the economic loss would significantly damage its business above and beyond a simple diminution in profits.") (collecting cases).

**B.    The Company Faces Substantial, Unrecoverable Economic Injury as a Result of the Department of War's Actions.**

The Department of War's arbitrary and unfounded 1260H designation has already caused the Company to suffer substantial economic losses, which will likely become permanent and irreparable if the designation is not enjoined pending resolution of this action. At stake is the Company's entire U.S. market—valued at several billion dollars and representing approximately 70% of the Company's total global revenue. Those critical relationships will fall victim to the tightening noose of the BIOSECURE Act, the restrictions of which are inextricably intertwined with the 1260H designation. Yang Decl. ¶ 19. At the time of this filing, the 1260H designation has

37

already caused the Company lost sales, contract cancellations, and customer loss. *Id.* ¶¶ 36–51.

While in general a Plaintiff can "demonstrate irreparable injury through economic harm [that] threatens the very existence of [its] business ... courts in this district have suggested that a lesser showing is permissible when the economic injury at issue is *unrecoverable.*" *Whitman-Walker Clinic, Inc. v. HHS*, 485 F. Supp. 3d 1, 58 (D.D.C. 2020) (Boasberg, C.J.) (collecting cases) (emphasis in original) (cleaned up). That lesser showing requires establishing that substantial economic losses are "certain, imminent and unrecoverable." *Id.* In such a scenario, a preliminary injunction is "appropriate and necessary." *Id*. Courts must make fact-specific findings based on the movant and harm before it, which is "not [simply] a mathematical judgment." *Dist. of Columbia v. U.S. Dep't of Ag.*, 444 F. Supp. 3d 1, 38 (D.D.C. 2020) (granting a preliminary injunction and rejecting the government's argument that economic injuries were insufficient).

This Court has found this lesser showing satisfied, and granted preliminary injunctions, where plaintiffs faced less severe harms. *See*, *e.g.*, *Everglades Harvesting and Hauling, Inc. v. Scalia*, 427 F. Supp. 3d 101, 115–16 (D.D.C. 2019) (company "facing a loss of more than 21% of [its] revenue…even if [its] projected losses do not sink the[] small business[]"); *CSL Plasma, Inc. v. CBP*, 628 F. Supp. 3d 243, 264 (D.D.C. 2022) (an agency action requiring a billion-dollar company to "incur…anywhere between $2.5 and $4.0 million [in loss]"); *Luokung Tech. Corp.*, 538 F. Supp. 3d at 192-93 (customers canceling contracts totaling "more than $10 million dollars in revenue," with further injury expected once a condition subsequent (Nasdaq delisting causing "restriction[s] on liquidity" and loss of access to capital markets) took effect); *Learning Resources, Inc. v. Trump*, 784 F.Supp.3d 209, 230 (D.D.C. 2025), *cert. granted before judgment*, 146 S. Ct. 73 (2025), *vacated and remanded on different grounds*, 607 U.S. 229 (2026) (federal tariffs costing a small business "over $1 million…[from] clients [who] have already canceled orders," with the

38

company "fac[ing] an immediate 40 or 50 percent decline in sales, year-over-year"). Because the Company's economic losses are indeed certain, imminent, and unrecoverable, the lesser showing is satisfied here, warranting a preliminary injunction.

*First*, the Company's economic injury is "certain." Defendants' actions have created pervasive confusion regarding whether any continued engagement with the Company is lawful or advisable. Yang Decl. ¶¶ 41-43. By labeling the Company a CMC, the Defendants have created serious and legitimate concerns among many of the Company's customers and partners about the repercussions to *their* businesses should they continue associating with the Company. *Id*. The resulting threat to the Company's business has been immediate, as described *supra* Section II.A. (*e.g.*, customers informing the Company of their significant concerns about maintaining their business relationships with the Company in light of the1260H designation). And this is the exact type of harm Courts have found sufficient to support economic injury. *See, e.g.*, *TikTok Inc.*, 490 F. Supp. 3d at 84 (finding irreparable harm where a government prohibition would erode the plaintiff's "competitive position" and drive away the "commercial partners and advertisers" its business "relie[d] on"); *Luokung Tech. Corp.,* 538 F. Supp. 3d at 192–93 (crediting a "high likelihood that [the company's] overall market share will decline as it loses customers to its competitors that are not saddled by [a government designation] as the basis for finding "significant economic loss"); *Nalco Co. v. EPA,* 786 F. Supp. 2d 177, 188 (D.D.C. 2011) (granting a preliminary injunction and finding irreparable economic harm in part due to "loss of long-standing clients that may be unwilling, or unable, to do business with Nalco hereafter if no injunction is issued … [and where] it will be difficult … to attract new customers.") (cleaned up).

