**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| WUXI APPTEC CO., LTD., <br><br> *Plaintiff*, <br><br> v. <br><br> U.S. DEPARTMENT OF DEFENSE a/k/a/ <br> U.S. DEPARTMENT OF WAR, *et al.*, <br><br> *Defendants*. | Civil Action No. 26-2069 (JEB) |

## DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................. 1

BACKGROUND .............................................................................................................. 2

      A.    Longstanding Concerns About Chinese Military-Civil Integration........... 2

      B.    Statutory Background ................................................................. 3

      C.    The Department's Designation of WuXi as a "Chinese Military
           Company" ............................................................................... 6

      D.    This Litigation.......................................................................... 9

LEGAL STANDARD....................................................................................................... 9

ARGUMENT.................................................................................................................... 10

     I.    Plaintiff Is Not Likely to Show that the Section 1260H Designation
         Violated the Law....................................................................... 10

      A.    Defendants' Section 1260H designation of WuXi satisfies the
           APA......................................................................................... 10

      B.    Defendants' designation was not *ultra vires*............................ 26

      C.    The text of Section 1260H clearly specifies a prohibited course of
           conduct, meaning the provision complies with the constitutional
           vagueness doctrine. .................................................................. 27

     II.    Plaintiff Fails to Satisfy Its Burden to Show Irreparable Harm. .......................... 30

      A.    The irreparable-harm standard sets a high bar for receiving relief. ......... 30

      B.    Most of Plaintiff's alleged harms stem from a hypothetical
           BIOSECURE Act designation and thus are abstract, theoretical,
           and not imminent. ..................................................................... 32

      C.    Plaintiff's alleged harms flowing directly from the Section 1260H
           designation are insufficiently great to support emergency relief............. 34

     III.    The Balance of the Equities and Public Interest Strongly Favor
          Defendants. .............................................................................. 40

     IV.    The Court Should Stay Any Preliminary Injunction and Require a Bond as
         Security ................................................................................... 42

CONCLUSION................................................................................................................. 43

## TABLE OF AUTHORITIES

**CASES**

*A.O. Smith Corp. v. Fed. Trade. Comm'n,*
530 F.2d 515 (3d Cir. 1976)....................................................................................... 38

*Air Transp. Ass'n of Am., Inc. v. Exp.-Imp. Bank of the U.S.,*
840 F. Supp. 2d 327 (D.D.C. 2012).................................................................... 36, 40

*Ala. Commc'ns Sys. Holdings, Inc. v. Nat'l Lab. Rels. Bd.,*
6 F.4th 1291 (D.C. Cir. 2021)............................................................................. 18, 24

*Alcresta Therapeutics, Inc. v. Azar,*
318 F. Supp. 3d 321 (D.D.C. 2018).................................................................... 36, 40

*Am. C.L. Union v. Clapper,*
785 F.3d 787 (2d Cir. 2015)........................................................................................ 42

*\*Am. Fed'n of Lab. & Cong. of Indus. Orgs. v. Sonderling,*
Civ. A. No. 26-2061 (JEB), 2026 WL 1906727 (D.D.C. July 2, 2026) ............................ 31, 34

*Am. Hosp. Ass'n v. Harris,*
625 F.2d 1328 (7th Cir. 1980) .................................................................................... 38

*Anthropic PBC v. U.S. Dep't of War,*
825 F. Supp. 3d 1101 (N.D. Cal. 2026), *appeal filed*, No. 26-2011 (9th Cir. Apr. 2, 2026).... 20

*Archer W. Contractors, LLC v. U.S. Dep't of Transp.,*
45 F.4th 1 (D.C. Cir. 2022)......................................................................................... 12

*Armour & Co. v. Freeman,*
304 F.2d 404 (D.C. Cir. 1962)................................................................................... 36

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009).................................................................................................... 10

*Ass'n for Educ. Finance & Policy, Inc. v. McMahon,*
786 F. Supp. 3d 13 (D.D.C. 2025).............................................................................. 40

*Bd. of Governors of Fed. Rsrv. Sys. v. MCorp Fin., Inc.,*
502 U.S. 32 (1991)...................................................................................................... 26

*Bd. of Regents of State Colls. v. Roth,*
408 U.S. 564 (1972).................................................................................................... 21

*Bello v. Gacki,*
  94 F.4th 1067 (D.C. Cir. 2024) ................................................................................ 19

*Biestek v. Berryhill,*
  587 U.S. 97 (2019) ..................................................................................................... 13

*Bloomberg, L.P. v. Secs. & Exch. Comm'n,*
  45 F.4th 462 (D.C. Cir. 2022) .................................................................................. 12

*Boumediene v. Bush,*
  553 U.S. 723 (2008) ................................................................................................... 42

*Cablevision Sys. Corp. v. FCC,*
  649 F.3d 695 (D.C. Cir. 2011) .................................................................................. 11

*Cardinal Health, Inc. v. Holder,*
  846 F. Supp. 2d 203 (D.D.C. 2012) ......................................................................... 36

*Changji Esquel Textile Co. v. Raimondo,*
  40 F.4th 716 (D.C. Cir. 2022) ............................................................................ 26, 27

*Citizens to Pres. Overton Park, Inc. v. Volpe,*
  401 U.S. 402 (1971), *abrogated by Califano v. Sanders*, 430 U.S. 99 (1977) ......... 11

*Clapper v. Amnesty Int'l USA,*
  568 U.S. 398 (2013) ................................................................................................... 20

*\*Clevinger v. Advoc. Holdings, Inc.,*
  134 F.4th 1230 (D.C. Cir. 2025) .................................................................... 31, 37, 39

*Coates v. City of Cincinnati,*
  402 U.S. 611 (1971) ................................................................................................... 27

*Conn v. Gabbert,*
  526 U.S. 286 (1999) ................................................................................................... 37

*Connecticut v. Massachusetts,*
  282 U.S. 660 (1931) ................................................................................................... 30

*Corley v. United States,*
  556 U.S. 303 (2009) ................................................................................................... 16

*Crooks v. Mabus,*
  845 F.3d 412 (D.C. Cir. 2016) .................................................................................. 12

*Dep't of Educ. v. California*,
  604 U.S. 650 (2025) ................................................................................................ 43

*DSE, Inc. v. United States*,
  169 F.3d 21 (D.C. Cir. 1999) ................................................................................... 43

*Ewing v. Mytinger & Casselberry, Inc.*,
  339 U.S. 594 (1950) ................................................................................................ 25

*Fares v. Smith*,
  249 F. Supp. 3d 115 (D.D.C. 2017) ......................................................................... 29

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009) ................................................................................................ 17

*First Nat'l Bank & Tr., Wibaux v. Dep't of the Treasury*,
  63 F.3d 894 (9th Cir. 1995) ..................................................................................... 24

*Freedom Holdings, Inc. v. Spitzer*,
  408 F.3d 112 (2d Cir. 2005) .................................................................................... 38

*Goldberg v. Kelly*,
  397 U.S. 254 (1970) ................................................................................................ 18

*Grayned v. City of Rockford*,
  408 U.S. 104 (1972) ................................................................................................ 27

*Hanson v. District of Columbia*,
  120 F.4th 223 (D.C. Cir. 2024), *cert. denied*, 145 S. Ct. 2778 (2025) ................... 32

*\*Hesai Tech. Co. v. U.S. Dep't of Def.*,
  792 F. Supp. 3d 22 (D.D.C. 2025), *appeal filed*, No. 25-5256 (D.C. Cir.
  July 16, 2025) .................................................................................................. *passim*

*Holder v. Humanitarian L. Project*,
  561 U.S. 1 (2010) ............................................................................................. 41, 42

*Humanitarian L. Project v. U.S. Dep't of the Treasury*,
  484 F. Supp. 2d 1099 (C.D. Cal. 2007) ................................................................... 29

*In re NTE Conn., LLC*,
  26 F.4th 980 (D.C. Cir. 2022) ................................................................................. 31

*Instant Air Freight Co. v. C.F. Air Freight, Inc.*,
  882 F.2d 797 (3d Cir. 1989) .................................................................................... 43

*Islamic Am. Relief Agency v. Gonzales*,
    477 F.3d 728 (D.C. Cir. 2007)......................................................................... 12, 24

*Jicarilla Apache Nation v. U.S. Dep't of the Interior*,
    613 F.3d 1112 (D.C. Cir. 2010)............................................................................ 25

*Johnson v. United States*,
    628 F.2d 187 (D.C. Cir. 1980)............................................................................... 19

*Jones v. District of Columbia*,
    177 F. Supp. 3d 542 (D.D.C. 2016)...................................................................... 38

*Kentucky v. Biden*,
    57 F.4th 545 (6th Cir. 2023) ................................................................................ 38

*Khalid v. Transp. Sec. Admin.*,
    172 F.4th 866 (D.C. Cir. 2026)....................................................................... 19, 24

*La. Pub. Serv. Comm'n v. Fed. Energy Regul. Comm'n*,
    20 F.4th 1 (D.C. Cir. 2021)................................................................................... 12

*League of Women Voters v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016).................................................................................. 41

*Leedom v. Kyne*,
    358 U.S. 184 (1958).............................................................................................. 26

*López Bello v. Smith*,
    651 F. Supp. 3d 20 (D.D.C. 2022)................................................................... 19, 23

*\*Luokung Tech. Corp. v. Dep't of Def.*,
    538 F. Supp. 3d 174 (D.D.C. 2021)................................................................. 28, 37

*Memphis Light, Gas & Water Div. v. Craft*,
    436 U.S. 1 (1978).................................................................................................. 25

*Mills v. District of Columbia*,
    571 F.3d 1304 (D.C. Cir. 2009)............................................................................ 38

*Mobil Oil Expl. & Producing Se. Inc. v. United Distrib. Cos.*,
    498 U.S. 211 (1991).............................................................................................. 17

*Morgan Stanley DW Inc. v. Rothe*,
    150 F. Supp. 2d 67 (D.D.C. 2001)........................................................................ 36

v

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983)...................................................................................................... 11

*Munaf v. Geren*,
  553 U.S. 674 (2008)................................................................................................. 9, 31

*NAACP v. U.S. Dep't of Educ.*,
  779 F. Supp. 3d 53 (D.D.C. 2025)............................................................................ 27

*Nat'l Kidney Patients Ass'n v. Sullivan*,
  958 F.2d 1127 (D.C. Cir. 1992)................................................................................ 43

*New Vision Photography Program, Inc. v. District of Columbia*,
  54 F. Supp. 3d 12 (D.D.C. 2014).............................................................................. 21

*Nguyen v. U.S. Dep't of Homeland Sec.*,
  460 F. Supp. 3d 27 (D.D.C. 2020)............................................................................ 40

*Nken v. Holder*,
  556 U.S. 418 (2009)............................................................................................ 10, 42

*PDK Lab'ys Inc. v. U.S. Drug Enf't Admin.*,
  362 F.3d 786 (D.C. Cir. 2004).................................................................................. 25

*Pham v. Nat'l Transp. Safety Bd.*,
  33 F.4th 576 (D.C. Cir. 2022)............................................................................. 12, 17

*Ralls Corp. v. Comm. on Foreign Inv. in the U.S.*,
  758 F.3d 296 (D.C. Cir. 2014).................................................................................. 23

*Reeve Aleutian Airways, Inc. v. United States*,
  982 F.2d 594 (D.C. Cir. 1993).................................................................................. 19

*Roberts v. United States*,
  741 F.3d 152 (D.C. Cir. 2014).................................................................................. 18

*Simms v. District of Columbia*,
  872 F. Supp. 2d 90 (D.D.C. 2012)............................................................................ 38

*\*Strait Shipbrokers Pte Ltd. v. Blinken*,
  560 F. Supp. 3d 81 (D.D.C. 2021)....................................................................... 41, 42

*\*SZ DJI Tech. Co. v. U.S. Dep't of Def.*,
  Civ. A. No. 24-2970 (PLF), 2025 WL 2761210 (D.D.C. Sep. 26, 2025).......................... *passim*

*Taylor v. Resol. Tr. Corp.*,
  56 F.3d 1497 (D.C. Cir. 1995)........................................................................... 21

*TikTok Inc. v. Trump*,
  490 F. Supp. 3d 73 (D.D.C. 2020)..................................................................... 36

*Town of Castle Rock v. Gonzales*,
  545 U.S. 748 (2005).................................................................................... 20–21

*\*Trifax Corp. v. District of Columbia*,
  314 F.3d 641 (D.C. Cir. 2003)................................................... 20, 21, 22, 39

