UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

WUXI APPTEC CO., LTD.,

    **Plaintiff,**

      **v.**

U.S. DEPARTMENT OF DEFENSE, also
known as U.S. DEPARTMENT OF WAR,
*et al.*,

    **Defendants.**

Civil Action No. 26-2069 (JEB)

**MEMORANDUM OPINION**

A scarlet letter sends a clear message: keep away.  With that understanding, the Department of Defense — also known as the Department of War — publicly designated Plaintiff WuXi AppTec Co., Ltd., a "Chinese military company" under Section 1260H of the National Defense Authorization Act for Fiscal Year 2021.  Congress created the Section 1260H list in part to warn others away from listees, and it has stacked serious consequences atop designation: a bar on Department contracts, limits on certain federal funds, and the necessary predicate for treatment as a "biotechnology company of concern" under the BIOSECURE Act.  Many have reacted accordingly.  In the weeks since publication, WuXi's customers and suppliers have canceled contracts, terminated longstanding relationships, and moved their business to competitors.

Plaintiff responded with this suit and now seeks a preliminary injunction barring Defendants from enforcing or giving effect to the designation while this case proceeds.  As the Department's justifications stray from the record, the Court concludes that Plaintiff has

1

established a likelihood that the designation was arbitrary and capricious under the

Administrative Procedure Act.  The designation, meanwhile, is inflicting harm on WuXi that

later relief cannot repair.  Because the remaining injunction factors also favor Plaintiff, the Court

will grant the Motion and preliminarily enjoin Defendants from enforcing or giving effect to the

designation.

## I.      Background

### A.      Statutory Background

Congress's efforts to identify companies with close ties to the Chinese government are

not new.  Stretching back to 1998, Section 1237 of the National Defense Authorization Act for

Fiscal Year 1999 directed the Secretary of Defense to identify "Communist Chinese military

companies" operating in the United States.  That category included entities identified in Defense

Intelligence Agency publications along with companies owned or controlled by the People's

Liberation Army (PLA) that engaged in commercial services, manufacturing, production, or

exporting.  See Pub. L. No. 105-261, § 1237(b)(1), (4), 112 Stat. 1920, 2160–61 (1998).  By

2004, Congress concluded that the definition overlooked "a class of firms engaged in Chinese

military modernization."  H.R. Rep. No. 108-491, at 367 (2004).  It therefore expanded the

statute to encompass companies linked to the PLA or Chinese government ministries, as well as

companies owned or controlled by China's defense-industrial base.  See Ronald W. Reagan

National Defense Authorization Act for Fiscal Year 2005, Pub. L. No. 108-375, § 1222, 118 Stat.

1811, 2089 (2004).

The present regime took shape in 2021, when Congress enacted Section 1260H and

created a new category of "Chinese military companies."  The term reached entities with

specified ownership, control, beneficial-ownership, or agency relationships with the PLA or

organizations subordinate to the Central Military Commission, as well as "military-civil fusion contributor[s]" to China's defense-industrial base.  See William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021, Pub. L. No. 116-283, § 1260H(d)(1)(B), 134 Stat. 3388, 3965–66 (2021) (codified as amended at 10 U.S.C. § 113 note).  Congress broadened the former category in December 2024 by adding "affiliated with" as a qualifying relationship and expanding the roster of covered entities.  See Servicemember Quality of Life Improvement and National Defense Authorization Act for Fiscal Year 2025, Pub. L. No. 118-159, § 1346(2)(B)–(C), 138 Stat. 1773, 2124 (2024).

That history yields the present governing framework.  Under Section 1260H, to be so designated, a "Chinese military company" must be "engaged in providing commercial services, manufacturing, producing, or exporting." § 1260H(g)(2)(B)(ii).  It must also satisfy one of two routes to designation.  The first, and the one relevant here, includes an entity that is

> directly or indirectly owned by, controlled by, or beneficially owned by, affiliated with, or in an official or unofficial capacity acting as an agent of or on behalf of, the People's Liberation Army, Chinese military and paramilitary elements, security forces, police, law enforcement, border control, the People's Armed Police, the Ministry of State Security (MSS), or any other organization subordinate to the Central Military Commission of the Chinese Communist Party, the Chinese Ministry of Industry and Information Technology (MIIT), the State-Owned Assets Supervision and Administration Commission of the State Council (SASAC), or the State Administration of Science, Technology, and Industry for National Defense (SASTIND).

§ 1260H(g)(2)(B)(i)(I) (emphasis added).

Three pieces of the governing language warrant elaboration.  First, Congress defined "affiliated with" to mean "in close formal or informal association."  § 1260H(g)(1).  Second, the "People's Liberation Army" includes the "land, naval, and air military services, the People's Armed Police, the Strategic Support Force, the Rocket Force, and any other related security or

3

intelligence element . . . Secretary deems appropriate." § 1260H(g)(5). Third, the statute names SASAC and SASTIND without definitions. The record describes SASAC as a "ministerial-level organization" of the Chinese State Council that "supervises and manages the state-owned assets of enterprises under the supervision of the Central Government." ECF No. 17-1 (Administrative Record) at AR4626–27. SASTIND oversees the science-and-technology component of China's defense industry by "coordinating scientific research into weapons, nuclear equipment, aviation, and other military-industrial capabilities." ECF No. 17 (Opp.) at 5.

Separate provisions govern the listing process. The Secretary must identify each qualifying entity that, "based on the most recent information available," operates directly or indirectly in the United States. See § 1260H(a). Each year, he must submit classified and unclassified versions of the list to the Armed Services Committees of the House and Senate and concurrently publish the unclassified list in the Federal Register. See § 1260H(b)(1)–(2). That publication must contain a justification for each company's inclusion. See § 1260H(b)(2)(B). At least annually, the Secretary must revisit the list and add or remove companies as appropriate, supplying a justification for either action. See § 1260H(b)(1), (3).

While Section 1260H began as a reporting regime, Congress has since made designation the trigger for restrictions that have bite. As of June 30, 2026, the Department "may not enter into, renew, or extend a contract for the procurement of goods, services, or technology" with a designated company. See National Defense Authorization Act for Fiscal Year 2024, Pub. L. No. 118-31, § 805(a)(1)(A), (b), 137 Stat. 136, 315–16 (2023). DoD also may not contract with an entity that retains a lobbyist who simultaneously represents a designated company. See 10 U.S.C. § 4663(a), (d)(1). For fiscal year 2026, the Department of Homeland Security operates under a comparable restriction. See Department of Homeland Security Appropriations Act,

4

2026, Pub. L. No. 119-86, § 535, 140 Stat. 773, 804 (2026).  Designation also forecloses certain Department of Energy support and participation in specified federal research and manufacturing programs.  See 42 U.S.C. § 18912(a)(2)–(3), (c)(1)–(2); id., § 19235.

A further consequence may arise under Section 851 of the recently passed National Defense Authorization Act for Fiscal Year 2026, commonly called the BIOSECURE Act.  That Act directs the Director of the Office of Management and Budget, acting in consultation with the Secretary of Defense and other agency heads, to publish by December 18, 2026, an initial list of "biotechnology companies of concern."  Pub. L. No. 119-60, § 851(f)(1), 139 Stat. 718, 984 (2025).  To qualify as such, a company must both appear on the Section 1260H list and be "to any extent involved in the manufacturing, distribution, provision, or procurement of any biotechnology equipment or service."  Id., § 851(f)(2)(A), 139 Stat. at 984.  A Section 1260H designation is therefore necessary, but not sufficient, for inclusion.