*Second*, the Company's economic injury is "unrecoverable" due to Defendants' sovereign immunity. *See* 5 U.S.C. § 702; *Perkins Coie LLP*, 783 F. Supp. 3d at 178–79 (economic harm

39

unrecoverable due to "sovereign immunity" can "constitute irreparable harm"). Further, Defendants "have at no point suggested any waiver of sovereign immunity that might enable recovery of monetary damages from" the Department of War. *Whitman-Walker Clinic, Inc*., 485 F. Supp. 3d at 59 (Boasberg, C.J.).

*Third*, the Company's economic injury is "imminent"—and in fact has already begun—for the reasons described at *supra* Section II.A. (*e.g.*, customers and suppliers canceling—or threatening to imminently cancel—contracts; the Company losing access to capital and financial markets), and is "poised to accelerate if preliminary relief is denied and the formal restrictions are allowed to go into effect." *Xiaomi Corp*., 2021 WL 950144, at *11.

The Company's economic harm alone—even apart from reputational harms—would warrant a preliminary injunction. But here, the reputational harms are intertwined.

In other contexts where the government has used national security concerns to target individual businesses, this Court has found the anticipated economic harm from losing business relationships is irreparable. *See*, *e.g.*, *Jenner & Block LLP v. U.S. Dep't of Just.*, 784 F. Supp. 3d 76, 88, 114 (D.D.C. 2025) (where government-targeted plaintiff was alleged to have "take[n] actions that threaten public safety and national security," irreparable economic harm was found given that "prospective clients will doubtless choose … firms without government-imposed disabilities and a government-inscribed scarlet letter"); *see also Perkins Coie LLP*, 783 F. Supp. 3d at 179 (finding, in similar context, that clients' withdrawal constituted irreparable economic harm); *Susman Godfrey LLP v. Exec. Off. of the President*, 789 F. Supp. 3d 15, 56 (D.D.C. 2025) (finding the same, even where the plaintiff did "not yet allege that it ha[d] lost money because of the" government's action); *Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of the President*, 784 F. Supp. 3d 127, 172 (D.D.C. 2025) (finding the same, while noting that "[t]he

monetary value of … current and future client relationships is difficult to calculate").

All told, the Defendants' actions threaten to substantially shrink or altogether eliminate the Company's U.S. business—which constituted several billion dollars in revenue last year and represents 70% of its global revenue. Yang Decl. ¶ 19. The scale of these impacts undermines investor confidence and severely limits the Company's ability to maintain and grow its business. *Id.* ¶ 48. This economic harm is irreparable and warrants a preliminary injunction.

Here, the Company's economic harms are not felt in isolation, as the Company experiences the impacts of Defendants' actions on its reputation, legal standing, and commercial relationships. Each standing alone warrants the protection of a preliminary injunction; together, they will result in ███████████████████████ absent the Court's prompt action. *Luokung Tech. Corp.*, 538 F. Supp. 3d at 194 ("These harms also are of such substantial economic impact—particularly when considered in the aggregate—to meet the requirement of 'significant' economic losses.").

## C.    The Company Faces Constitutional Injury as a Result of the Department of War's Actions.

The Department of War has also violated the Company's procedural due process rights. *See supra* Section I.B. "[T]he loss of constitutional freedoms, 'for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)). Where, as here, a plaintiff is likely to succeed on the merits of a procedural due process claim, *see* Section I.B, this deprivation of constitutional rights constitutes irreparable harm. *See*, *e.g.*, *Advance Am. v. FDIC*, No. 14-CV-953 (GK), 2017 WL 2672741, at *10 (D.D.C. Feb. 23, 2017); *Simms v. District of Columbia*, 872 F. Supp. 2d 90, 104–05 (D.D.C. 2012); *Goings v. Court Servs. & Offender Supervision Agency for D.C.*, 786 F. Supp. 2d 48, 78–79 (D.D.C. 2011).

41

### III.    THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST SUPPORT A PRELIMINARY INJUNCTION.

A preliminary injunction's third and fourth factors require the Court to balance the equities between the parties and to weigh the public consequences of granting or denying relief. *Winter*, 555 U.S. at 20 (2008). Where the federal government opposes an injunction, the balance-of-equities and public-interest factors "merge." *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016) (citation omitted). The court weighs the harm to the Company if relief is denied against the harm to Defendants if it is granted. *Id.*

That balance weighs heavily in the Company's favor. Absent immediate injunctive relief, the Company will suffer severe and unrecoverable harm—constitutional, reputational, and economic injuries—that no later merits victory can undo. The harm caused by the Department of War's arbitrary and capricious actions extends far beyond the Company: to its customers and American patients who depend on the continuation of the Company's work conducted in partnership with more than 1,000 U.S.-based pharmaceutical and biotechnology companies. Yang Decl. ¶¶ 8, 51. Disrupting this fragile supply chain for life-saving medicine will injure third parties who have no stake in whatever unknown factors compelled the Secretary of War to summarily designate the Company on the 1260H list, and they cannot be undone by a later merits ruling.