*United States v. Bronstein*,
  849 F.3d 1101 (D.C. Cir. 2017)................................................................ 27, 30

*United States v. Edge Broad. Co.*,
  509 U.S. 418 (1993)............................................................................................ 17

*Va. Petroleum Jobbers Ass'n v. Fed. Power Comm'n*,
  259 F.2d 921 (D.C. Cir. 1958)......................................................................... 37

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008).................................................................................... *passim*

*\*Wis. Gas Co. v. Fed. Energy Regul. Comm'n*,
  758 F.2d 669 (D.C. Cir. 1985)............................................................ *passim*

*Woodhull Freedom Found. v. United States*,
  72 F.4th 1286 (D.C. Cir. 2023)................................................................. 28–29

*Woodstream Corp. v. Jackson*,
  Civ. A. No. 11-867 (JEB), 2011 WL 8883395 (D.D.C. June 3, 2011)................... 31

*Yakus v. United States*,
  321 U.S. 414 (1944)............................................................................................ 25

**STATUTES**

5 U.S.C. § 706.......................................................................................... 10, 19

10 U.S.C. § 113 note........................................................................................ 3

10 U.S.C. § 4663...................................................................................... 39, 40

National Defense Authorization Act for Fiscal Year 1999,
  Pub. L. No. 105-261, 112 Stat. 1920 (1998)............................................... 2

National Defense Authorization Act for Fiscal Year 2024,
Pub. L. No. 118-31, 137 Stat. 136 (2023)......................................................................... 43

*National Defense Authorization Act for Fiscal Year 2026,
Pub. L. No. 119-60, 139 Stat. 718 (2025)................................................................... *passim*

*Servicemember Quality of Life Improvement and National Defense Authorization Act for
Fiscal Year 2025,
Pub. L. No. 118-159, 138 Stat. 1773 (2024)............................................................... *passim*

*William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021,
Pub. L. No. 116-283, 134 Stat. 3388 (2021)............................................................. 1, 3, 4, 17

## LEGISLATIVE MATERIALS

H.R. Rep. No. 108-491 (2004)....................................................................................................... 2

## ADMINISTRATIVE AND EXECUTIVE MATERIALS

Fed. R. App. 8(a)......................................................................................................................... 42

Fed. R. Civ. P. 65(c) .................................................................................................................... 43

Notice of Availability of Designation of Chinese Military Companies,
91 Fed. Reg. 35189 (June 10, 2026) ................................................................................ 7, 8, 13

## OTHER AUTHORITIES

*About Us*, State Administration of Science, Technology and Industry for National
Defence.PRC (archived on June 30, 2026),
https://web.archive.org/web/20260630195245/https://www.sastind.gov.cn/index.html............ 5

Alexandra G. Neenan, Cong. Rsch. Serv., R48110, *Department of Defense Contractors and
Efforts to Mitigate Foreign Influence* 1 (2024),
https://www.congress.gov/crs-product/R48110......................................................................... 41

Black's Law Dictionary (12th ed. 2024)...................................................................................... 29

Brandon Vigliarolo, *US Closes Subsidiary Loophole on Dozens of Chinese Entity List
Members*, The Register (Mar. 26, 2025),
https://perma.cc/GK8Z-ACF4 .................................................................................................... 23

*Close*, Merriam-Webster,
https://www.merriam-webster.com/dictionary/close ................................................................. 29

*Currency Exchange Rates Converter*, FiscalData.Treasury.gov,
  https://fiscaldata.treasury.gov/currency-exchange-rates-converter/ .................................. 35, 36

Dep't of Def., Off. of the Sec'y of Def., *Annual Report to Congress: Military & Security
  Developments Involving the People's Republic of China, 2020*,
  https://perma.cc/8FT9-M9V3 ....................................................................................... 2, 3

Dep't of Def., Off. of the Sec'y of Def., *Annual Report to Congress: Military & Security
  Developments Involving the People's Republic of China, 2011*,
  https://perma.cc/QLE7-AJ87 ........................................................................................... 2

*Own*, Merriam-Webster,
  https://www.merriam-webster.com/dictionary/own ................................................................. 29

**INTRODUCTION**

The United States has determined that the Chinese government's symbiotic relationships with certain Chinese technology companies present a national security threat. Pursuant to the congressional mandate in Section 1260H of the William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021, Pub. L. No. 116-283, § 1260H(a), 134 Stat. 3388, 3965, as amended ("Section 1260H"), the Department of Defense ("the Department") submitted to Congress a list of companies identified as "Chinese military companies" in June 2026. That list includes WuXi AppTec Co., Ltd. ("WuXi" or "Plaintiff").

Relying on the Administrative Procedure Act (APA), the Constitution, and the statutory authority enumerated in Section 1260H itself, Plaintiff challenges the Department's determination that it merits inclusion on the most recent Section 1260H list of Chinese military companies. Its claims fail. The record underlying the Department's Section 1260H determination provides substantial evidence that WuXi is indirectly owned by a statutorily enumerated Chinese state asset-administration agency. It also supports that WuXi is indirectly affiliated with another Chinese state technology administration and the People's Liberation Army, two entities also identified in Section 1260H. The Department has supported its three independent determinations that Plaintiff is a Chinese military company with substantial evidence. And its designation of Plaintiff does not violate due process because Plaintiff shows neither that the Department deprived it of a constitutionally protected interest nor that any process was lacking. Nor is the Department's determination unconstitutionally vague, as the statutory text provides sufficient guidance to regulated entities, the Department, and the courts. Thus, Defendants respectfully request that the Court deny Plaintiff's motion for preliminary injunction.

## BACKGROUND

### A.    Longstanding Concerns About Chinese Military-Civil Integration

Both Congress and the Executive Branch have long expressed significant concerns about the national security threat posed by the relationship between Chinese technology companies and the Chinese government. In the National Defense Authorization Act for Fiscal Year 1999, Congress directed the President to identify entities that meet the statutory definition of a "Communist Chinese military company." Pub. L. No. 105-261, § 1237(a), (b), 112 Stat. 1920, 2160 (1998). In 2005, Congress expanded the definition of a Communist Chinese military company because the then-effective definition, which depended on a company's relationship to the Chinese People's Liberation Army, *see* § 1237(b)(4), 112 Stat. at 2161, was too narrow—it "exclud[ed] a class of firms engaged in Chinese military modernization." H.R. Rep. No. 108-491, at 367 (2004).

In its 2011 Annual Report to Congress, the Department observed that "China's defense industry has benefited from integration with a rapidly expanding civilian economy and science and technology sector, particularly elements that have access to foreign technolog[ies]." Dep't of Def., Off. of the Sec'y of Def., *Annual Report to Congress: Military & Security Developments Involving the People's Republic of China, 2011*, at 42, https://perma.cc/QLE7-AJ87. A decade later, the Department again noted that China's broader military-civil fusion strategy seeks to " 'fuse' its economic and social development strategies with its security strategies to build an integrated national strategic system" aimed at advancing the country's national goals. Dep't of Def., Off. of the Sec'y of Def., *Annual Report to Congress: Military & Security Developments Involving the People's Republic of China, 2020*, at 18, https://perma.cc/8FT9-M9V3. China's military-civil fusion strategy aims to "develop and acquire advanced dual-use technology for military purposes," to "deepen reform" of the nation's national defense science and technology industries, and to

2

"strengthen all of China's instruments of national power by 'fusing' aspects of its economic, military, and social governance." *Id.* China "seeks to become a leader in key technologies with military potential," including "biotechnology." *Id.* at 144.

Responding to these concerns, on January 1, 2021, Congress enacted Section 1260H in the William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021. *See* § 1260H, 134 Stat. at 3965–66. The passage of Section 1260H intended to "build on the foundation laid" by the earlier statutory framework by "extend[ing] and moderniz[ing]" the "Department's reporting requirements regarding 'Chinese Communist Party military companies operating in the United States.'" Ex. 3 to Mills Decl. at 2–3, ECF No. 13-5. In enacting Section 1260H, Congress aimed to use a "more targeted and nuanced approach" than it had previously. *Id.* at 3.

## B.    Statutory Background

Section 1260H requires the identification of "each entity the Secretary [of Defense] determines, based on the most recent information available, is operating directly or indirectly in the United States" and "is a Chinese military company." § 1260H(a), 134 Stat. at 3965.[1] As relevant here, a "Chinese military company" means an entity that is "directly or indirectly owned by, controlled by, or beneficially owned by, affiliated with, or in an official or unofficial capacity acting as an agent of or on behalf of," the "People's Liberation Army," the "State-Owned Assets Supervision and Administration Commission of the State Council (SASAC)," or "the State Administration of Science, Technology, and Industry for National Defense (SASTIND)."

---

[1] Section 1260H has been amended twice: once in December 2024, *see* Servicemember Quality of Life Improvement and National Defense Authorization Act for Fiscal Year 2025, Pub. L. No. 118-159, § 1346, 138 Stat. 1773, 2123–26 (2024); and once in December 2025, *see* National Defense Authorization Act for Fiscal Year 2026, Pub. L. No. 119-60, §§ 1262–63, 139 Stat. 718, 1118–19 (2025). One 2025 amendment—reorganizing a list of Chinese entities—is not effective until December 18, 2026, and does not apply here. *See* § 1262(b), 139 Stat. at 1119. Citations throughout are to Section 1260H, as amended, and to the relevant U.S. Statutes at Large pincite. The consolidated provision is also available at 10 U.S.C. § 113 note.

§ 1260H(g)(2)(B)(i)(I), 138 Stat. at 2124; *see also* 138 Stat. at 2125 (redesignating the former subsection (d) as subsection (g)).

To qualify, the entity must be "engaged in providing commercial services, manufacturing, producing, or exporting." § 1260H(g)(2)(B)(ii), 134 Stat. at 3966; *see also* 138 Stat. at 2125. And the definition "includes a wholly-owned or wholly-controlled subsidiary or wholly-owned or wholly-controlled affiliate of such an entity or any entity that owns in the aggregate, directly or indirectly, 50 percent or more of any entity or entities described in subparagraph (B)." § 1260H(g)(2)(C), 138 Stat. at 2124.

Congress defined "affiliated with" to mean "in close formal or informal association." § 1260H(g)(1), 138 Stat. at 2124. And it explained that the phrase "operating directly or indirectly in the United States or any of its territories and possessions" includes "an entity selling goods in, or receiving goods or services from, the United States or any of its territories or possessions, regardless of whether the entity has a physical presence in the United States." § 1260H(g)(4), 138 Stat. at 2125. The "People's Liberation Army" means the "land, naval, and air military services, the People's Armed Police, the Strategic Support Force, the Rocket Force, and any other related security or intelligence element within the Government of China or the Chinese Communist Party that the Secretary determines is appropriate." § 1260H(g)(5), 134 Stat. at 3966; 138 Stat. at 2125. The definition also includes "other Chinese military and paramilitary elements, security forces, police, law enforcement, border control, and the Ministry of State Security." § 1260H(g)(5), 138 Stat. at 2125. SASAC is an "ad-hoc ministerial-level organization" directly controlled by the Chinese "State Council"; SASAC, which is wholly state-owned and operated, "supervises and manages the state-owned assets of enterprises under the supervision of the [Chinese] Central

4

Government." Ex. A, Excerpts of Administrative Record ("AR") at 4626–27.[2] SASTIND is the Chinese state agency responsible for managing the defense science and technology industry, including by coordinating scientific research into weapons, nuclear equipment, aviation, and military industrial capabilities. *See About Us*, State Administration of Science, Technology and Industry for National Defence.PRC (archived on June 30, 2026), https://web.archive.org/web/20260630195245/https://www.sastind.gov.cn/index.html (machine translated using Microsoft Translator in Microsoft Edge).

A Section 1260H designation interrelates with various other statutory provisions. As relevant to this litigation, pursuant to last year's National Defense Authorization Act amendment, executive agencies may not "procure or obtain any biotechnology equipment or service produced or provided by a biotechnology company of concern," nor may agencies enter into contracts with entities that use such equipment or services. § 851(a), 139 Stat. at 982.[3] Under the legislation, "[n]ot later than one year after the date of the enactment" of the Act—*i.e.*, by December 18, 2026— "the Director of the Office of Management and Budget shall publish a list of the entities that constitute biotechnology companies of concern" based on "a list of suggested entities" provided by the Secretary of Defense in coordination with other agencies. § 851(f)(1), 139 Stat. at 984. Under one relevant definition, a "biotechnology company of concern" is an entity that "is to any

---

[2] Excerpts from the certified administrative record are attached as Exhibit A to this opposition. Pincites refer to the bates-stamped page numbers. Counsel for Defendants produced the full administrative record to Plaintiff's counsel today, July 13, 2026.