Once the Act's restrictions become operative, executive agencies may not procure equipment or services "produced or provided by a biotechnology company of concern," nor may they contract with an entity that "uses" such equipment or services "in performance of [a] contract with [an] executive agency."  Id., § 851(a)(1)–(2), 139 Stat. at 981–82.  Agencies likewise may not "obligate or expend" loan or grant funds for the procurement or use of such equipment or services.  Id., § 851(b)(1), 139 Stat. at 982.  The Act accordingly affects not only biotechnology companies of concern, but also customers that rely on their equipment or services in federally contracted or funded work.

B.    Factual Background

1.    *WuXi AppTec Co., Ltd.*

Plaintiff WuXi AppTec (WXAT) "is a global provider of services to pharmaceutical and life science companies."  ECF No. 1 (Compl.), ¶ 18; see also ECF No. 13-22 (Declaration of Steve Qing Yang), ¶ 2 (describing WXAT as "Contract Research, Development, and Manufacturing Organization" or "CRDMO").  Founded in 2000, the company does not sell its own products but supports customers throughout the drug-development lifecycle — from discovery and testing through large-scale manufacturing — to advance projects addressing cancer, HIV, obesity, diabetes, and cardiovascular disease.  See Yang Decl., ¶¶ 2, 10, 18.  More than 4,000 customers across the globe, including leading pharmaceutical companies, use those services.  See Compl., ¶¶ 3, 13; Yang Decl., ¶ 10.

Although incorporated in China and traded on the Hong Kong and Shanghai stock exchanges, see Compl., ¶ 13, Plaintiff maintains U.S. ties that are far from *de minimis*.  WXAT operates six facilities in the United States, employs roughly 450 people here, and serves more than 1,000 U.S. customers.  See Yang Decl., ¶¶ 8, 17–19.  A majority of the company's Board of Directors and executive managers are U.S. citizens — among them is founder, Chairman, and Chief Executive Officer Dr. Ge Li, who stands as the company's controlling shareholder.  Id., ¶ 17; Compl., ¶ 21.  Customers in the United States accounted for roughly 70% of WXAT's 2025 revenue, compared with 15% from China and 11% from Europe.  See Yang Decl., ¶ 13.  The company's recent domestic investment includes a 190-acre manufacturing site in Middletown, Delaware, built at a cost of approximately $600 million and scheduled for completion this year.  Id., ¶ 18.

6

### 2.    *1260H Designation*

WXAT's appearance on the 1260H list followed years of exchanges with the Department of Defense.  On August 26, 2024, Plaintiff briefed Department officials, presenting "information about the [c]ompany's business," advancing its position that it does not meet Section 1260H's criteria, and disputing reports linking it to the PLA.  Id., ¶ 25; Compl., ¶ 28.  In response to a slew of follow-up questions from the Government, WXAT provided written responses stating that it had "never received financial sponsorship from the Chinese Communist Party ('CCP'), PLA, or Chinese Academy of Sciences."  Yang Decl., ¶ 25.  When the next 1260H list was published on January 7, 2025, Plaintiff's name was absent.  See Compl., ¶ 30.

Whatever comfort WXAT drew from that omission soon evaporated.  With amendments to Section 1260H changing the landscape for designation, the company reached out to the Department on August 25, 2025, to make its case anew.  Id., ¶ 31.  A meeting set for October was postponed to November given a lapse in appropriations.  Id.  In the interim, however, Deputy Secretary of Defense Steve Feinberg sent a letter to the House and Senate Armed Services Committees on October 7 indicating that several companies should be added to the 1260H list — WXAT included.  Id.; see also ECF No. 13-6 (Bloomberg Article).  Unaware of that letter, Plaintiff forged ahead with the November meeting, once again describing its business, governance, and ownership structures and denying any Chinese state or military ownership or affiliation.  See Compl., ¶¶ 31, 33.

An updated 1260H list eventually appeared, disappeared, and reappeared.  On February 13, 2026, the Department made public a pre-publication version that included Plaintiff with a single-sentence justification: "WuXi AppTec is indirectly owned by SASAC and is indirectly affiliated with SASTIND and the PLA."  ECF No. 13-10 (Feb. 2026 Designation Notice) at ECF

p. 19.  Roughly an hour later, the Federal Register removed the list at the Department's request.  See Compl., ¶ 42.  Plaintiff sought the reasoning behind that brief listing through a Freedom of Information Act request on May 9, 2026, see ECF No. 13-12 (FOIA Request) at ECF pp. 2–5, but DoD replied only to say that it would not answer within the statutory period.  See Compl., ¶ 46.  On June 8, Plaintiff wrote to Deputy Secretary Feinberg to dispute each of the three characterizations and to offer, once more, answers to any questions.  See ECF No. 13-25 (Connell Letter) at ECF pp. 2–4.  Hours later, the Department posted an updated list naming Plaintiff, which the Federal Register published on June 10.  See Compl., ¶ 48; ECF No. 13-14 (June 2026 Designation Notice); Notice of Availability of Designation of Chinese Military Companies, 91 Fed. Reg. 35189, 35189, 35194 (June 10, 2026).  The justification remained the February sentence, unchanged.  See 91 Fed. Reg. at 35194.

Behind that sentence sits an internal Department report dated May 29, 2026, see Administrative Record at AR55–77, which Plaintiff first saw when excerpts of the administrative record were produced in this litigation.  See Opp. at 5 n.2.  That report states that the Department relied on "the latest information available" and took into account its prior exchanges with WXAT.  See Administrative Record at AR57, AR60.  It sets out three independent grounds for designation, each said to satisfy either the ownership or affiliation prong.  Id. at AR60–66.

The first is indirect ownership by SASAC.  The report finds that the Aviation Industry Corporation of China (AVIC) — a state-owned enterprise owned and overseen by SASAC and itself designated on the Section 1260H list — holds a 5.32% stake in WXAT through the AVIC Military-Civilian Integration Selected Fund.  Id. at AR60–61, AR4554.  It also cites reporting of an undisclosed investment from a similarly named fund likely tied to the same corporation.  Id. at AR61, AR4581.  The second is indirect affiliation with SASTIND, which the report grounds in

five studies, or sets of studies, that Plaintiff allegedly conducted with universities supervised by SASTIND. Id. at AR63–65. The third — indirect affiliation with the People's Liberation Army — rests on a single study that a WXAT subsidiary in Shanghai conducted alongside the PLA General Hospital. Id. at AR65–66.

### C.    Procedural Background

Plaintiff filed this action on June 11, 2026, against the Department of Defense — also known as the Department of War — along with Secretary Pete Hegseth, Deputy Secretary Feinberg, and Assistant Secretary Michael Cadenazzi in their official capacities. See Compl., ¶¶ 14–17. Because the Government's own briefing retains the name Department of Defense, the Court does the same.