Defendants, by contrast, would not be harmed by being enjoined from enforcing an unlawful designation. While the government is generally afforded deference in matters of national security, that deference carries little weight where, as the record indicates, the government's action was not the product of reasoned decision-making, and was contrary to the facts before it. *Luokung Tech. Corp.*, 538 F. Supp. 3d at 195 ("Deference is only appropriate when national security interests are actually at stake, which the Court concludes is not evident here."); *see also Zaid v. Exec. Off. of the President*, 815 F. Supp. 3d 113, 136 (D.D.C. 2025) (finding that equities favored

the movant where the government only "gesture[d] vaguely at 'national security interests'").

The Department of War's decision to include the Company on the June 2026 1260H List was based on materially the same facts on which the Department of Defense had relied in *not* including the Company on prior lists. Nothing had materially changed—other than the presidential administration. The Department of War's conduct strongly suggests not national security concerns grounded in fact, but rather arbitrary, erratic, and unreasonable action. For example, the Department of War agreed to hold a meeting with the Company in 2025, ostensibly to gather information to inform its designation decision, but it failed to tell the Company it had already made that decision. Months later, in February 2026, the Department of War posted a version of the 1260H List that included the Company, which it abruptly withdrew an hour later. And months after that, spurning both the Company's questions about the momentary listing and its offer to provide information, the Department of War issued the instant conclusory and unsupported designation.

As a whole, this process gives no indication that "weighty national security interests are actually implicated." *Xiaomi Corp.*, 2021 WL 950144, at *12; *see also Singh v. Berger*, 56 F.4th 88, 109 (D.C. Cir. 2022) (finding that the equities favored the movant where, despite the government's asserted harm to national security, the relief sought would "fully comport with military training needs"). Enjoining Defendants' unlawful actions would cost Defendants nothing. They would then be free to address any genuine concern about the Company through lawful, evidence-based channels. An injunction merely preserves the status quo.

Nor would the balance sway towards the public interest, because there is "generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). To the contrary, the public is served "when agencies comply with

43

their obligations under the APA," *N. Mariana Islands v. United States*, 686 F. Supp. 2d 7, 21 (D.D.C. 2009), which is furthered by granting the requested injunctive relief.

Because Defendants suffer no harm "from an injunction that merely ends an unlawful practice," *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015) (citation omitted), and for the other reasons explained herein, the balance of equities and the public interest support granting the requested injunctive relief.

## IV.    NO BOND SHOULD BE REQUIRED.

No bond is warranted. Defendants face no risk of monetary harm from the requested relief. Federal Rule of Civil Procedure 65 "vests broad discretion in the district court to determine the appropriate amount of an injunction bond, including the discretion to require no bond at all." *Simms v. District of Columbia*, 872 F. Supp. 2d 90, 107 (D.D.C. 2012) (citation omitted). Courts exercise this discretion to dispense with bonds where the enjoined party faces no risk of monetary harm. *See*, *e.g.*, *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, 775 F. Supp. 3d 100, 130 (D.D.C. 2025) (no bond appropriate where the defendants—a federal agency and its director—would face no monetary injury from preliminary injunctive relief). Requiring a bond here would serve no purpose.

## CONCLUSION

For the foregoing reasons, the Company respectfully requests that the Court enter a preliminary injunction enjoining Defendants and their officers, employees, and agents from enforcing, implementing, applying, or taking any action whatsoever under, or in reliance on the designation of the Company as a CMC under Section 1260H.

44

45

Respectfully submitted,

WILSON SONSINI GOODRICH & ROSATI, P.C.

Dated: June 29, 2026

/s/ Melissa Mills
Melissa Mills (D.C. Bar No. 90033390)
  (*pro hac vice*)
953 East Third Street, Suite 100
Los Angeles, CA 90013-1955
(323) 210-2991
mmills@wsgr.com

Michael S. Sommer
  (*pro hac vice forthcoming*)
Morris Fodeman
  (*pro hac vice*)
Sheryl Shapiro Bassin
  (*admission forthcoming*)
31 West 52nd Street, Fifth Floor
New York, NY 10019-6118
(212) 999-5800
msommer@wsgr.com
mfodeman@wsgr.com
sbassin@wsgr.com

Timothy M. Broas (D.C. Bar No. 391145)
1700 K Street NW, Fifth Floor
Washington, DC 20006-3814
(202) 973-8846
tbroas@wsgr.com

*Counsel for Plaintiff WuXi AppTec Co., Ltd.*

## CERTIFICATE OF SERVICE

I hereby certify that on June 29, 2026, the foregoing was electronically filed through this Court's CM/ECF system. Because Defendants have not yet entered an appearance of record, I certify that all Defendants have been mailed a true and correct copy of the foregoing via certified mail.

Respectfully submitted,

WILSON SONSINI GOODRICH & ROSATI, P.C.

Dated: June 29, 2026

/s/ Melissa Mills
Melissa Mills (D.C. Bar No. 90033390)
  (*pro hac vice*)
953 East Third Street, Suite 100
Los Angeles, CA 90013-1955
(323) 210-2991
mmills@wsgr.com

*Counsel for Plaintiff WuXi AppTec Co., Ltd.*