[3] This provision is commonly called the "BIOSECURE Act," a reference to standalone legislation that was passed by the House of Representatives in 2024 but did not become law. *See* Ex. 19 to Mills Decl. at 2, ECF No. 13-21. Provisions similar to those included in the original BIOSECURE Act were included in the fiscal year 2026 National Defense Authorization Act. *See id.* For ease, and because Plaintiff uses this shorthand in its motion, *see* Pl.'s Mot. for Prelim. Inj. at 12–13, ECF No. 13, any references to the BIOSECURE Act here refer to Section 851 of the National Defense Authorization Act for Fiscal Year 2026.

5

extent involved in the manufacturing, distribution, provision, or procurement of any biotechnology equipment or service, as determined by the process established in [§ 851(f)(1)]," and "is identified in the annual list published in the Federal Register by the Department of Defense of Chinese military companies operating in the United States pursuant to" Section 1260H. § 851(f)(2)(A)(i)–(ii), 139 Stat. at 984.

### C. The Department's Designation of WuXi as a "Chinese Military Company"

Plaintiff WuXi is a joint-stock limited liability company incorporated in Shanghai, China. *See* Pl.'s Compl. ¶ 13, ECF No. 1. Plaintiff alleges that it "helps customers develop and manufacture pharmaceuticals and healthcare products to benefit patients around the world." *Id.* It operates "as a customer-driven Contract Research, Development, and Manufacturing Organization," meaning it "does not sell its own products and instead supports customers through every stage of drug development." *Id.* ¶ 18; *see also* Decl. of Steve Qing Yang ¶¶ 2, 10, ECF No. 13-22. The company has "more than 1,200 customers in the United States." ECF No. 1 ¶ 20. It further operates 22 facilities across seven countries; four of those facilities—and "hundreds of employees"—are in the United States. *Id.* Roughly 70 percent of WuXi's fiscal year 2025 revenue was from customers in the United States. *See* ECF No. 13-22 ¶ 13. The company earned 15 percent of its total revenue from customers in China, 11 percent from customers in Europe, and the remainder—about four percent—from the rest of the world. *See id.*

In February 2024, four members of Congress—Representatives Mike Gallagher and Raja Krishnamoorthi of the House Select Committee on China and Senators Gary Peters and Bill Hagerty—wrote to the then-Secretaries of Commerce, Treasury, and Defense "urg[ing]" them to "investigate WuXi AppTec" and its subsidiary for the company's affiliation with the People's Liberation Army and the Chinese Communist Party. Ex. 5 to Decl. of Melissa Mills at 2, ECF No. 13-7 ("Mills Decl."). Thereafter, in August 2024, Plaintiff engaged in discussions with the

6

Department to communicate "information about the Company's business and why the Company should not be categorized as a 'Chinese military company.'" ECF No. 13-22 ¶ 25. Plaintiff provided "written responses" to questions that Department officials asked at the meeting, "including confirming that the Company never received financial sponsorship from the Chinese Communist Party," the People's Liberation Army, or the Chinese Academy of Sciences. *Id.* After that late-2024 correspondence, the Department published a Section 1260H list on January 7, 2025, that did not include WuXi. *See* Decl. of Richard Damian Conell ¶ 9, ECF No. 13

After Congress amended Section 1260H in 2025, and after the Department sent a letter to Congress—well before the 2026 Section 1260H listing process was completed—indicating that it had identified certain companies to be added to the Section 1260H list, Plaintiff participated in another meeting in November 2025 with the Department to "demonstrate that the Company still did not meet the criteria for 1260H list designation under the newly amended statutory framework." ECF No. 13-24 ¶ 10; ECF No. 1 ¶ 31. At the meeting, Plaintiff presented "additional facts" and information about WuXi's operations, intended to help show that WuXi does not qualify as a Chinese military company under Section 1260H. ECF No. 13-24 ¶ 11. The next month, the chairs of nine committees of the House of Representatives sent a joint letter to Secretary Hegseth urging him to "expand the Department's list of Chinese military companies." Ex. 7 to Mills Decl. at 2, ECF No. 13-9. That letter included WuXi. *See id.* at 4.

On February 13, 2026, the Department temporarily made public a pre-publication version of the Section 1260H list. *See id.* ¶ 12; *see also* Ex. 8 to Mills Decl. at 2, ECF No. 13-10. The list included WuXi. *See* ECF No. 13-10 at 19. On June 8, 2026, the Department made public a revised pre-publication version of the Section 1260H, which was published in the Federal Register on June 10. *See* ECF No. 13-24 ¶ 13; *see also* Notice of Availability of Designation of Chinese Military

Companies, 91 Fed. Reg. 35189 (June 10, 2026). The June 2026 list—currently the effective Section 1260H list—similarly included WuXi. *See* 91 Fed. Reg. at 35194. The Department based its designation on its determination that "WuXi AppTec is indirectly owned by SASAC" and "is indirectly affiliated with SASTIND" and the People's Liberation Army. *Id.*

The Department's internal report, dated May 29, 2026, sets forth the bases in detail for placing WuXi on the Section 1260H list. *See* AR 55–77. The report explains that WuXi is indirectly owned by SASAC because the company is owned in part by a SASAC-owned state-owned enterprise. *See* AR 60; *see also* § 1260H(g)(2)(B)(i)(I), 138 Stat. at 2124. The report also explains that WuXi is "indirectly affiliated with SASTIND" and the People's Liberation Army, two additional independent bases justifying a finding that WuXi is a Chinese military company. AR 60; *see also* § 1260H(g)(2)(B)(i)(I), 138 Stat. at 2124. In reaching its conclusion, the Department "considered the latest information available, including information provided by WuXi AppTec in a presentation to the Department on August 26, 2024," in "written materials provided to the Department on October 14, 2025," and at "a meeting with the Department on November 24, 2025." AR 60.

Importantly, Plaintiff does not allege that Defendants or any other government agency have taken any additional action related to Plaintiff's status on the Section 1260H list. Plaintiff alleges that the Section 1260H designation "*will* also subject the Company to the restrictions of the BIOSECURE Act." ECF No. 13 at 2 (emphasis added); *see also id.* at 13 (noting that the restrictions of the BIOSECURE Act "*could* take effect more imminently" than "the second half of 2028" (emphasis added)); ECF No. 1 ¶ 57. Plaintiff alleges that designation under Section 1260H "automatically" results in designation under the BIOSECURE Act. ECF No. 1 ¶ 57. But the agency responsible for implementing the provisions of the BIOSECURE Act—the Office of Management

8

and Budget, *see* § 851(f)(1), 139 Stat. at 984—has not yet designated Plaintiff as a "biotechnology company of concern," ECF No. 13 at 13 (citation omitted).

Indeed, "a 1260H listing" is only "the first step toward" designation under the BIOSECURE Act. Ex. 16 to Mills Decl. at 2, ECF No. 13-18. In fact, a Section 1260H designation fulfills only one of the two required elements sufficient (under one path) for a designation under that Act. *See* § 851(f)(2)(A), 139 Stat. at 984. The Director of the Office of Management and Budget must still, in consultation with the Secretary of Defense and other cabinet secretaries, "determine[]" that an entity "is to any extent involved in the manufacturing, distribution, provision, or procurement of any biotechnology equipment or service." *See* § 851(f)(2)(A)(i), 139 Stat. at 984. Plaintiff does not allege that such a determination has occurred, nor does Plaintiff allege that the Director of the Office of Management and Budget has in fact made a formal designation. *See* ECF No. 1 ¶¶ 62–64 (alleging only that the Department of Defense has taken an agency action).

### D.    This Litigation

On June 11, 2026, Plaintiff initiated this suit challenging the Department's determination that WuXi is a Chinese military company under Section 1260H. *See* ECF No. 1. On June 29, 2026, Plaintiff moved for a preliminary injunction, seeking to enjoin Defendants from enforcing or implementing the designation. *See* Pl.'s Mot. for Prelim. Inj., ECF No. 13.

### LEGAL STANDARD

Preliminary injunctive relief is an "extraordinary and drastic remedy" that is "never awarded" as a matter "of right." *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008) (citations omitted). A plaintiff must show that "he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7,

20 (2008). Against the federal government, the balance of equities and public interest factors merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009).

## ARGUMENT

**I.    Plaintiff Is Not Likely to Show that the Section 1260H Designation Violated the Law.**

**A.    Defendants' Section 1260H designation of WuXi satisfies the APA.**

Plaintiff's primary merits argument invokes the APA's requirement that courts set aside any agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," is "contrary to constitutional right," and is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A)–(C); *see* ECF No. 13 at 17. In Plaintiff's view, the Department's designation was "unreasoned," "unfounded," and contrary to the evidence before the agency, rendering it arbitrary and capricious. *See* ECF No. 13 at 18, 21. Plaintiff also argues that the Department deprived WuXi of its procedural-due-process rights by "revers[ing] its prior determination that [WuXi] did not belong on the 1260H List and summarily designat[ing] it" as a Chinese military company without sufficient notice or an opportunity to be heard. *Id.* at 24–29. But substantial evidence supported the Department's conclusions. And the Department neither deprived Plaintiff of a protected property or liberty right nor provided it inadequate procedural-due-process. Plaintiff's APA claims are thus not likely to succeed.[4]

---

[4] Plaintiff's complaint includes a claim that, "[t]o the extent that Defendants failed to comply with the requirements set forth in Section 1260H [to submit a list to Congress, to the Federal Register, and to agency heads]," its designation "is without observance of the procedures required by law, in violation of the APA." ECF No. 1 ¶ 75. But Plaintiff does not rely on this claim to seek preliminary relief. *See* ECF No. 13 at 17–30. And, at any rate, Plaintiff fails to adequately allege any such procedural violation actually occurred, merely conclusorily providing the statutory requirements and alleging that Defendants have violated them. *See* ECF No. 1 ¶ 75 ("*To the extent* that Defendants failed to comply[.]" (emphasis added)). Such a claim is unviable. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### 1. Substantial evidence supports the Department's designation of WuXi as a Chinese military company.

Relying only on the brief explanation the Department included in its publication of the Section 1260H list, Plaintiff argues that Defendants lacked any reasoned basis for the Department's designation of WuXi as a Chinese military company. *See id.* at 18–23. In Plaintiff's view, Defendant justified its designation only with a "one-sentence, boilerplate, *ipse dixit* 'explanation' " that merely "parrot[ed]" the statutory language. *Id.* at 18–19 (citation omitted). To the contrary, the record before the Department at the time it made its decision provides ample evidence—much more than the APA's lenient substantial-evidence standard requires—that WuXi is indirectly owned by SASAC and indirectly affiliated with both SASTIND and the People's Liberation Army. And the Department thoroughly explained and supported its conclusion.

The APA's arbitrary-and-capricious standard "is a narrow one." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), *abrogated by Califano v. Sanders*, 430 U.S. 99 (1977). APA review is "very deferential." *Cablevision Sys. Corp. v. FCC*, 649 F.3d 695, 714 (D.C. Cir. 2011) (citation omitted). Indeed, a "court is not empowered" under the APA "to substitute its judgment for that of the agency." *Overton Park*, 401 U.S. at 416. A court may find an agency's decision arbitrary and capricious only where the agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency," or made a decision "so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Under this highly deferential standard, an agency's decision should be upheld as long as the decision is supported by a rational basis and the findings are supported by substantial evidence. *See id.*

11

The APA's substantial-evidence standard sets a "low bar." *La. Pub. Serv. Comm'n v. Fed. Energy Regul. Comm'n*, 20 F.4th 1, 7 (D.C. Cir. 2021). Substantial evidence "is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pham v. Nat'l Transp. Safety Bd.*, 33 F.4th 576, 581 (D.C. Cir. 2022) (citation omitted). The standard "requires more than a mere scintilla, but can be satisfied by something less than a preponderance of the evidence." *Bloomberg, L.P. v. Secs. & Exch. Comm'n*, 45 F.4th 462, 475 (D.C. Cir. 2022) (citation omitted). Factual findings "may be supported by substantial evidence even though a plausible alternative interpretation of the evidence would support a contrary view." *Archer W. Contractors, LLC v. U.S. Dep't of Transp.*, 45 F.4th 1, 6 (D.C. Cir. 2022) (citation omitted). The fact that the agency "did not draw the inferences" that a plaintiff "might wish when examining" the evidence "does not render its decision arbitrary and capricious or unsupported by substantial evidence." *Crooks v. Mabus*, 845 F.3d 412, 424 (D.C. Cir. 2016). Indeed, an agency is "not required" to credit a plaintiff's claims, nor must it "explain away every point raised" or "piece of evidence contained" in any submission a plaintiff might make to the agency. *Id.* (citation omitted). Further, deference under the APA is especially heightened in cases—like this one—that involve national security and foreign affairs. *See Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728, 734 (D.C. Cir. 2007) (noting that such review is "extremely deferential").