The Complaint pleads five counts. The first three arise under the Administrative Procedure Act, alleging that the Section 1260H designation (1) is arbitrary and capricious, in excess of statutory authority, and unsupported by substantial evidence, id., ¶¶ 65–72; (2) was made without observance of legally required procedure, id., ¶¶ 73–76; and (3) is contrary to constitutional right as a deprivation of protected liberty and property interests without adequate notice or an opportunity to be heard. Id., ¶¶ 77–83. The fourth count contends that the designation was ultra vires, id., ¶¶ 84–87, and the fifth that Section 1260H is void for vagueness as applied to Plaintiff or, in the alternative, on its face. Id., ¶¶ 88–91.

WXAT moved for a preliminary injunction on June 29, seeking to "enjoin[] Defendants from enforcing, implementing, or otherwise giving effect to" Plaintiff's designation as a Chinese military company. See ECF No. 13 (PI Mot.) at ECF p. 1. The Government opposed that motion, see generally Opp., and the Court heard oral argument on July 22. See Minute Entry of July 22, 2026. This Opinion now follows.

## II.    Legal Standard

"A preliminary injunction is an extraordinary remedy never awarded as of right." Winter v. NRDC, 555 U.S. 7, 24 (2008). "A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." Sherley v. Sebelius, 644 F.3d 388, 392 (D.C. Cir. 2011) (alterations in original) (quoting Winter, 555 U.S. at 20). "[I]f the government is the opposing party," the latter two factors "merge." Glob. Health Council v. Trump, 153 F.4th 1, 12 (D.C. Cir. 2025).

"The moving party bears the burden of persuasion and must demonstrate, 'by a clear showing,' that the requested relief is warranted." Hosp. Staffing Sols., LLC v. Reyes, 736 F. Supp. 2d 192, 197 (D.D.C. 2010) (quoting Chaplaincy of Full Gospel Churches v. England, 454 F.3d 290, 297 (D.C. Cir. 2006)). A court "may deny a motion for preliminary injunction, without further inquiry, upon finding that a plaintiff is unable to show either irreparable injury or a likelihood of success on the merits," making those two factors "particularly crucial." Luokung Tech. Corp. v. Dep't of Def., 538 F. Supp. 3d 174, 182 (D.D.C. 2021) (quotation marks omitted).

## III.    Analysis

The Court addresses the four preliminary-injunction factors in turn. As "[t]he likelihood of success and irreparability of harm 'are the most critical' factors," Trump v. Thompson, 20 F.4th 10, 31 (D.C. Cir. 2021) (quoting Nken v. Holder, 556 U.S. 418, 434 (2009)), they occupy the bulk of the discussion that follows.

A.      Likelihood of Success on Merits

Plaintiff's Motion does not want for theories, pressing as bases for preliminary relief every count in its Complaint save for the claim that the Section 1260H designation was issued without observance of required procedure. See PI Mot. at 17, 23, 29; Opp. at 10 n.4. The Court, however, need not run each to ground. As WXAT is likely to succeed on its challenge that the designation was arbitrary and capricious, the analysis begins and ends there.

The Department's designation rests on three findings set out in the May 29 report: that WXAT is indirectly owned by SASAC, indirectly affiliated with SASTIND, and indirectly affiliated with the PLA. See Administrative Record at AR60. Because the Government asserts that each justification independently sustains the designation, WXAT must show that all three are likely infirm. See Opp. at 12 ("Defendants relied on substantial evidence for three independent findings, each sufficient to sustain the Department's decision . . . ."). The Court first sets out the standards before applying them to those rationales.

1.      *Arbitrary-and-Capricious Review*

Three principles govern, beginning with the standard of review. The APA directs courts to "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Action earns those labels where an agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency." Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983).

The inquiry is a narrow one, and a court may not "substitute its judgment for that of the agency." Citizens to Pres. Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971); see also

11

Trongone v. Comm'r, 179 F.4th 1, 6 (D.C. Cir. 2026).  The task is instead to determine "whether the agency has articulated a rational connection between its factual judgments and its ultimate policy choice" and "whether the underlying factual judgments are supported by substantial evidence."  Ctr. for Auto Safety v. Fed. Highway Admin., 956 F.2d 309, 314 (D.C. Cir. 1992); see also Phoenix Herpetological Soc'y, Inc. v. U.S. Fish & Wildlife Serv., 998 F.3d 999, 1005 (D.C. Cir. 2021) (explaining that arbitrary-and-capricious review "does not substantively differ" from substantial-evidence review when "assuring factual support") (quoting Ass'n of Data Processing Serv. Orgs., Inc. v. Bd. of Governors of Fed. Rsrv. Sys., 745 F.2d 677, 683 (D.C. Cir. 1984)).  The requirement is undemanding, asking only for "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Pham v. Nat'l Transp. Safety Bd., 33 F.4th 576, 581 (D.C. Cir. 2022) (quoting Chritton v. NTSB, 888 F.2d 854, 856 (D.C. Cir. 1989)).

The second principle considers the materials under review.  "[J]udicial review of agency action is limited to the grounds that the agency invoked when it took the action."  Dep't of Homeland Sec. v. Regents of the Univ. of Cal., 591 U.S. 1, 20 (2020) (quotation marks omitted); see also Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs, 985 F.3d 1032, 1048 (D.C. Cir. 2021) (applying principle to reject justification offered in brief but not considered during decision).  The record in question is "the administrative record already in existence, not some new record made initially in the reviewing court."  Camp v. Pitts, 411 U.S. 138, 142 (1973).  A court, moreover, "may not supply a reasoned basis for the agency's action that the agency itself has not given."  State Farm, 463 U.S. at 43.  If the stated rationale is insufficient, the cure is not a better one drafted from the bench.

12

The last looks at the subject area of this type of case. Where an agency acts at the intersection of national security and foreign affairs, review is "extremely deferential." Islamic Am. Relief Agency v. Gonzales, 477 F.3d 728, 734 (D.C. Cir. 2007). The Department's assessments of the risks that China's military-civil-fusion strategy poses, and of the significance of a company's ties to the organs of the Chinese state, command considerable respect. Even so, "courts retain a role, and an important one, in ensuring that agencies have engaged in reasoned decisionmaking." Judulang v. Holder, 565 U.S. 42, 53 (2011); see also Xiaomi Corp. v. Dep't of Def., 2021 WL 950144, at *4 (D.D.C. Mar. 12, 2021) (applying that gatekeeping function to designation of Chinese military company).

Taken together, these principles require the Court to ask, with appropriate deference, whether the report's stated rationales accurately describe the record, rest on adequate evidentiary support, and rationally connect the facts found to the designation imposed. As the discussion below shows, the evidence falls short even under that deferential standard.

### 2. *Indirect Ownership by SASAC*

The report's first and leading rationale is ownership. DoD concluded that Plaintiff is indirectly owned by SASAC because AVIC — recall, an enterprise owned and overseen by SASAC, and itself a designated Chinese military company — invested in WXAT through the AVIC Military-Civilian Integration Selected Fund. See Administrative Record at AR60–61; see also 91 Fed. Reg. at 35190 (AVIC designation). The report identifies two pieces of support. First, it reads a 2019 web post as demonstrating that AVIC held a 5.32% stake in WXAT. See Administrative Record at AR61, AR4554. Second, it cites a 2024 article as reporting an "undisclosed investment" by AVIC. Id. at AR61, AR4581–82. From those sources, the

13

Department concluded that an entity owned by SASAC "itself owns more than 5 percent of WuXi's equity." Opp. at 14. This is flat-out wrong.