Defendants relied on substantial evidence for three independent findings, each sufficient to sustain the Department's decision to include WuXi on the most recent Section 1260H list. *See* § 1260H(g)(2)(B)(i)(I), 138 Stat. at 2124. Specifically, the Department determined that WuXi is (1) indirectly owned by SASAC, AR 60–62; (2) indirectly affiliated with SASTIND, *see id.* at 62–65; and (3) indirectly affiliated with the People's Liberation Army, *see id.* at 65–66. Plaintiff argues that each finding was wholly unreasoned, *see* ECF No. 13 at 18–21, and counter to the evidence

before the agency, *see id.* at 21–23. But the record reveals more than sufficient evidence to support each determination. *See Hesai Tech. Co. v. U.S. Dep't of Def.*, 792 F. Supp. 3d 22, 34 (D.D.C. 2025), *appeal filed*, No. 25-5256 (D.C. Cir. July 16, 2025); *SZ DJI Tech. Co. v. U.S. Dep't of Def.*, Civ. A. No. 24-2970 (PLF), 2025 WL 2761210, at *17 (D.D.C. Sep. 26, 2025), *appeal filed*, No. 25-5367 (D.C. Cir. Oct. 16, 2025); *see also Biestek v. Berryhill*, 587 U.S. 97, 103 (2019). And the evidence the Department relied on does not directly contradict the materials Plaintiff provided to the Department, meaning it cannot show the decision ran counter to the available factual evidence. *See Hesai*, 792 F. Supp. 3d at 47.

*First*, the Department uncovered and considered an adequate factual basis to determine that WuXi is indirectly owned by a statutorily specified Chinese state agency, SASAC. *See* § 1260H(g)(2)(B)(i)(I), 138 Stat. at 2124. According to public information, the Aviation Industry Corporation of China—itself a state-owned enterprise wholly owned and "overseen" by SASAC, *see* AR 4205, 4222, 4228—owns a 5.32 percent stake in WuXi through the "AVIC Military-Civilian Integration Selected Fund," AR 61; *see also* AR 4554. The Aviation Industry Corporation is itself a Chinese military company included on the Department's most recent Section 1260H list on the basis that it is "directly owned and controlled by SASAC." 91 Fed. Reg. at 35189–90. That ownership stake qualifies under the Section 1260H criteria permitting designation of any entity "indirectly owned by" SASAC. § 1260H(g)(2)(B)(i)(I), 138 Stat. at 2124. Underscoring that public evidence is further reporting that WuXi received an undisclosed investment from a fund called the "Military-Civilian Integrated Select Mixed Securities Investment Fund," which, per the reporting, "likely" ties directly to the Aviation Industry Corporation. AR 4581; *see also* AR 61. The substantial evidence that Defendants found suffices to support a determination that WuXi is indirectly owned by SASAC.

Moreover, Plaintiff presented its argument that such a determination was counter to the evidence available to the agency—and the Department rejected its claim. *See* AR 60. The Department identified evidence "refut[ing]" WuXi's claims that it is not owned or controlled by any of the statutorily specified Chinese agencies. *Id.* Indeed, Plaintiff disavows any certainty that there are *no* owners of WuXi equity with "a government affiliation." Ex. 1 to Connell Decl. at 3, ECF No. 13-25; *see also* ECF No. 13-22 ¶ 30 n.2 (noting that Plaintiff "cannot exclude the possibility that some miniscule interest" exists). Available evidence suggests that more than a miniscule interest in WuXi exists: an entity owned and controlled directly by SASAC itself owns more than 5 percent of WuXi's equity, and it is likely that same entity provided additional investment funds via the Military-Civilian Integrated Select Mixed Securities Investment Fund. Plaintiff fails to "point to a direct contradiction" in the evidence before the agency. *Hesai*, 792 F. Supp. 3d at 47; *see also* ECF No. 13 at 21 (asserting conclusorily that "the Company is not indirectly owned by SASAC, and Defendants could not have reasonably determined otherwise"). The Department's determination that Plaintiff is indirectly owned by SASAC is supported by substantial evidence.

*Second*, the Department had a sufficient factual basis to determine that WuXi is indirectly affiliated with SASTIND. *See* § 1260H(g)(2)(B)(i)(I), 138 Stat. at 2124. The Department uncovered evidence of five independent affiliations—each a study or series of studies conducted in partnership with universities in China jointly supervised by SASTIND and the State Ministry of Education—demonstrating that WuXi has a close informal association with SASTIND. *See* AR 63–65; *see also* AR 4916–19 (explaining that SASTIND jointly oversees a specific set of universities with the goal of developing national defense science and technology disciplines, laboratories, and research tasks); § 1260H(g)(1) (defining "affiliated with" to mean "in close

14

formal or informal association").The first piece of evidence concerns an October 2022 approval from the Ministry of Science and Technology for "multiple drug studies" conducted by a wholly owned subsidiary of WuXi in partnership with Peking University, a "SASTIND-supervised university." AR 63; *see also* AR 4820, 4851, 4853, 4892. The series of studies includes research on the "treatment of insomnia in Chinese subjects" and on obesity in a similar population. *See* AR 63.

The second datapoint concerns an October 2022 drug study on malignant tumors conducted with Xiamen University, also a SASTIND-supervised entity. *See* AR 64; *see also* AR 4858, 4903. The third concerns multiple studies—related to a genetic disorder and to ulcerative colitis—conducted in partnership with Shanghai Jiao Tong University, also a SASTIND-supervised university. *See* AR 64–65; *see also* AR 4844–45, 4850, 4895. The fourth relates to a study with Jilin University First Hospital, another SASTIND-supervised university, on chronic hepatitis B. *See* AR 65; *see also* AR 4845, 4883. And the fifth concerns another study on malignant tumors, conducted in partnership with Sichuan University—a SASTIND-supervised university—and other entities. *See* AR 65; *see also* AR 4839, 4841; AR 4896. The Department uncovered multiple instances of WuXi and its subsidiaries partnering with SASTIND-supervised entities—ample evidence supporting its determination that WuXi is indirectly affiliated with SASTIND.

As above, Plaintiff fails to point to any direct contradiction to the evidence included in Defendants' decisional report. *See* ECF No. 13 at 22 (arguing only that the "Company has no such close association with or control by SASTIND"). Plaintiff's corporate officers agued to the Department that no entity like SASTIND played "any role in [Plaintiff's] management or corporate governance." ECF No. 13-22 ¶ 30; ECF No. 13-25 at 3 (asserting that the company "has no affiliation with the [Chinese] government or military"). The lack of any contradiction to the

15

evidence before the agency means this determination too should stand. *See Hesai*, 792 F. Supp. 3d at 47.

*Third*, Defendants identified sufficient evidence to determine that WuXi is indirectly affiliated with the People's Liberation Army. *See* § 1260H(g)(2)(B)(i)(I), 138 Stat. at 2124. In October 2022, Shanghai WuXi received approval to conduct a drug study on "Chinese overweight or obese subjects" with the "Chinese People's Liberation Army General Hospital," which is affiliated with the People's Liberation Army. AR 66; *see also* AR 4810. The Department located no evidence suggesting that the drug study has concluded. *See* AR 66. Accordingly, the Department had substantial evidence to determine that the "Chinese People's Liberation Army General Hospital" is itself affiliated with the People's Liberation Army, *see* § 1260H(g)(2)(B)(i)(I), meaning that WuXi's "close . . . association" with the hospital satisfies the criteria for designation under Section 1260H, § 1260H(g)(1), (2)(B)(i)(I), 138 Stat. at 2124.

And, as above, Plaintiff fails to provide any direct contradiction to that evidence. *See* ECF No. 13 at 22 (asserting only that Plaintiff "has no such close association with or control by . . . the [People's Liberation Army]"); *see also* ECF No. 13-22 ¶ 30. Indeed, Plaintiff's evidentiary support seems to rest on an untenably narrow definition of the term "[a]ffiliated," which Plaintiff noted its directors define as one entity that is "effectively controlled by another or associated with others under common ownership or control." ECF No. 13-22 ¶ 30 n.3. Plaintiff's definition ignores that Congress has directly defined the term "affiliated with" and, in doing so, disavowed any requirement to show control by one entity over another. § 1260H(g)(1), 138 Stat. at 2124. Moreover, such a definition would render superfluous Section 1260H's separate regulation of entities "controlled by" statutorily designated entities. § 1260H(g)(2)(B)(i)(I), 138 Stat. at 2124; *see also Corley v. United States*, 556 U.S. 303, 314 (2009) (outlining the interpretive canon against

16

superfluousness). In other words, Plaintiff's evidentiary support rests on its assertion that the People's Liberation Army (and SASTIND) do not "effectively control[]" WuXi. ECF No. 13-22 ¶ 30 n.3. But that evidence does not directly contradict the Department's finding that WuXi is "in close formal association" with the People's Liberation Army. AR 66. The Department never "ignored" a "direct contradiction" to the evidence before it. *Hesai*, 792 F. Supp. 3d at 47.

The Department relied on substantial evidence supporting its independent findings that WuXi is indirectly owned by SASAC, indirectly affiliated with SASTIND, and indirectly affiliated with the People's Liberation Army. Its finding thus satisfies the APA. *See Pham*, 33 F.4th at 581. And because the Department relied on substantial evidence for its designation, the designation necessarily survives any challenge to the agency's purported "change" in policy. ECF No. 13 at 20. It provided a "reasoned explanation," *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009), for why Plaintiff qualifies as a Chinese military company. That reasoned explanation— which "need not" be "more detailed than what would suffice for a new policy created on a blank slate," especially where there are no contradictory factual findings, *id.*—provides a sufficiently rational basis to qualify under APA review. Indeed, Section 1260H requires the Department to update the list "not less frequently than annually." § 1260H(b)(3)(A), 138 Stat. at 2124. And the Department might reasonably have concluded in undertaking that annual revision process that, since Plaintiff's 2024 communications, the "latest information available," § 1260H(b)(3)(A), 134 Stat. 3965, merited including WuXi on the Section 1260H list even though the Department did not previously make that determination. The law is clear that an agency need not "make progress on every front before it can make progress on any front." *United States v. Edge Broad. Co.*, 509 U.S. 418, 434 (1993); *see also Mobil Oil Expl. & Producing Se. Inc. v. United Distrib. Cos.*, 498 U.S. 211, 231 (1991) ("[A]n agency need not solve every problem before it in the same proceeding.").

17

The Department's prioritization of scarce resources—particularly as it becomes newly aware of relevant information—to research and designate relevant entities reflects the discretion Congress intended the agency to exercise in administering the Section 1260H list. Plaintiff's arbitrary-and-capricious claim thus fails.

### 2. The Department's Section 1260H designation procedure does not infringe on liberty and property rights and provides sufficient due process.

Plaintiff's due-process argument fares no better. It argues that the Department violated its procedural-due-process rights in designating WuXi as a Chinese military company, claiming both that the Department deprived it of constitutionally protected liberty and property interests, *see* ECF No. 13 at 27–28 (identifying the company's existing and future contractual rights as property and liberty interests and its right to its reputation and goodwill as a liberty interest), and that the Department failed to accord it sufficient procedural due process before doing so, *see id.* at 23–29. But Plaintiff fails to show its entitlement to any constitutionally protected property interest, and the reputational and economic interests it identifies do not suffice to create a protected liberty interest. Moreover, Defendants provided Plaintiff ample due process, especially considering the national-security interests at stake, to satisfy constitutional requirements.