Start with the supposed 5.32% stake. The report mistakes the share of the AVIC fund's portfolio invested in WXAT for the share of WXAT owned by the fund. The 2019 post does not say that AVIC owned 5.32% of WXAT. It lists WXAT among the fund's "top holdings" at "5.32%" — that is, as a share of the <u>fund's</u> portfolio. <u>See</u> Administrative Record at AR4554. The 2024 post makes that express: WXAT "was the sixth largest heavy stock in the product" during the second quarter of 2019, "accounting for 5.32% of the fund's net asset value." <u>Id.</u> at AR4582. Both sources thus describe how much of the fund's assets were invested in WXAT stock, not how much of WXAT the fund owned.

That is a surprising mistake. If a household puts 5% of its modest savings into a blue-chip stock, that does not mean it owns 5% of the company. Working from AVIC's own public reports, WXAT makes the point clear. Plaintiff calculates that a 5.32% ownership interest in WXAT would have been worth roughly $850 million in 2019, or more than 40 times the fund's total assets at the end of that year. <u>See</u> ECF No. 19 (Reply) at 4. The position that the sources actually describe, by contrast, was AVIC's purchase on the open market of publicly traded WXAT shares worth approximately $200,000, representing about 0.001% of the company's equity. <u>Id.</u>; <u>see also</u> ECF No. 19-8 (Supplemental Declaration of Steve Qing Yang), ¶ 5. While those figures draw on data outside the record, the Court need not adopt them. On any accounting, the percentage of a fund invested in a company is not the percentage of the company the fund owns.

The report's reliance on an "undisclosed investment" by AVIC breathes no new life into the determination. <u>See</u> Administrative Record at AR61. The cited 2024 post describes the very

14

same 2019 investment by the AVIC Military-Civilian Integration Selected Fund: WXAT shares comprising 5.32% of the fund's net asset value. Id. at AR4581–82. It does not, for example, reveal some additional holding that the quarterly report left undisclosed. The Department thus skimmed not one but two web pieces reporting where AVIC's Military-Civilian Integration Fund parked 5.32% of its portfolio and nonetheless concluded that the fund owned 5.32% of WXAT. "These errors do not inspire confidence in the fastidiousness of the agency's decision-making process." Xiaomi Corp., 2021 WL 950144, at *5 (assessing error in Chinese-military-company designation).

Defendants nonetheless scaffold the report with doctrines built for other fights. See Opp. at 12. They invoke the rules that an agency's factual findings may stand "even though a plausible alternative interpretation of the evidence would support a contrary view," Archer W. Contractors, LLC v. U.S. Dep't of Transp., 45 F.4th 1, 6 (D.C. Cir. 2022) (quoting W. Air Lines, Inc. v. Civ. Aeronautics Bd., 495 F.2d 145, 152 (D.C. Cir. 1974)), and that an agency need not "draw the inferences" that a plaintiff "might wish." Crooks v. Mabus, 845 F.3d 412, 424 (D.C. Cir. 2016). Those principles are sound but have little purchase here. Reading 5.32% of the fund's net asset value to mean 5.32% of WXAT is not a plausible alternative interpretation, nor is it an inference from the evidence — it is a misstatement of the evidence. Cf. Code v. McCarthy, 959 F.3d 406, 409 (D.C. Cir. 2020) ("[A] basic mistake of fact renders the [agency's] decision arbitrary and capricious . . . ."). Defendants also fault WXAT for failing "to point to a direct contradiction in the evidence before the agency." Opp. at 14 (quoting Hesai Tech. Co. v. U.S. Dep't of Def., 792 F. Supp. 3d 22, 47 (D.D.C. 2025)). Yet Plaintiff has identified one as direct as they come: the report says AVIC has a 5.32% ownership stake in WXAT, while the sources say that WXAT stock accounted for 5.32% of the fund's net asset value.

The remaining question — whether the position the sources actually describe could itself amount to indirect ownership by SASAC — is not the Court's to answer. Another court in this district has read Section 1260H to require "some level of control, not just mere possession of . . . equity" before ownership attaches. SZ DJI Tech. Co. v. U.S. Dep't of Def., 2025 WL 2761210, at *19–20 (D.D.C. Sept. 26, 2025). Whether the far smaller position the sources reflect clears that bar, or any other, is a determination the Department never made: it found ownership on the premise of a 5.32% stake not supported by the record. The Court may not make the determination in its place. See State Farm, 463 U.S. at 43. The first ground therefore cannot sustain the designation.

### 3.    *Affiliation with SASTIND*

Defendants' second rationale, that WXAT is "[i]ndirectly [a]ffiliated with SASTIND," Administrative Record at AR62, fares no better. At the outset, it is questionable whether "indirect affiliation" tracks the statute at all. Section 1260H identifies three distinct relationships: being "directly or indirectly owned by, controlled by, or beneficially owned by"; being "affiliated with"; or acting "in an official or unofficial capacity" as an agent of one of the listed entities. See § 1260H(g)(2)(B)(i)(I). As a grammatical matter, "directly or indirectly" most naturally modifies only the first cluster of ownership and control terms. Reading it to sweep across the entire series would produce awkward results, such as "indirectly . . . in an official or unofficial capacity acting as an agent." The idea of "indirect affiliation," furthermore, seems redundant with the definition of affiliation itself, which includes "close formal or informal association." Id., § 1260H(g)(1). The Court need not resolve that question, however, because the Department's rationale fails even on its own terms.

16

The report based its determination of indirect affiliation on five sets of scientific studies. It describes them as "conducted by WuXi AppTec in partnership with SASTIND-supervised universities" and states, repeatedly, that WXAT's subsidiary "received approval from MOST" for them.  See Administrative Record at AR63–65.  The universities are Peking, Xiamen, Shanghai Jiao Tong, Jilin, and Sichuan.  Id.  All five findings derive from a single source: a compilation of approvals that China's Ministry of Science and Technology (MOST) issued in October 2022 for the use of human genetic material in clinical drug studies.  Id. at AR4799–861. The compilation contradicts the first assertion and does not substantiate the second.

For each study, the compilation separately identifies an applicant, a medical institution, a contract research organization, and a third-party laboratory.  The applicants — the entities that sought MOST's approval — are largely global pharmaceutical companies, some headquartered in the United States and Europe; the medical institutions are hospitals affiliated with the named universities.  See, e.g., id. at AR4808–11, AR4850–51.  WXAT or one of its subsidiaries appears in only one of the four roles: the far-right column titled "Third-Party Laboratory."

The report's assertion that Plaintiff "received approval from MOST" thus finds no footing in the source it cites.  The table entries assign that role to others — the applicants.  As for partnership, the compilation does not identify one.  No entry describes any agreement, dealing, or relationship between WXAT and the universities.  The only role assigned to WXAT is "Third-Party Laboratory," separately listed from the applicant, medical institution, and contract research organization.  Whatever relationship may have existed among those actors, the table does not describe WXAT as conducting the research project, much less as doing so "in partnership with" the universities.  The report nevertheless transforms WXAT's listing in that discrete, expressly

17

third-party role into MOST-approved research that WXAT conducted with SASTIND institutions, without explaining the connection.