Generally, to be successful on a due-process claim, a plaintiff "must show the Government deprived" it of "a liberty or property interest" to which it had a "legitimate claim of entitlement." *Roberts v. United States*, 741 F.3d 152, 161 (D.C. Cir. 2014) (citation omitted). Moreover, a plaintiff must show that "the procedures attendant upon that deprivation were constitutionally [in]sufficient." *Id.* (alteration in original) (citation omitted). The "fundamental requisite of due process of law" is the "opportunity to be heard" at "a meaningful time and in a meaningful manner." *Ala. Commc'ns Sys. Holdings, Inc. v. Nat'l Lab. Rels. Bd.*, 6 F.4th 1291, 1298 (D.C. Cir. 2021) (quoting *Goldberg v. Kelly*, 397 U.S. 254, 267 (1970)). The "Fifth Amendment requires

18

only that a person receive his or her due process, not every procedural device that he or she may claim or desire." *Hesai*, 792 F. Supp. 3d at 48; *see also Johnson v. United States*, 628 F.2d 187, 194 (D.C. Cir. 1980).

At the threshold, a court must "first determine whether constitutional safeguards apply at all, *i.e.*, whether a private party has a property or liberty interest that triggers Fifth Amendment due process protection." *Reeve Aleutian Airways, Inc. v. United States*, 982 F.2d 594, 598 (D.C. Cir. 1993). And, on the merits, courts weigh " 'the private interest' at stake," the " 'risk of erroneous deprivation of such interest through the procedures used' and the 'probable value' of alternate procedural safeguards,' " and " 'the Government's interest' in the administrative process and any burdens of providing alternate safeguards." *Khalid v. Transp. Sec. Admin.*, 172 F.4th 866, 873 (D.C. Cir. 2026) (citation omitted). Importantly, pre-deprivation notice is not required where (1) the deprivation was "necessary to secure an important governmental interest"; (2) there was a "special need for very prompt action"; and (3) the party "initiating the deprivation was a governmental official" responsible for finding, under a "narrowly drawn statute," that the deprivation was "necessary and justified in the particular instance." *López Bello v. Smith*, 651 F. Supp. 3d 20, 39 (D.D.C. 2022) (citation omitted), *aff'd sub nom. Bello v. Gacki*, 94 F.4th 1067 (D.C. Cir. 2024). And, moreover, a plaintiff must be prejudiced by the agency's purported violation of its due process rights to succeed on such a claim. *See Hesai*, 792 F. Supp. 3d at 48–49; *see also* 5 U.S.C. § 706 (instructing reviewing courts to take "due account" of the "rule of prejudicial error").

*1. Property and liberty interests.* Plaintiff alleges that it has suffered a harm to its "liberty interest in the right to contract" and has further suffered "public stigmatization, severely damaging

19

the Company's international reputation and professional goodwill." ECF No. 13 at 27. These interests are not constitutionally protected.

Plaintiff first ignores that due-process contractual-liberty caselaw—even the caselaw Plaintiff cites—generally considers only whether the government has functionally deprived a corporation of its right to engage in "*government contract* bidding." *Anthropic PBC v. U.S. Dep't of War*, 825 F. Supp. 3d 1101, 1126 (N.D. Cal. 2026) (emphasis added), *appeal filed*, No. 26-2011 (9th Cir. Apr. 2, 2026); *see also* ECF No. 13 at 27 (citing *Anthropic*); *Trifax Corp. v. District of Columbia*, 314 F.3d 641, 643 (D.C. Cir. 2003) (noting that "formally debarring a corporation from government contract bidding constitutes a deprivation of liberty that triggers the procedural guarantees of the Due Process Clause"). And Plaintiff "has not alleged that it has any intention on bidding on [government] contracts, making any such injury associated with the inability to bid on the contracts too 'hypothetical' to serve as a basis for a constitutional claim." *SZ DJI Tech.*, 2025 WL 2761210, at *20 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)); *see also* ECF No. 1 ¶ 57 (alleging only that Section 1260H designation and potential designation under the BIOSECURE Act "precludes" WuXi "from certain U.S. federal funding and contracts" and further "precludes private sector companies—many of which are [WuXi] customers—from contracting for [WuXi] services"); *id.* ¶ 58 (noting that the Departments of Defense and Homeland Security are "prohibited from" contracting with Chinese military companies). Moreover, the magnitude of the asserted contract-infringement injury bears on whether the relevant interest is constitutionally protected. The mere "desire to obtain future government contracts is generally considered insufficient to establish that a plaintiff has been deprived of a protected property interest." *SZ DJI Tech.*, 2025 WL 2761210, at *20. To have a protected interest under the Due Process Clause, a plaintiff must "have a legitimate claim of entitlement to it." *Town of Castle Rock v. Gonzales*, 545

20

U.S. 748, 756 (2005) (quoting *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972)). And Plaintiff cites nothing to show that it has an entitlement to a government contract. *See New Vision Photography Program, Inc. v. District of Columbia*, 54 F. Supp. 3d 12, 29 (D.D.C. 2014) (explaining that the Supreme Court has "never held that government contracts for goods or services create property interests protected by due process" (citation omitted)).

Framed as a stigmatization claim, *see* ECF No. 13 at 27–28, Plaintiff's due-process claim fares no better. To show a protectable interest, only "government stigmatization that broadly precludes individuals or corporations from a chosen trade or business deprives them of liberty in violation of the Due Process Clause." *Trifax*, 314 F.3d at 644. Specifically, a plaintiff claiming it has suffered a reputation-based due-process violation must show the government "seriously affected, if not destroyed" its ability to obtain "contracts" in its field. *Id.* (quoting *Taylor v. Resol. Tr. Corp.*, 56 F.3d 1497, 1506 (D.C. Cir. 1995)). Judge Friedman's decision in *SZ DJI Technology* is instructive. The plaintiff in that case maintained that it had been forced to "exit from critical governmental and private markets" because "the prohibitions preventing" the Department "from using or procuring products or services of [Chinese military companies]" deters "existing and potential partners" from "engaging with DJI." *SZ DJI Tech.*, 2025 WL 2761210, at *21 (citation omitted). The plaintiff there also cited to "several examples of its clients who ha[d] terminated business relationships . . . in response to its placement on the Section 1260H list." *Id.* The court nonetheless held that because these alleged harms did not appear "so severe" that they "broadly preclude" the plaintiff from pursuing "a chosen trade or business," the plaintiff had "failed to show that it ha[d] been deprived of a protected liberty or property interest." *Id.* at *22 (citation omitted).

Plaintiff here fails even to make the showing that Judge Friedman found insufficient to support a due-process claim in *SZ DJI Technology*. Plaintiff's evidence suggests that a

21

BIOSECURE Act designation would "foreclose a substantial part of the U.S. market that the Company currently serves," resulting in "reassess[ment]" of certain customer relationships. ECF No. 13-22 ¶ 37. That designation has *not* occurred, though, and any such harms are, at this stage, purely speculative. Plaintiff argues that "drugmakers are evaluating alternative suppliers and adding contractual safeguards to prepare for the restrictions the designation may trigger." *Id.* ¶ 38. It notes that the designation has led certain customers to pause or suspend some work, express "concern," place certain projects on hold, and ask for clarification on Section 1260H's "effect." *Id.* ¶¶ 41–44. And one customer raised "military-use concerns as a condition of continued supply," noting that future purchase orders "would need to include a commitment that the products would not be used in military projects before it would ship them." *Id.* ¶ 45.

The evidence Plaintiff provides fails to satisfy the demanding standard to show that the government sufficiently stigmatized its reputation to qualify under the Due Process Clause. None of its allegations establish that it has been "broadly preclude[d]" from pursuing its "chosen trade or business." *Trifax*, 314 F.3d at 644. All that Plaintiff's evidence shows is that some number of customers have begun "reassess[ing]" their contracts or have suspended them. ECF No. 13-22 ¶¶ 36–51. And Plaintiff's forecasts about the impact it might suffer on its United States operations—*i.e.*, to roughly 70 percent of its total revenue, *see id.* ¶ 13—depend on a future designation under the BIOSECURE Act that has not yet happened, *see id.* ¶ 37 (noting that a BIOSECURE Act designation would "foreclose a substantial part of the U.S. market that the Company currently serves"). Indeed, Plaintiff's factual allegations underscore a key conclusion: that the company *will continue* to pursue its chosen trade or business, especially before any BIOSECURE Act designation takes effect, whether that business might be in other global markets or for United States customers that, for example, seek "commitment[s]" as conditions to the

services and products Plaintiff sells, *id.* ¶ 45. Plaintiff has failed to show that the Department deprived it of a constitutionally protected liberty or property interest, so its due-process claim fails.

 2. *Adequate procedural safeguards.* In any event, "due process is flexible and calls for such procedural protections as the particular situation demands." *Ralls Corp. v. Comm. on Foreign Inv. in the U.S.*, 758 F.3d 296, 317 (D.C. Cir. 2014) (citation omitted). The three requirements to remove any need to provide pre-deprivation notice, *see López Bello*, 651 F. Supp. 3d at 39, are satisfied here. First, Section 1260H furthers the compelling government interest of protecting the U.S. military supply chain by preventing infiltration from foreign actors. Because the United States—including the Department—purchases large quantities of goods from China, it must take all necessary steps to prevent purchases of equipment and services (such as drug development and manufacturing services) from Department contractors where the individuals implementing those services might be able to collect and disseminate data to China and other foreign adversaries. Second, the Department has a special need for very prompt action to protect the U.S. military supply chain from infiltration by foreign adversaries. Advance notification of a Section 1260H designation would permit entities to take countermeasures, such as spinning off assets to create a new entity or creating new entities while obscuring their true ownership. *See, e.g.*, Brandon Vigliarolo, *US Closes Subsidiary Loophole on Dozens of Chinese Entity List Members*, The Register (Mar. 26, 2025), https://perma.cc/GK8Z-ACF4 (noting the "constant game of whack-a-mole as China-based entities add subsidiaries that spring up to circumvent bans which some American companies continue to accommodate"). In the interim, prior to designation, such entities would be fully able to compete for contracts with the Department of Defense, the Departments of Energy and Homeland Security, and other government agencies. Relatedly, very prompt action is required to ensure that entities cannot spoliate relevant evidence. Third, the Deputy Secretary of

23

Defense is responsible for approving Section 1260H designations, ensuring that such designations are necessary and justified. And that determination holds special force here, where a court's deference is at its height for issues of national security. *See Islamic Am. Relief Agency*, 477 F.3d at 734.

Moreover, in this particular case, Plaintiff received adequate process. Plaintiff lays out numerous opportunities it had—of which it availed itself—to present its argument to Department officials. Indeed, Plaintiff had an "opportunity to be heard," *Ala. Commc'ns Sys.*, 6 F.4th at 1298 (citation omitted), in person in August 2024 and November 2025, *see* ECF No. 1 ¶¶ 28–29, 33–34. And Plaintiff further emailed the Department in November 2025 and June 2026 to communicate its position on Section 1260H designation. *See id.* ¶¶ 35, 47; *see also* ECF No. 13-25. Indeed, the administrative record reflects that the Department considered the information and materials it received from Plaintiff as part of the Department's determination of whether to include WuXi on the Section 1260H list, and, thus, as part of the pre-deprivation process afforded to Plaintiff. *See* AR 89–122 (emails and August 2024 presentation to Department); AR 487–512 (emails and November 2025 presentation to Department). Considering the Department's national-security interests, Plaintiff's lack of any fundamental entitlement to receive government contracts, and the fact that the Section 1260H designation process provides entities an opportunity to request reconsideration of their designation, *see* § 1260H(e), 138 Stat. at 2126, Plaintiff cannot show it was entitled to any "additional process," *Khalid*, 172 F.4th at 873–74.

And, at any rate, the requirements of due process are satisfied post-deprivation by the opportunity for Plaintiff to seek reconsideration and to pursue judicial review under the APA. *See First Nat'l Bank & Tr., Wibaux v. Dep't of the Treasury*, 63 F.3d 894, 898–99 (9th Cir. 1995) (holding that the plaintiff had an opportunity "[a]t every turn" to "respond" to the agency's

"concerns," including at a "district court hearing"); *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 16 n.17 (1978) ("The opportunity for informal consultation with designated personnel empowered to correct a mistaken determination constitutes a 'due process hearing' in appropriate circumstances."); *Ewing v. Mytinger & Casselberry, Inc.*, 339 U.S. 594, 599 (1950) ("It is sufficient, where only property rights are concerned, that there is at some stage an opportunity for a hearing and a judicial determination."); *Yakus v. United States*, 321 U.S. 414, 442–43 (1944) (noting that "when justified by a compelling public interest the legislature may authorize summary action subject to later judicial review of its validity"). The process here was adequate; Plaintiff's procedural-due-process rights were not infringed.