Plaintiff's account of the research process crystallizes the error.  According to WXAT's CEO, the applicant for each study selects both the hospital where it will occur and the laboratory that will process its samples, contracts separately with each, and applies to MOST for authorization to use human genetic material.  See Yang Suppl. Decl., ¶¶ 20–22.  WXAT's contractual relationship in each study runs to the applicant alone, and the company's work — performed at its own facilities — involves no interaction, collaboration, or joint project with any university or hospital.  Id., ¶ 21.  That account lies outside the administrative record, and the Court does not adopt it as the definitive account of the studies.  But the materially different arrangement it describes illustrates why the Department erred in using a few table headings to characterize WXAT as receiving MOST approval to conduct studies with SASTIND-supervised universities.

That error matters because the pertinent question is close association.  A third-party laboratory's role in a study involving a SASTIND-supervised university might, depending on the actual relationship, bear on affiliation.  But whether that more attenuated connection establishes a "close formal or informal association" is the Department's question to answer in the first instance.  The report did not examine the nature of WXAT's relationship with the universities or explain why the role reflected in the compilation sufficed.  It relied instead on approvals the compilation attributes to others and partnerships the cited source does not identify.  The Court cannot reconstruct the relationship, decide whether it is close enough, and supply the missing rationale on the Department's behalf.  See Env't Health Tr. v. FCC, 9 F.4th 893, 914 (D.C. Cir.

18

2021) (courts "cannot supply reasoning in the agency's stead") (citing SEC v. Chenery Corp., 318 U.S. 80, 87–88 (1943)).

The need for that analysis becomes clear from another entry in the compilation. It lists the University of Michigan as the applicant for a study conducted at a hospital affiliated with Peking University, the same SASTIND-supervised institution that the report invokes against WXAT. See Administrative Record at AR4817. Michigan thus occupies the role directly connected to the study's approval. If WXAT's more remote role suffices to establish a close association with SASTIND, the report's logic would make a member of the Big Ten a Chinese military company.

In short, the designation rested on approvals the cited source attributes to others and partnerships it does not identify. A laboratory's role in these studies may bear on affiliation, but the Department must accurately characterize that role and explain why the resulting relationship is sufficiently close. Upon even a fairly cursory review, the second rationale falls apart.

4.    *Affiliation with PLA*

Defendants' final justification rests on the same error as the second, just in miniature. The Department's report found that WXAT is indirectly affiliated with the PLA based on one additional entry in the same MOST compilation: an October 2022 approval for a drug study at the Chinese People's Liberation Army General Hospital, a facility the report treats as affiliated with the PLA. Id. at AR65–66, AR4810. According to the Government, a Shanghai-based WXAT subsidiary "received approval to conduct a drug study" with the hospital. See Opp. at 16. The entry itself, however, describes the now-familiar arrangement. It identifies a European pharmaceutical company (Novo Nordisk) as the applicant, the PLA General Hospital as the study institution, and the WXAT subsidiary as a selected third-party laboratory (along with two

19

others).  See Administrative Record at AR4810.  The entry thus assigns the application to Novo Nordisk and lists WXAT's subsidiary only in the column reserved for third parties.  For the reasons just explained, it shows neither an approval WXAT received nor a study it conducted with the PLA hospital.  See *supra* Section III.A.3.

The report also notes that nothing indicates that the study has concluded.  See Administrative Record at AR66.  Yet the possible continuation of Plaintiff's laboratory work does not convert that role into WXAT's receiving MOST approval to run a study at a PLA hospital.  One entry, resting on the same mischaracterization as the five before it, is the entirety of the evidence connecting Plaintiff to the PLA.  The third rationale therefore falls with the second.

*      *      *

Congress charged the Department with identifying companies that serve Chinese military modernization, and weighty judgments of that kind lie beyond the Court's ken.  Even so, "[a]n agency acts arbitrarily and capriciously when it offers inaccurate or unreasoned justifications" for a decision.  Env't Def. Fund v. EPA, 922 F.3d 446, 454 (D.C. Cir. 2019).  Here, the Department's justifications each rested on a misreading: a stake in a fund reported as a stake in the company, and third-party laboratory work reported as studies WXAT conducted in partnership with SASTIND- and PLA-affiliated institutions.  Plaintiff is therefore likely to succeed on the merits of its claim that the Section 1260H designation was arbitrary and capricious.  On now to irreparable harm.

B.      Irreparable Harm

A likely unlawful designation does not by itself unlock preliminary relief.  WXAT must also show that the designation is inflicting injury that no eventual judgment can repair.  Alpine

20

Sec. Corp. v. Fin. Indus. Regul. Auth., 121 F.4th 1314, 1332 (D.C. Cir. 2024).  The company

succeeds on that score.  Its placement on the Section 1260H list officially brands Plaintiff an

instrument of the Chinese military, and that label is now producing significant commercial

losses.  No later judgment can make Plaintiff whole for those losses.  Nor, given how

pharmaceutical outsourcing works, will prevailing later bring business back: a customer that

moves its programs elsewhere is, as a practical matter, likely gone for good.  As that showing

suffices, the Court does not reach Plaintiff's alternative contention that the alleged deprivation of

its constitutional rights is itself irreparable.  See PI Mot. at 41.

    1.  *Governing Principles*

  The bar to demonstrate irreparable injury is high.  Harm "must be both certain and great,"

"actual and not theoretical," and "of such <u>imminence</u> that there is a clear and present need for

equitable relief to prevent irreparable harm."  Wis. Gas Co. v. FERC, 758 F.2d 669, 674 (D.C.

Cir. 1985) (quotation marks omitted).  It must also be "beyond remediation" — the kind of injury

a merits victory would arrive too late to fix.  Chaplaincy of Full Gospel Churches, 454 F.3d at

297.  While WXAT alleges several forms of injury, the Court trains its focus on two: economic

losses flowing from the designation and the reputational harm that drives them.  See PI Mot. at

31.

  Economic loss is ordinarily not irreparable because damages may ultimately make the

movant whole.  In re NTE Conn., LLC, 26 F.4th 980, 990–91 (D.C. Cir. 2022).  That logic,

however, does not hold when the defendant is the Government: sovereign immunity typically

forecloses damages, so money lost today cannot be recovered tomorrow.  Am. Fed'n of Lab. &

Cong. of Indus. Orgs. v. Sonderling, 2026 WL 1906727, at *4 (D.D.C. July 2, 2026).  Still, the

fact that a loss cannot be recovered is not enough.  The injury must be "great," Wis. Gas, 758

F.2d at 674; Clevinger v. Advoc. Holdings, Inc., 134 F.4th 1230, 1234 (D.C. Cir. 2025), for otherwise "[a]ny movant that could show any damages against an agency with sovereign immunity — even as little as $1 — would satisfy the standard." Sonderling, 2026 WL 1906727, at *4 (quoting Woodstream Corp. v. Jackson, 2011 WL 8883395, at *8 (D.D.C. June 3, 2011)). Ultimately, a plaintiff need not show that the loss threatens its continued existence, but it must demonstrate unrecoverable financial injury that is certain, imminent, and substantial in its practical effect. See Whitman-Walker Clinic, Inc. v. HHS, 485 F. Supp. 3d 1, 58–59 (D.D.C. 2020).