3. *Harmless error.* Finally, to the extent that any procedural error occurred, it was harmless. Plaintiff has not suffered any prejudice from any alleged deprivation of procedural rights. And if "the agency's mistake did not affect the outcome, if it did not prejudice the petitioner, it would be senseless to vacate and remand for reconsideration." *PDK Lab'ys Inc. v. U.S. Drug Enf't Admin.*, 362 F.3d 786, 799 (D.C. Cir. 2004). Plaintiff has failed to satisfy its "burden to demonstrate prejudicial error," *Jicarilla Apache Nation v. U.S. Dep't of the Interior*, 613 F.3d 1112, 1121 (D.C. Cir. 2010). Its due-process claim should, therefore, fail.

Here, as in *Hesai*, Plaintiff does not "argue that had it been afforded its desired process, it would have had an opportunity to include evidence in the record that would have 'affect[ed] the outcome] of the [Department's] decision-making process." *Hesai*, 792 F. Supp. 3d at 48 (quoting *PDK Lab'ys*, 362 F.3d at 799); *see also* ECF No. 1 ¶ 81 (alleging that Plaintiff received no "notice or an opportunity to be heard regarding its designation" but failing to indicate what information it would have provided that could have changed the determination). Indeed, as in *Hesai*, "[s]uch an argument would be difficult to make since [Plaintiff] did in fact have an opportunity to submit

evidence"—both in advance of in-person conversations in August 2024 and November 2025 and by written communication in November 2025—"rebutting the [Department's] core contentions in this case." 792 F. Supp. 3d at 48. And the Department considered that evidence. *See id.*; *see also* AR 60, 62, 65. The Department's actions did not prejudice Plaintiff. Its claim fails.

**B.    Defendants' designation was not *ultra vires*.**

Plaintiff superficially argues that Defendants' actions were *ultra vires* and in excess of their statutory authority under Section 1260H. *See* ECF No. 1 ¶¶ 84–87; ECF No. 13 at 29. In doing so, though, Plaintiff merely repackages its earlier claims that WuXi "does not qualify" for the Section 1260H designation and that Defendants "failed to put forward an adequate basis for the designation." ECF No. 1 ¶ 86; *see also* ECF No. 13 at 29 (arguing Defendants' actions were *ultra vires* "[f]or the reasons discussed" under their earlier arguments).

The claim fails at the outset. To succeed here, a plaintiff must show more than that Defendants violated the law. *See Bd. of Governors of Fed. Rsrv. Sys. v. MCorp Fin., Inc.*, 502 U.S. 32, 43 (1991) (noting that *Leedom v. Kyne*, 358 U.S. 184 (1958), does not authorize *ultra vires* "judicial review of any agency action that is alleged to have exceeded the agency's statutory authority"); *see also Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 722 (D.C. Cir. 2022) (citing *MCorp*). It must show that judicial review of the agency action is impliedly—not expressly—precluded, that "there is no alternative procedure for review of the statutory claim," and that "the agency plainly act[ed] in excess of its delegated powers and contrary to a specific prohibition in the statute that is clear and mandatory." *Changji*, 40 F.4th at 722 (citation omitted). "The third requirement is especially demanding." *Id.* An agency "violates a 'clear and mandatory' statutory command only when the error is 'so extreme that one may view it as jurisdictional or nearly so.' " *Id.* (citation omitted). Plaintiff fails to point to any clear, mandatory, or unambiguous

26

statutory directive that Defendants violated. *See* ECF No. 1 ¶¶ 84–87; ECF No. 13 at 29. Its "Hail Mary pass," *Changji*, 40 F.4th at 722 (citation omitted), is not likely to succeed.

### C. The text of Section 1260H clearly specifies a prohibited course of conduct, meaning the provision complies with the constitutional vagueness doctrine.

Plaintiff's final merits argument challenges the text of Section 1260H as unconstitutionally vague. *See* ECF No. 1 ¶¶ 88–91; ECF No. 13 at 29–30. Plaintiff raises a facial and as-applied challenge, arguing that the phrases "affiliated with" and "owned by" fail to provide sufficiently clear standards for enforcement against corporate entities and, here, resulted in "arbitrary and discriminatory enforcement" against WuXi. ECF No. 13 at 29 (citation omitted). A provision may be unconstitutionally vague where it fails to give a "person of ordinary intelligence a reasonable opportunity to know what is prohibited." *NAACP v. U.S. Dep't of Educ.*, 779 F. Supp. 3d 53, 65–66 (D.D.C. 2025) (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972)). The key inquiry is whether the relevant terms are "clearly defined." *Grayned*, 408 U.S. at 108. Importantly, "a statute's vagueness is either susceptible to judicial construction or is void for vagueness based on the application of traditional rules for statutory interpretation." *United States v. Bronstein*, 849 F.3d 1101, 1106 (D.C. Cir. 2017). A statutory provision "is not rendered unconstitutionally vague" simply because it may not "mean the same thing to all people, all the time, everywhere." *Id.* at 1107 (citation omitted). Instead, a provision transgresses constitutional bounds only if, "applying the rules for interpreting legal texts," it specifies "no standard of conduct . . . at all." *Id.* (alteration in original) (quoting *Coates v. City of Cincinnati*, 402 U.S. 611, 614 (1971)).

The plain meaning of the challenged phrases wholly defeats Plaintiff's claim. Indeed, Congress specifically defined the phrase "affiliated with"—under Section 1260H, it means "in close formal or informal association." § 1260H(g)(1), 138 Stat. at 2124. And courts have had no trouble applying that definition in the Section 1260H context. Judge Friedman in *SZ DJI*

27

*Technology* applied the statutory definition in a case that considered both the pre- and post-amendment statute, noting that the term "should be interpreted broadly and requires some 'close' relationship." 2025 WL 2761210, at *12. Further underscoring that the term is susceptible to the standard tools of statutory interpretation is the fact that earlier (pre-Section 1260H) cases took a narrower view of the same phrase in a predecessor statute.

In *Luokung Technology Corp. v. Department of Defense*, Judge Contreras rejected the government's argument that the phrase—as enacted in section 1237, the pre-Section 1260H scheme—meant any entity with "a common purpose" or "shared characteristics," finding instead that the term meant "a company effectively controlled by another or associated with others under common ownership or control." 538 F. Supp. 3d 174, 183–88 (D.D.C. 2021) (citation omitted).[5] In that case, the plaintiff made a policy argument—like Plaintiff here—that the broad definition would "have almost no limiting princip[le]," suggesting that Congress could not have "intended to provide the Department of Defense" with such discretion. *Id.* at 187.

The problem for Plaintiff is that Congress later amended Section 1260H to provide an explicit definition for the phrase and to make clear that it *did* intend the term to be interpreted broadly and independently of whether any control relationship exists. *See* § 1260H(g)(1), 138 Stat. at 2124. That amendment itself provides important evidence as to the scope of the statutory definition and the corresponding specified standard of conduct—*i.e.*, that it should be "interpreted broadly." *SZ DJI Tech.*, 2025 WL 2761210, at *12. And the questions of whether one entity has an "association" that is some way "close" is readily susceptible to judicial review through the application of the traditional rules of statutory interpretation. *See Woodhull Freedom Found. v.*

---

[5] Incidentally, this out-of-date definition aligns with the definition that Plaintiff appears to have adopted in submitting evidence to the Department for its consideration. *See* ECF No. 13-22 ¶ 30 n.3; ECF No. 13-25 at 3.

*United States*, 72 F.4th 1286, 1305 (D.C. Cir. 2023) ("[T]he fact that a statutory . . . question may be difficult or unresolved does not make the law unconstitutionally vague."); *see also Association*, Black's Law Dictionary (12th ed. 2024) ("A gathering of people for a common purpose; the persons so joined."); *Close*, Merriam-Webster, https://www.merriam-webster.com/dictionary/close ("[B]eing near in time, space, effect, or degree."). Moreover, Plaintiff's own authority suggests that the use of a specific definition—thus providing a court sufficient context to determine the boundaries of the conduct prohibited under the statute—cures constitutional vagueness concerns. *See Humanitarian L. Project v. U.S. Dep't of the Treasury*, 484 F. Supp. 2d 1099, 1106–07 (C.D. Cal. 2007). Congress did just that here. And the broad definition it adopted serves to provide a standard of conduct for courts to apply to the Department's determinations here. *See SZ DJI Tech.*, 2025 WL 2761210, at *12–16 (applying the definition to determine that substantial evidence supported an "affiliated with" finding in some instances and not in others).

Plaintiff's passing reference to purported vagueness in the term "owned by," ECF No. 13 at 29—a claim it failed to raise in its complaint, *see* ECF No. 1 ¶¶ 88–91; *see also Fares v. Smith*, 249 F. Supp. 3d 115, 125 (D.D.C. 2017) (noting that it is "axiomatic" that plaintiffs "cannot amend their Complaint via their briefs")—fails for similar reasons. As noted above, the plain meaning of the phrase "owned by" adequately conveys that one entity "ha[s] or hold[s] as property" or "possess[es]" another. *Own*, Merriam-Webster, https://www.merriam-webster.com/dictionary/own; *see also Own*, Black's Law Dictionary (12th ed. 2024) ("To rightfully have or possess as property; to have legal title to."); *Mediate Possession*, Black's Law Dictionary (12th ed. 2024) ("Also termed *indirect possession*"; "[p]ossession of a thing through someone else, such as an agent."). And the determination of whether one entity owns another

29

one—either directly or indirectly—is, using the standard tools of statutory interpretation, readily susceptible to judicial construction. *See Bronstein*, 849 F.3d at 1106. Section 1260H is not unconstitutionally vague.

## II.    Plaintiff Fails to Satisfy Its Burden to Show Irreparable Harm.

Plaintiff fails to satisfy its heavy burden to show irreparable harm for two main reasons. First, the bulk of the harm it alleges—both regulatory and economic—would result from a hypothetical future designation under the BIOSECURE Act as a "biotechnology company of concern." Such harm is, at this stage, merely theoretical and cannot support preliminary relief against the application of Section 1260H.

Second, the harms that Plaintiff alleges flow directly from the Section 1260H designation, including certain reputational, economic, and constitutional injuries, are insufficiently great to warrant preliminary relief. Indeed, the magnitude of these alleged harms is, at this stage, indeterminate and limited in scope. And, in the context of WuXi's entire business, WuXi has failed to show that any impact to its operations—either in terms of costs or its ability to attract or retain employees—constitutes sufficiently great irreparable harm to receive preliminary relief.

### A.    The irreparable-harm standard sets a high bar for receiving relief.

To receive preliminary-injunctive relief, a plaintiff must prove it has suffered or will imminently suffer immediate and irreparable harm. To satisfy that burden, a plaintiff must show that an alleged injury is "both certain and great." *Wis. Gas Co. v. Fed. Energy Regul. Comm'n*, 758 F.2d 669, 674 (D.C. Cir. 1985). And the injury must be "actual," not "theoretical." *Id.* Indeed, "[i]njunctive relief 'will not be granted against something merely feared as liable to occur at some indefinite time.' " *Id.* (quoting *Connecticut v. Massachusetts*, 282 U.S. 660, 674 (1931)). The "party seeking injunctive relief must show" that the injury is "of such *imminence* that there is a 'clear and present' need for equitable relief to prevent irreparable harm." *Id.* (citation omitted).

In particular, "economic loss" typically "does not, in and of itself, constitute irreparable harm." *Id.* "Recoverable monetary loss may constitute irreparable harm only where the loss threatens the very existence of the movant's business." *Id.* To be sure, the government's "sovereign immunity almost always bars a party from recovering those costs even if" an agency action or rule "is later invalidated." *Am. Fed'n of Lab. & Cong. of Indus. Orgs. v. Sonderling*, Civ. A. No. 26-2061 (JEB), 2026 WL 1906727, at *4 (D.D.C. July 2, 2026). In those cases, because such losses are "unrecoverable," "monetary loss can be irreparable." *Id.*

But, to receive preliminary relief, even irreparable harm—be it economic, reputational, or otherwise, must be sufficiently "great." *Clevinger v. Advoc. Holdings, Inc.*, 134 F.4th 1230, 1234 (D.C. Cir. 2025) (citation omitted); *see also Wis. Gas*, 758 F.2d at 674. "That universal rule applies to monetary loss, just as it does to any other kind of harm." *Sonderling*, 2026 WL 1906727, at *4; *see also In re NTE Conn., LLC*, 26 F.4th 980, 990 (D.C. Cir. 2022) (noting that the claimant there faced harm to its revenue stream worth "millions of dollars," which the agency did "not dispute" is significant). Indeed, were it true that any lesser showing could satisfy preliminary-injunctive relief simply because the defendant enjoys sovereign immunity, then such a rule would "effectively eliminate the irreparable harm requirement," *Woodstream Corp. v. Jackson*, Civ. A. No. 11-867 (JEB), 2011 WL 8883395, at *8 (D.D.C. June 3, 2011). Under that logic, "[a]ny movant that could show any damages against an agency with sovereign immunity—even as little as $1—would satisfy the standard." *Id.* And such injuries could hardly be said to satisfy the standard for entry of the "extraordinary and drastic remedy" of an injunction against the enforcement of an agency action. *Munaf*, 553 U.S. at 689 (citation omitted).