Reputational injury, conversely, "often is viewed as irreparable" because it "is not easily measurable in monetary terms." 11A Wright & Miller's Federal Practice & Procedure § 2948.1 (3d ed. Apr. 2026 update); see Armour & Co. v. Freeman, 304 F.2d 404, 406 (D.C. Cir. 1962) (official misbranding of hams caused "[i]rreparable injury" to producer's "good name" that was readily "apparent"); Patriot, Inc. v. U.S. Dep't of Hous. & Urban Dev., 963 F. Supp. 1, 5 (D.D.C. 1997) (irreparable reputational harm from agency letter casting plaintiffs' business practices as predatory). A reputational-harm showing must nonetheless be "concrete and corroborated, not merely speculative." Trudeau v. FTC, 384 F. Supp. 2d 281, 297 (D.D.C. 2005), aff'd, 456 F.3d 178 (D.C. Cir. 2006).

With those principles in mind, the Court considers whether WXAT has actual and imminent injuries, whether damages are unrecoverable and great, and whether later relief could otherwise restore the status quo.

### 2. *Certain, Actual, and Imminent Harm*

To begin, Plaintiff demonstrates injury that is certain and already underway. The Section 1260H designation announces in the Federal Register, with the Government's imprimatur, that

22

WXAT is a Chinese military company. That branding is not merely incidental: the list was designed, at least in part, to "name and shame" designated companies and thereby discourage others from dealing with them. See 169 Cong. Rec. H4617 (daily ed. Sept. 27, 2023) (statement of Rep. Andrew Ogles); cf. Jenner & Block LLP v. U.S. Dep't of Just., 784 F. Supp. 3d 76, 114 (D.D.C. 2025) (crediting reputational injury that "government-inscribed scarlet letter" inflicts as irreparable). Congress has also bolted legal consequences onto that announcement. For instance, the designation supplies the necessary predicate for treatment as a "biotechnology company of concern" under the BIOSECURE Act. See supra Section I.A. Those prohibitions, once operative, will reach not just WXAT but every federal contractor and grant recipient that uses the company's services or equipment. Id.

The market has responded in kind. Within ten days of publication, WXAT fielded a wave of customer inquiries about the designation. See Yang Decl., ¶ 42. Concern quickly hardened into action. In short order, one U.S. biopharmaceutical customer paused all engagement; another "placed all collaborative projects [with WXAT] on hold"; a third advised that its in-process contracts would have to be reassessed; others halted clinical-stage work, paused all new activity, or announced that no new projects would be forthcoming; and two customers terminated or redirected programs outright, expressly citing the need to preserve or obtain government funding. Id., ¶¶ 41–43. Suppliers joined in. One suspended shipments in writing, attributing its decision to the designation. Id., ¶ 44.

The weeks since Plaintiff filed its Motion have only substantiated and widened the pattern of loss. A longstanding customer eliminated its business with WXAT under a company-wide policy adopted in response to the designation; another canceled a collaboration set to begin July 1; a third declined to award a new program despite Plaintiff's competitive price and

23

performance record and began moving its existing work to another supplier; and an online marketplace where customers procure research services made Plaintiff's offerings non-purchasable absent a cumbersome customer-specific exception. See Yang Suppl. Decl., ¶¶ 38–42. That sliver of customer actions alone implicates millions of dollars in annual revenue, existing commitments, and both long- and near-term programs. See Yang Decl., ¶¶ 41, 43; Yang Suppl. Decl., ¶¶ 40–42.

That conduct reflects logic, not panic. WXAT serves more than 1,000 U.S. customers, many of which hold federal contracts or receive federal funding. See Yang Decl., ¶¶ 8, 37. For them, reliance on a 1260H-designated supplier "complicate[s] the compliance representations [they] must make," strains relations with agencies, and invites precisely the scrutiny a federal contractor most wants to avoid. See ECF No. 13-26 (Declaration of Joseph Damond), ¶ 39. As Plaintiff's industry expert puts it, "[C]ompanies that regularly do business with United States government agencies do not wait until a statute officially requires prohibition before implementing changes to their contracts, supply chains, and capital investments." Id., ¶ 50. A customer with reason to believe that a relationship must eventually end "has every rational incentive to begin that transition now." Id., ¶ 42. Industry advisers — including law firms — are reinforcing that response, counseling prospective customers to select alternative providers and existing customers to move away from WXAT. Id., ¶¶ 58–60.

Defendants' principal rejoinder is that all of this is speculation dressed up as injury. Because OMB — a non-party — has not yet designated WXAT a biotechnology company of concern under the BIOSECURE Act, they contend that the "bulk" of the alleged harms "are abstract, theoretical, and not imminent." Opp. at 30, 32–34. That argument mistakes the injury. Plaintiff does not ask the Court to predict what OMB will do by December, and the Court

24

expresses no view on that question.  The harm credited here is the present conduct of counterparties reacting to a designation that exists now, and one that already supplies BIOSECURE's necessary predicate regardless of whether OMB ever marks Plaintiff as a biotechnology company of concern.

This Court's recent Opinion in Sonderling, on which Defendants lean, does not counsel otherwise.  See Opp. at 31, 34.  The only relevant injury there was the need for the plaintiff's own staff to manually recode accounting entries following the promulgation of a new rule — a task its declarations placed months away and likely after resolution of the merits.  See 2026 WL 1906727, at *5–6.  Both features are missing here.  WXAT cannot manipulate the timing of the injury it faces to manufacture urgency; the harm is inflicted daily by customers acting on rational commercial judgment.  Nor is the injury likely to be preempted by an expeditious merits decision from the Court: customers are suspending, canceling, and redirecting work while this case proceeds, and the supplemental record shows that those losses continue to mount.

        3.     *Unrecoverable and Great*

Whether damages might later compensate Plaintiff's losses is quickly answered.  The commercial losses described above will not be recoverable if WXAT ultimately prevails.  As is generally true when agency action inflicts financial injury, "the Federal Government's sovereign immunity almost always bars a party from recovering those costs even if the [action] is later invalidated."  Sonderling, 2026 WL 1906727, at *4.  Defendants do not seriously contend otherwise.  The fight, instead, is over the magnitude of harm.

On that front, Defendants contend that losses are insufficient because economic harm must be measured against the movant's overall finances.  Weighed against $6.7 billion in annual global revenue, they urge that the losses in the case are too small to count as "great."  Opp. at

34–37.  That argument fails twice over.  First, it treats percentage of revenue as a necessary metric for greatness.  Second, it limits Plaintiff's injury to the designation's first weeks, when the record shows that those losses are a floor rather than a ceiling.

Begin with the legal premise.  Relative magnitude can inform whether an injury is serious in its practical effect, but neither Wisconsin Gas nor the decisions applying it make a percentage-of-revenue comparison indispensable.  What the movant must show is that the loss "would significantly damage its business above and beyond a simple diminution in profits."  Mylan Pharms., Inc. v. Shalala, 81 F. Supp. 2d 30, 43 (D.D.C. 2000).  In that vein, courts have found unrecoverable losses sufficient without conducting a percentage-of-revenue analysis.  See Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs., 594 U.S. 758, 765 (2021) (landlords risked losing rent payments "with no guarantee of eventual recovery"); NTE Conn., 26 F.4th at 990–91 (crediting lost revenue stream worth "millions of dollars"); compare Alcresta Therapeutics, Inc. v. Azar, 2018 WL 11670883, at *7 (D.D.C. June 15, 2018) ("Whether the harm is 'significant' can be evaluated only in the context of the movant's overall finances."), with Alcresta Therapeutics, Inc. v. Azar, 755 F. App'x 1, 5 (D.C. Cir. 2018) (reversing district court and crediting $15.3 million in unrecoverable forgone sales without calculating losses as share of total revenue).