Finally, a movant must show with a "high degree of proof" that the "harm is irreparable." *Sonderling*, 2026 WL 1906727, at *5. That means a plaintiff must show "injury that is sufficiently

31

certain, persuasively demonstrated, and so clearly irremediable that it warrants a court reaching out to alter the status quo before the merits are resolved." *Hanson v. District of Columbia*, 120 F.4th 223, 244 (D.C. Cir. 2024), *cert. denied*, 145 S. Ct. 2778 (2025). That showing must be "clear." *Winter*, 555 U.S. at 22.

**B.     Most of Plaintiff's alleged harms stem from a hypothetical BIOSECURE Act designation and thus are abstract, theoretical, and not imminent.**

Plaintiff alleges that it has suffered and will suffer "legal impacts," "regulatory scrutiny," "reputational harms," and "substantial economic losses" from Defendants' designation of WuXi as a Chinese military company. ECF No. 13 at 32–41. But closer inspection of those claims—and the evidence Plaintiff provides to support those claims—reveals that they rest on the premise that the Director of the Office of Management and Budget will designate Plaintiff under the BIOSECURE Act. Because that designation has not yet occurred, harms resulting from that hypothetical future designation are not of "such *imminence* that there is a 'clear and present' need for equitable relief." *Wis. Gas*, 758 F.2d at 674 (citation omitted).

For instance, Plaintiff's harm showing starts by referencing harm to its "hard-won reputation." ECF No. 13 at 31. It continues, though, by arguing that "the damage to its relationships and reputation is intertwined with and compounded by the BIOSECURE Act." *Id.* It contends that the "very significant restrictions of that Act" flow from the Section 1260H designation. *Id.* at 32. And it pins its alleged regulatory harms, "[f]irst and foremost," on the "devastating restrictions in the BIOSECURE Act." *Id.* Even alleged reputational harms impacting Plaintiff's ability to recruit and retain employees ties to the potential for BIOSECURE Act designation: Plaintiff cites "uncertainty" in the time period following the original 2024 BIOSECURE Act introduction, *id.* at 36, and argues that Defendants' actions have now "placed the Company fully in the crosshairs" of the Act, *id.* And Plaintiff's economic harm showing ties almost exclusively to the harms it alleges

32

will result to its "entire U.S. market"—which "will fall victim to the tightening noose of the BIOSECURE Act." *Id.* at 37; *see also* ECF No. 13-22 ¶¶ 19, 37 (laying out Plaintiff's revenue breakdown and further explaining that a BIOSECURE Act "restriction would foreclose a substantial part of the U.S. market that the Company currently serves").

But no BIOSECURE Act designation has occurred. Indeed, the entity responsible for making that designation—the Office of Management and Budget—is not a party to this litigation, presumably for that very reason. Plaintiff asserts throughout its papers that Section 1260H designation "automatically results" in designation under the BIOSECURE Act, ECF No. 1 ¶ 7; *see also* ECF No. 13 at 2, but that claim is (1) mistaken and (2) not sufficiently imminent to support an irreparable-harm showing. As outlined above, a Section 1260H designation is only "the first step toward" designation under the BIOSECURE Act. ECF No. 13-18 at 2. To be designated a biotechnology company of concern, the Director of the Office Management and Budget must still—upon receiving a list of "suggested entities" from the Secretary of Defense, Attorney General, Secretary of Health and Human Services, Secretary of Commerce, Director of National Intelligence, Secretary of Homeland Security, Secretary of State, and National Cyber Director— affirm that an entity is "to any extent involved in the manufacturing, distribution, provision, or procurement of any biotechnology equipment or service, as determined by" the consultation among identified agency heads. § 851(f)(2)(A)(i), 139 Stat. at 984. Plaintiff acknowledges that it has no evidence such a process has occurred or been consummated, noting that BIOSECURE Act restrictions "*could* take effect more imminently" than late 2028. ECF No. 13 at 13 (emphasis added).

The very fact that no BIOSECURE Act designation has yet occurred means that Plaintiff's asserted harms flowing from such a designation cannot support an irreparable-harm showing for

33

an injunction against a *Section 1260H* designation. Harms to Plaintiff's "entire U.S. market," *id.* at 37, are, at this point, entirely speculative and insufficiently imminent, especially considering that there is no definite time by which such restrictions may take effect, *see Wis. Gas*, 758 F.2d at 674. Indeed, should this litigation proceed as other Section 1260H cases have—according to a dispositive-motion briefing schedule following the production of an administrative record, *see, e.g.*, Order, *Yangtze Memory Techs. Co. v. U.S. Dep't of Def.*, Civ. A. No. 25-4244 (PLF) (D.D.C. Mar. 27, 2026), ECF No. 16; Order, *SZ DJI Tech. Co. v. U.S. Dep't of Def.*, Civ. A. No. 24-2970 (PLF) (D.D.C. Feb. 24, 2025), ECF No. 25—then this Court could decide the merits of the litigation in mere months, well before the asserted injury from a hypothetical BIOSECURE Act designation "would occur," *Sonderling*, 2026 WL 1906727, at *6 (citation omitted). The many harms Plaintiff cites might flow from a BIOSECURE Act designation—including economic harms to Plaintiff's entire U.S. market, any regulatory burden that would result from such a designation, market uncertainty resulting from the potential for a such a designation, and reputational harms that might result from an inability to access biotechnology markets in the United States—cannot support a showing for preliminary relief against designation under a separate and distinct statutory scheme.

**C.    Plaintiff's alleged harms flowing directly from the Section 1260H designation are insufficiently great to support emergency relief.**

Plaintiff alleges a narrower set of harms flowing directly from its Section 1260H designation. Specifically, it alleges that the designation has caused certain customers and partners to "reassess" their reliance on WuXi, that other customers have "paused" or "suspend[ed]" work with WuXi, and that other customers have expressed "concern." ECF No. 13-22 ¶¶ 38–45. It also describes that its reputational injuries have resulted in market "volatility" and have impacted its

34

customer "relationships." *Id.* ¶¶ 47–50. And it further pins harms to its ability to attract and retain employees on those reputational injuries. *See* ECF No. 13 at 35–36.

These additional harms Plaintiff alleges come nowhere close to sufficiently great to justify emergency relief. Plaintiff's evidence shows that, in response to the Section 1260H designation, "the Company's customers and partners" are "reassess[ing] their reliance on the Company" and beginning to develop "contingency arrangements" by, for instance, "evaluating alternative suppliers and adding contractual safeguards." ECF No. 13-22 ¶ 38. Plaintiff does not contend that these reassessments have led to any tangible loss in business or other cognizable harm. *See id.* Plaintiff then further describes one "U.S. biopharmaceutical customer" that has "paused further engagement with the Company pending an internal review," *id.* ¶ 41, an apparent "wave" of "customer concern," *id.* ¶ 42, another customer that "placed all collaborative projects on hold," *id.* ¶ 43, another customer who may "reassess[]" their contracts, *id.*, and several instances—the exact number is unclear—of customers "paus[ing]" "new activity" and "suspend[ing]" pending orders, *id.* ¶¶ 43–44. And it points to "concerns" from one supplier that may lead the supplier to "include a commitment that the products would not be used in military projects before it would ship them"—again, without specifying how such a requirement might tangibly harm Plaintiff. *Id.* ¶ 45.

The few specific examples Plaintiff cites of pauses or suspensions of current or pending orders due to the Section 1260H designation, *see id.* ¶ 43–44, fail to establish sufficiently "certain and great" harm, *Wis. Gas*, 758 F.2d at 674, especially considering the magnitude (or lack thereof) of any potential revenue impacts from the pauses and suspensions as compared to Plaintiff's total global revenue of 45.5 billion renminbi, *see id.* ¶ 13, which, as of filing, totals approximately $6.7 billion, *see Currency Exchange Rates Converter*, FiscalData.Treasury.gov, https://fiscaldata.treasury.gov/currency-exchange-rates-converter/ (converted by selecting "June

35

30, 2026" as the "Published Date," entering 45,500,000,000 into "Foreign Currency" "Amount," and selecting "China-Renminbi" under "Country-Currency"). Indeed, without establishing that such pauses or suspensions are significant "in the context of" Plaintiff's "overall financial health," Plaintiff cannot show they constitute sufficiently great irreparable injury. *Alcresta Therapeutics, Inc. v. Azar*, 318 F. Supp. 3d 321, 327 (D.D.C. 2018); *see also Cardinal Health, Inc. v. Holder*, 846 F. Supp. 2d 203, 212 (D.D.C. 2012) (finding insufficient an alleged loss of $1 billion in sales in the context of the plaintiff's $102 billion in revenue); *Air Transp. Ass'n of Am., Inc. v. Exp.-Imp. Bank of the U.S.*, 840 F. Supp. 2d 327, 338 (D.D.C. 2012) (finding insufficient an alleged harm of $2.1 billion in the context of the plaintiff's $31.8 billion in revenue).

Not only does this purported harm from customer "concerns," pauses, suspensions, reassessments, and imposition of contract conditions fail to establish that the "very existence" of Plaintiff's business is "threaten[ed]," *Wis. Gas*, 758 F.2d at 674, but Plaintiff's own authority establishes that the impact from the Section 1260H designation is not sufficient to warrant preliminary relief. *See, e.g.*, *Morgan Stanley DW Inc. v. Rothe*, 150 F. Supp. 2d 67, 77 (D.D.C. 2001) (finding irreparable harm both because potential damages to the plaintiff could be "incalculable," as hundreds of high-value clients could be lost, and customer "trust and goodwill" for all clients if their accounts were rendered non-confidential); *Armour & Co. v. Freeman*, 304 F.2d 404, 406 (D.C. Cir. 1962) (noting that "damage" to a plaintiff's "good name" would result and that the plaintiff's "only other alternative" to compliance with a regulation would be to wholly withdraw "from the interstate market," causing "loss of profits"); *TikTok Inc. v. Trump*, 490 F. Supp. 3d 73, 77–78, 84 (D.D.C. 2020) (establishing that the plaintiff would suffer irreparable harm, as "one of the fastest growing apps in the United States," due to "erosion of [the plaintiff's] attractiveness as a commercial partner" and its inability to "recruit and retain employees to build—

36

or even maintain—its business" only after imposition of conditions that would wholly ban the plaintiff from participating in the United States social-media market); *Luokung*, 538 F. Supp. 3d at 192–194 (D.D.C. 2021) (finding the plaintiff had suffered irreparable harm upon a showing of economic loss that had already been consummated through contract terminations, the delisting of the plaintiff from the only public trading market for the company's shares in the United States, the complete termination of access to U.S. capital markets, and negative impacts to the plaintiff's "ability to recruit or retain top talent," made acute by the fact that "73% of total compensation for core employees in the past year was in the form of stock and stock options"); *see also* ECF No. 13 at 35–41 (relying on the above caselaw). Plaintiff fails to establish its alleged economic harms will occur with the same certainty and extent as economic harms that have been found to be irreparable. At best, it alleges a "brief interruption" to its business, not "a complete prohibition of the right to engage in a calling," typically necessary to show harm for similar claims (including due-process reputation-based claims). *Conn v. Gabbert*, 526 U.S. 286, 292 (1999).