The factual premise is similarly flawed.  Defendants compare a snapshot of concrete losses documented during the designation's first weeks with a full year of worldwide revenue, then treat that snapshot as the injury's outer limit.  See Opp. at 35–36.  The record weighs against such an inference.  The customer actions already identified implicate millions of dollars in annual revenue, existing commitments, and several programs.  See supra Section III.B.2.  Plaintiff's supplemental declaration, moreover, shows that both the number and scope of adverse

26

actions continued to grow after WXAT filed its Motion, revealing that the harm is compounding rather than complete. See Yang Suppl. Decl., ¶¶ 37–44.

There is little reason to expect the injury to remain confined to those early losses. The designation attaches to WXAT itself, not to a particular facility, product line, or contract. Its effects have already rippled across business units and through customers, suppliers, and a platform used to procure new work. See supra Section III.B.2. The designation also strikes at the center of Plaintiff's business. Roughly 70% of WXAT's revenue comes from U.S. customers, and the resulting disruption has spread to foreign counterparties with their own exposure to the U.S. market. See Yang Decl., ¶¶ 13, 37; Yang Suppl. Decl., ¶¶ 39, 42.

The cases on which Defendants rely do not change the analysis. True, two of them assessed irreparable harm by comparing asserted losses with the movant's overall revenue. See Air Transp. Ass'n of Am., Inc. v. Exp.-Imp. Bank of the U.S., 840 F. Supp. 2d 327, 337–38 (D.D.C. 2012); Cardinal Health, Inc. v. Holder, 846 F. Supp. 2d 203, 211–13 (D.D.C. 2012). In each, however, the ratio served as a backstop: the claimed harm was speculative, so the court tested it against a numerator of its own generous construction.

Take Air Transport. The plaintiffs there had not shown that the challenged conduct would cause any participating airline to lose revenue at all. See 840 F. Supp. 2d at 337. In the absence of any concrete estimate tied to the challenged action, this Court used a proxy, considering every dollar Delta earned on every route where it competed with an airline receiving Export-Import Bank support. Id. at 338. The percentage-of-revenue loss did not clear the irreparable-harm bar. Id. Cardinal Health followed the same course. Because the plaintiff offered no concrete estimate of the losses attributable to the challenged suspension of a single facility, the court used as a proxy the $1 billion in annualized sales allegedly lost during earlier

27

suspensions of three facilities.  See 846 F. Supp. 2d at 212–13.  The percentage-of-revenue figure similarly did not establish irreparable harm.  Id.

In short, those courts used revenue ratios, in alternative holdings, as generous stress tests for harm the movants could neither prove nor measure.  They say nothing about discounting documented, entity-wide, and compounding losses that the record already shows are outgrowing Defendants' snapshot.

### 4.    *Beyond Remediation*

The absence of a damages remedy resolves whether WXAT can later be compensated, but not whether a merits victory could otherwise restore the status quo.  See Mexichem Specialty Resins, Inc. v. EPA, 787 F.3d 544, 555 (D.C. Cir. 2015) (asking whether "adequate compensatory or other corrective relief" will later be available) (quotation marks and citation omitted) (emphasis added).  Defendants contend that it could.  Several customers, they observe, framed their withdrawals as conditional, placing projects on hold "until the Company's name is removed from the 1260H list" or adopting a "wait and see" posture.  See Opp. at 37 (quoting Yang Decl., ¶ 43).  Delisting, the Government reasons, should therefore return the work, leaving Plaintiff with nothing more than a pause that the merits will cure.  Id.

Two flaws undermine Defendants' suggestion that WXAT should sit tight until litigation comes to a close.  The first is that it reads the record selectively.  Conditional pauses are only part of the picture.  As canvassed above, customers have already terminated or redirected programs, adopted categorical policies against dealing with WXAT, and begun moving existing work to competitors.  See Yang Decl., ¶ 43; Yang Suppl. Decl., ¶¶ 40–42.

The second error is the assumption that later delisting will reverse changes now underway.  Drug development unfolds over years and across multiple stages, and a CRDMO

28

such as WXAT cannot be swapped out like an ordinary vendor.  See Damond Decl., ¶ 42 (describing drug development as "multi-year, multi-stage process").  Moving a program to a competitor may require fresh validation of manufacturing processes, the transfer of testing methods, and additional submissions to the FDA — "in effect restarting a long, expensive and risky process all over again."  Id., ¶ 43.  Those switching costs make the move difficult to undo. After investing the time and resources needed to qualify a competitor, a customer is unlikely to repeat the process merely because WXAT is ultimately delisted.  Id., ¶ 44.  As Plaintiff's expert explains, "Once a customer begins qualification of an alternative supplier, the relationship with the incumbent CRDMO is functionally over, regardless of when the formal contract terminates." Id., ¶ 42.  Courts have credited the same dynamic in other contexts, recognizing that customers driven to competitors by government action "may be unwilling, or unable, to do business" with the plaintiff thereafter.  Nalco Co. v. EPA, 786 F. Supp. 2d 177, 188 (D.D.C. 2011) (cleaned up); see also TikTok Inc. v. Trump, 490 F. Supp. 3d 73, 84 (D.D.C. 2020).

What leaves with a customer, moreover, is not confined to the canceled engagement. CRDMO relationships often generate additional work as a drug proceeds through development, and many WXAT customers return for successive projects.  Losing a customer now may therefore cost WXAT opportunities that would have arisen later in the product cycle or through future engagements.  See Yang Suppl. Decl., ¶ 43; Damond Decl., ¶¶ 41–43.  Those consequences do not disappear with delisting.  A later judgment may conclusively remove WXAT from the 1260H list, but it cannot bring back programs transferred to competitors, restore customer relationships displaced in the meantime, or recover the follow-on opportunities lost while the designation remained in force.

*    *    *

29

In sum, the brand the Government has affixed to WXAT is inflicting losses that no damages award can return and displacing relationships that no delisting order can rebuild. Plaintiff has thus carried its burden on irreparable harm.

C.      Balance of Equities and Public Interest

The remaining factors point in the same direction, though perhaps not as clearly.  The balance-of-equities and the public-interest factors "merge" when the Government is the opposing party, Glob. Health Council, 153 F.4th at 12, and require courts to "balance the competing claims of injury" and pay "particular regard [to] the public consequences" of an injunction.  Winter, 555 U.S. at 24 (first quoting Amoco Prod. Co. v. Vill. of Gambell, 480 U.S. 531, 542 (1987); then quoting Weinberger v. Romero-Barcelo, 456 U.S. 305, 312 (1982)).  Defendants' side of the scale carries genuine weight.  Section 1260H exists to identify companies with defined ties to Chinese military and state organs and to insulate the defense supply chain from adversarial influence, and the Executive's assessments in that domain implicate the "sensitive and weighty interests of national security and foreign affairs."  Holder v. Humanitarian L. Project, 561 U.S. 1, 33–34 (2010).  Congress has since constructed an active statutory regime around the Section 1260H list, revising its criteria and attaching procurement bars and other restrictions to designation.  See supra Section I.A.