Indeed, the very fact that many of Plaintiff's purported harms here rest explicitly on the eventual outcome of this litigation—*e.g.*, by "plac[ing] all collaborative projects on hold until the Company's name is removed from the 1260H list," ECF No. 13-22 ¶ 43, by asking Plaintiff to "clarify the scope and timing of the law's effect," *id.*, or by adopting a "wait and see" posture, *id.*—means that Plaintiff cannot make the requisite irreparable-harm showing to receive extraordinary emergency relief. "The possibility that adequate compensatory or other corrective relief will be available at a later date . . . weighs heavily against a claim of irreparable harm." *Va. Petroleum Jobbers Ass'n v. Fed. Power Comm'n*, 259 F.2d 921, 925 (D.C. Cir. 1958); *see also Wis. Gas*, 758 F.2d at 674 (restating the same rule); *Clevinger*, 134 F.4th at 1234 (same). Plaintiff fails to quantify those costs or harms *now*, meaning that—should the Court find in its favor on the

37

merits—it is likely to suffer no harm at all, given that the contingent suspensions it identifies now will no longer be in effect.

Further, mere "apprehension and unease," ECF No. 13 at 35; *see also id.* at 35–37 (describing similar concerns related to employee retention and in maintaining banking relationships), without a more significant showing, do not constitute sufficient injury to receive preliminary relief, *see Jones v. District of Columbia*, 177 F. Supp. 3d 542, 547–48 (D.D.C. 2016) (explaining that reputational harm must not be "vague and unsupported" and must be "certain and great" (citation omitted)). And unspecified "compliance costs" resulting from a regulatory burden are "typically insufficient to constitute irreparable harm." *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 115 (2d Cir. 2005); *see also Am. Hosp. Ass'n v. Harris*, 625 F.2d 1328, 1331 (7th Cir. 1980); *A.O. Smith Corp. v. Fed. Trade. Comm'n*, 530 F.2d 515, 527–28 (3d Cir. 1976). *But see Kentucky v. Biden*, 57 F.4th 545, 556 (6th Cir. 2023) (noting that other courts of appeals have held that compliance costs "do not qualify as irreparable harm" and declining to adopt a categorical rule against considering them, instead factoring in costs' "peculiarity and size" for their "weight in the equitable balance").

Plaintiff also proposes that the "loss of constitutional freedoms," for "even minimal periods of time," constitutes irreparable injury. ECF No. 13 at 41 (quoting *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009)). But that finding depends on showing a likelihood of success on the merits of the constitutional due-process claim brought here. *See Simms v. District of Columbia*, 872 F. Supp. 2d 90, 104–05 (D.D.C. 2012). As explained above, Plaintiff has failed to establish a likelihood of success on its procedural-due-process claim. *See supra* Section I.A.2. And the weakness of Plaintiff's claim has additional relevance under the irreparable-harm prong given that it alleges harm in part due to the "public stigmatization" of WuXi. ECF No. 13 at 27.

38

But, as discussed above, only "stigmatization that broadly precludes individuals or corporations from a chosen trade or business deprives them of liberty in violation of the Due Process Clause." *Trifax*, 314 F.3d at 644. Plaintiff has not made that showing. Even under its most drastic—and speculative—predictions, BIOSECURE Act restrictions may, at some point, "foreclose a substantial part of the U.S. market that the Company currently serves," which makes up approximately 70 percent of WuXi's total revenue. ECF No. 13-22 ¶¶ 13, 37. That is not a broad preclusion. And Plaintiff cannot even say with certainty that such restrictions will apply, what proportion of its U.S. market may be foreclosed, and how its business in other locations might or might not change in the coming months and years. Even setting aside the merits of its constitutional claim, Plaintiff fails to carry its burden to show that its purported due-process harms satisfy its demanding burden to obtain emergency injunctive relief.

Finally, on the evening of Friday, July 10, 2026—the eve of Defendants' filing deadline on Monday, July 13—Plaintiff's counsel informed Defendants' counsel that Plaintiff intended to raise an argument in its reply that it is being irreparably harmed because its sole U.S. lobbying firm terminated its relationship with WuXi, purportedly due to concerns over liability under 10 U.S.C. § 4663, which prohibits the Department from entering into a contract with "an entity, a parent company of such entity, or a subsidiary of such entity if such entity is a party to a contract with a 'covered lobbyist' "—an entity that engages in lobbying activities for any entity determined to be a Chinese military company listed in accordance with [S]ection 1260H." 10 U.S.C. §§ 4663(a), (d)(1). But Plaintiff failed to make this argument or provide supporting evidence in its preliminary-injunction motion, noting only in a footnote that "the Company's lobbyists are being forced to consider cutting ties with the Company." ECF No. 13 at 33 n.2; *see Clevinger*, 134 F.4th at 1236 (noting that the plaintiff-appellant had failed to raise a legal argument in support of its

preliminary-injunctive irreparable-harm showing "until its reply brief" on appeal, forfeiting that argument); *Ass'n for Educ. Finance & Policy, Inc. v. McMahon*, 786 F. Supp. 3d 13, 31 n.7 (D.D.C. 2025) (noting that a plaintiff forfeited its merits claim in a preliminary-injunction motion because it was "raised for the first time in reply" and the party was initially "obscure on the issue" and "only warmed to the issue in their reply brief" (citation omitted)); *Nguyen v. U.S. Dep't of Homeland Sec.*, 460 F. Supp. 3d 27, 34 (D.D.C. 2020) (noting that evidence of standing "newly proffered" in reply in the context of a temporary restraining order or preliminary injunction is forfeited (citation omitted)).

In any event, nothing in 10 U.S.C. § 4663 prohibits Plaintiff from enlisting the assistance of another lobbying firm or from lobbying on behalf of itself. And any economic injury Plaintiff might suffer from the loss of its lobbying firm (which, as of now, is entirely unquantified), cannot suffice to show sufficient harm without additional context as to the scope of the injury in the context of Plaintiff's overall operations. As such, Plaintiff's claim is not sufficiently "great" to obtain preliminary relief. *Wis. Gas.*, 758 F.2d at 674; *see also Alcresta Therapeutics*, 318 F. Supp. 3d at 327; *Air Transp. Ass'n*, 840 F. Supp. 2d at 338.

\*   \*   \*

Plaintiff fails to show irreparable harm both certain and great enough to warrant preliminary relief. The bulk of its allegations concern hypothetical harms from a designation that has not yet occurred. And its remaining allegations are insufficiently extensive to warrant extraordinary emergency relief. Plaintiff's motion for preliminary injunction can be denied on this basis alone.

## III.   The Balance of the Equities and Public Interest Strongly Favor Defendants.

Under the final factors necessary to show an entitlement to emergency injunctive relief, courts must "balance the competing claims of injury" and "consider the effect on each party" with

40

"the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24 (citation omitted). Courts must also pay "particular regard for the public consequences in employing the extraordinary remedy of injunction." *Id.* (citation omitted). And courts give particular deference to the government's factual determinations and corresponding interests in the "sensitive and weighty interests of national security and foreign affairs." *Holder v. Humanitarian L. Project*, 561 U.S. 1, 33–34 (2010); *see also Strait Shipbrokers Pte Ltd. v. Blinken*, 560 F. Supp. 3d 81, 99–100 (D.D.C. 2021).

Here, as in *Strait Shipbrokers*, Plaintiff argues that it will suffer "severe and unrecoverable harm" and that the purported illegality of the government's action itself suggests that Defendants cannot succeed in showing the equities favor them or that there is a public interest in "the perpetuation of unlawful agency action." ECF No. 13 at 42–43 (quoting *League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016)); *see also Strait Shipbrokers*, 560 F. Supp. 3d at 99–100. But that "description of the equities and the public interest is myopic." *Strait Shipbrokers*, 560 F. Supp. 3d at 100. Section 1260H provides the government an important national-security and foreign-affairs tool to limit foreign—"particularly adversarial government"—influence on Department contractors. Alexandra G. Neenan, Cong. Rsch. Serv., R48110, *Department of Defense Contractors and Efforts to Mitigate Foreign Influence* 1 (2024), https://www.congress.gov/crs-product/R48110. Indeed, two branches of the government, working in concert, have determined that security risks posed by adversarial government influence on government contracting and supply chains merit significant oversight. *See id.*

The public interest, then, is at its zenith where, as here, both Congress and the Executive have made the assessment that specific foreign-affairs and national-security concerns justify the creation and application of a specific statutory scheme to address those concerns. *See*

41

*Humanitarian L. Project*, 561 U.S. at 33–34; *see also Winter*, 555 U.S. at 24 (noting the deference due at the preliminary-injunction stage to the "professional judgment of military authorities concerning the relative importance of a particular military interest" (citation omitted)); *Boumediene v. Bush*, 553 U.S. 723, 797 (2008) ("Unlike the President and some designated Members of Congress, neither the Members of this Court nor most federal judges begin the day with briefings that may describe new and serious threats to our Nation and its people. The law must accord the Executive substantial authority to [address such threats].").

Congress intended the Department to have significant tools at its disposal to ensure that the federal contracting supply chain remains free of any security risks, and it trusted that the "institutional expertise," *Strait Shipbrokers*, 560 F. Supp. 3d at 100, of the Department could be applied to address such risks expeditiously and effectively. Such interests are "sensitive and weighty," *Humanitarian L. Project*, 561 U.S. at 33, and "plainly" outweigh any individual corporate interest or harm Plaintiff may suffer during the pendency of this litigation, *Winter*, 555 U.S. at 26; *see also Am. C.L. Union v. Clapper*, 785 F.3d 787, 826 (2d Cir. 2015) (noting that the maintenance of national security "is a public interest of the highest order"). The balance of the equities and public interest weigh decisively against Plaintiff's request for a preliminary injunction.

## IV.    The Court Should Stay Any Preliminary Injunction and Require a Bond as Security

If the Court decides to grant preliminary relief, it should stay any such injunction pending any appeal authorized by the Solicitor General. *See* Fed. R. App. 8(a). For the reasons explained above, Defendants have, at a minimum, satisfied the requirements for a stay of any injunction pending appeal. *See Nken*, 556 U.S. at 434 (describing the standard for obtaining such a stay and noting the "substantial overlap" between that standard and "the factors governing preliminary injunctions").

Finally, the Court should order security with any preliminary injunction. Under Federal Rule of Civil Procedure 65(c), the Court may issue a preliminary injunction "only if the movant give security" for "costs and damages sustained" by Defendants if they are later found "to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). In the event the Court issues an injunction here, the Court should require Plaintiff to post an appropriate bond commensurate with the scope of any injunction. *See DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999) (noting that Rule 65(c) vests in the district court "broad discretion to determine the appropriate amount of an injunction bond"). Contrary to Plaintiff's argument, *see* ECF No. 13 at 44, a bond is appropriate here given that any preliminary relief may result in a mandate that the Executive—at a minimum, the Department of Defense, *see* National Defense Authorization Act for Fiscal Year 2024, Pub. L. No. 118-31, § 805, 137 Stat. 136, 315–17 (2023)—spend money on unwanted uses of goods or services from WuXi or its subsidiaries that may be lost forever once distributed. *See Dep't of Educ. v. California*, 604 U.S. 650, 651 (2025) (noting that an order setting aside an agency's action may result in the disbursement of funds). Indeed, setting bond serves an important deterrence effect: "that of forcing the plaintiff to consider the injury to be inflicted on its adversary in deciding whether to press ahead in its quest for a preliminary injunction." *Nat'l Kidney Patients Ass'n v. Sullivan*, 958 F.2d 1127, 1134 (D.C. Cir. 1992); *see also Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 804 (3d Cir. 1989) (recognizing that the "bond deters rash applications for interlocutory orders" (citation omitted)). Security is warranted here.

## CONCLUSION

For the reasons stated above, the Court should deny Plaintiff's motion for preliminary injunction (ECF No. 13). To preserve the Court's and the parties' resources and to limit duplicative seriatim briefing, Defendants also request that the Court stay Defendants' obligation to answer or

otherwise respond to Plaintiff's complaint—which response is currently due by August 14, 2026,

*see* Return of Service, ECF No. 5—until 60 days after the Court's resolution of Plaintiff's motion

for preliminary injunction (ECF No. 13).

Dated: July 13, 2026                                      Respectfully submitted,

                                                         BRETT A. SHUMATE
                                                         Assistant Attorney General, Civil Division

                                                         ERIC J. HAMILTON
                                                         Deputy Assistant Attorney General

                                                         KRISTINA A. WOLFE
                                                         Assistant Branch Director

                                                         */s/ William S. Jankowski*
                                                         WILLIAM S. JANKOWSKI
                                                         D.C. Bar No. 90021524
                                                         Trial Attorney
                                                         U.S. Department of Justice
                                                         Civil Division, Federal Programs Branch
                                                         1100 L Street NW
                                                         Washington, DC 20530
                                                         (202) 353-7578
                                                         william.s.jankowski@usdoj.gov

                                                         *Counsel for Defendants*