Those interests, however, decide less than the Government supposes.  In its telling, the public interest stands "at its zenith" because Congress and the Executive have together concluded that adversarial influence over defense supply chains warrants a statutory response. See Opp. at 41.  So they have.  But the congressional judgment Defendants invoke did not stop at the creation of a list.  In shaping the Section 1260H process, Congress defined who may be designated, directed the Secretary to act based on "the most recent information available," and

30

conditioned every listing on a published justification, revisited at least annually.  See § 1260H(a)–(b), (g).  Those requirements are not ornaments on the statutory scheme; they are Congress ensuring that the severe label of "Chinese military company" would attach only to companies shown to warrant that label.  The public interest in a list with teeth is thus inseparable from the public interest in a list that is accurate.  An injunction against a designation likely resting on misread sources does not displace the political branches' considered judgment.  It gives effect to the conditions Congress placed on that judgment.

The deference owed in this sensitive domain does not require a different result on this record.  Strait Shipbrokers Pte. Ltd. v. Blinken, 560 F. Supp. 3d 81 (D.D.C. 2021), on which Defendants principally rely, see Opp. at 41–42, illustrates why.  There, the challenged sanctions designations rested in part on "what may be a dense, classified administrative record"; the Government was still declassifying materials; administrative reconsideration remained underway; and the plaintiffs had not established a likelihood that the agency had acted unlawfully.  See 560 F. Supp. 3d at 100.  Those circumstances made an expedited preliminary-injunction proceeding a poor vehicle for second-guessing the judgments of the State Department and intelligence agencies.  Id. at 86, 100.

The circumstances here are different.  DoD has identified no classified intelligence, and Defendants have not suggested that undisclosed materials supply what the report's stated rationales lack.  Nor is Plaintiff's designation the subject of any ongoing reconsideration through which the record might yet develop.  Most important, the Court has concluded that each rationale the Department itself offered likely fails to accurately describe the sources on which it rests.  See supra Section III.A.  Deference remains due to the Department's national-security judgments,

but it cannot supply a connection between evidence and conclusion that the Department's own report does not contain.

Properly framed, then, the question is not whether DoD may maintain the Section 1260H list, identify Chinese military companies, or protect defense supply chains from foreign influence. It plainly may. The question is what the Government loses if this particular designation, on this particular record, is not given effect while the case proceeds. Preliminary relief would make no permanent judgment about WXAT's eligibility for the list, would leave every other designation untouched, and would not disturb Section 805, Section 4663, or the BIOSECURE Act as applied to any other entity. It would not prevent the Department from designating Plaintiff anew on a justification that accurately describes the evidence and reasonably explains why that evidence satisfies the statute. And because the Court's merits assessment rests on the mismatch between the report's rationales and its sources — rather than a finding that WXAT presents no conceivable security concern — the relief would not substitute the Court's assessment of national-security risk for the Department's.

Properly framed in that way, the familiar principles have force. The Government "cannot suffer harm from an injunction that merely ends an unlawful practice," R.I.L-R v. Johnson, 80 F. Supp. 3d 164, 191 (D.D.C. 2015) (quoting Rodriguez v. Robbins, 715 F.3d 1127, 1145 (9th Cir. 2013)), and "[t]here is generally no public interest in the perpetuation of unlawful agency action." League of Women Voters of U.S. v. Newby, 838 F.3d 1, 12 (D.C. Cir. 2016). On the contrary, "[t]he public interest is served when administrative agencies comply with their obligations under the APA." N. Mariana Islands v. United States, 686 F. Supp. 2d 7, 21 (D.D.C. 2009). Weighed against the injury detailed above, the Government's temporary, designation-

32

specific hardship does not tip the scale.  The balance of equities and the public interest accordingly favor preliminary relief.

D.      Final Issues

Two final matters remain.  Defendants first ask the Court to "stay any [preliminary] injunction pending any appeal."  Opp. at 42.  A stay, however, "is not a matter of right."  Nken, 556 U.S. at 433 (quoting Virginian Ry. Co. v. United States, 272 U.S. 658, 672 (1926)).  And "[t]he party requesting a stay bears the burden of showing that the circumstances justify an exercise of" the court's discretion.  Id. at 433–34.  The familiar factors consider the applicant's likelihood of success, its irreparable injury absent a stay, the injury a stay would inflict on other parties, and the public interest.  Id. at 434.  Defendants devote a single sentence to that inquiry, asserting only that they have satisfied it "[f]or the reasons explained above."  Opp. at 42.  Such "perfunctory and undeveloped arguments" may be treated as waived.  Johnson v. Panetta, 953 F. Supp. 2d 244, 250 (D.D.C. 2013); see also Urb. Sustainability Dirs. Network v. U.S. Dep't of Agric., 2026 WL 1877821, at *12 (D.D.C. June 30, 2026) (denying similarly abbreviated request for stay pending appeal).

The request fails even if considered on the merits.  The above analysis explains why Plaintiff is likely to succeed, why the equities and public interest favor relief, and why the designation will continue to inflict irreparable injury if allowed to remain in force.  Defendants, meanwhile, identify no irreparable injury that the Government would suffer from permitting the injunction to operate during an appeal.  Their general invocation of the interests served by Section 1260H does not establish that temporarily suspending this single likely unlawful designation will cause the Government immediate and irreparable harm.  A stay would instead

33

restore the very designation responsible for Plaintiff's ongoing losses and thus defeat the purpose of preliminary relief.

Defendants fare little better on their request for a bond. Federal Rule of Civil Procedure 65(c) provides that a court may issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper" to cover the costs and damages sustained by a party later found to have been wrongfully enjoined. While district courts retain "broad discretion to determine the appropriate amount of an injunction bond," N. Am.'s Bldg. Trades Unions v. Dep't of Def., 783 F. Supp. 3d 290, 315 (D.D.C. 2025), a recent Circuit panel clarified that "injunction bonds are generally required," including when the Government is the opposing party. Nat'l Treasury Emps. Union v. Trump, 2025 WL 1441563, at *3 n.4 (D.C. Cir. May 16, 2025).

The Government contends that a substantial bond is warranted because preliminary relief "may result in a mandate" that the Department spend money on unwanted goods or services from WXAT or its subsidiaries. See Opp. at 43. That concern confuses permission with compulsion. The injunction requires no agency to contract with Plaintiff, continue an existing contract, or disburse any funds. It merely prevents the designation from being enforced while this case proceeds. Any expenditure would result from an agency's independent procurement decision, not from the injunction, and Defendants remain free to decline WXAT's services for reasons unrelated to the designation.

As Defendants have identified no material monetary injury or quantifiable cost likely to result from the injunction, a nominal bond is appropriate. See Endocrine Soc'y v. FTC, 2026 WL 1257289, at *15 (D.D.C. May 7, 2026) (requiring $1.00 bond absent showing of material monetary injury); Am. Oversight v. Hegseth, 788 F. Supp. 3d 14, 32 (D.D.C. 2025) (same). The Court will therefore require Plaintiff to post security in the amount of $1.00.

## IV.    Conclusion

Plaintiff has shown that each factor governing preliminary relief favors an injunction. The Court will therefore grant its Motion and enjoin Defendants from enforcing, implementing, or otherwise giving effect to the Department of Defense's designation of WuXi AppTec Co., Ltd., as a Chinese military company under Section 1260H.  A separate Order so stating will issue this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
Chief Judge

Date:  August 7, 2026